ACCEPTED
03-15-00657-CV
7565577
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/27/2015 4:07:34 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00657-CV

# In the Court of Appeals for the Third Judicial District at Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/27/2015 4:07:34 PM
JEFFREY D. KYLE
Clerk

CHRIS TRAYLOR, AS EXECUTIVE COMMISSIONER OF THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION, et al.
*Appellants*,

v.

DIANA D., AS NEXT FRIEND OF KD, A CHILD, et al.
*Appellees*.

On Appeal from the
200th Judicial District Court of Travis County, Texas

## RULE 24.4 MOTION TO VACATE COUNTER-SUPERSEDEAS ORDER OR, IN THE ALTERNATIVE, INCREASE COUNTER-SUPERSEDEAS BOND

TO THE HONORABLE THIRD COURT OF APPEALS:

The trial court's grant of counter-supersedeas regarding its injunction, which prevents the Health and Human Services Commission from using the recently adopted rates for therapy services, or from adopting new rules using the Commission's own methodology. The new rates were adopted pursuant to a budget rider directing cuts to this specific program. A judicial order precluding the Commission from giving effect to that rider violates both the Supremacy and

Spending Clauses of the United States Constitution and the separation-of-powers and business-with-the-United-States provisions of the Texas Constitution. The trial court's order—like any injunctive relief related to Medicaid rates for which there is no express statutory remedy—impermissibly changes the form and substance of Texas's Medicaid obligations, usurps a power expressly reserved to the executive branch of the federal government, and acts as a *de facto* judicial veto of a budget rider without any judicial determination of a constitutional defect.

The effect of this order is magnified by the fact that the cuts in question were triggered by a budget rider requiring cuts to these rates in each year of the upcoming biennium. Delay in setting the new rate could well result in the Commission having to cut rates even further to satisfy the Legislature's instructions for the amount to be spent in this fiscal year—in effect, the order is a judicial line-item budget veto.

The *only* remedy contemplated by law for a general complaint about the setting of Texas Medicaid rates is withholding of Medicaid funding by the United States Secretary of Health and Human Services, and there is no statutory- or rule-based right in Texas law broader than the Medicaid Act's provisions. Accordingly, it is a violation of both the Texas and United States Constitutions to issue judicial relief concurrent to—and potentially in conflict with—the executive branch of the federal government.

**Alternatively**, defendants ask the Court to increase the bond on which the counter-supersedeas is based from $500 to the $100,000,000 of taxpayer funds that the budget rider indicates this case could cost if the appellate process is not completed within two years. Rule 24 does not contemplate a reduced bond amount based on the plaintiff's status: counter-supersedeas is available only based on a bond that will make the party who sought to supersede the judgment from the damages caused by changing the *status quo*, then having to change it back. TEX. R. APP. P. 24.2(a)(3). And that damage is real: money will ultimately have to be moved from other programs, or Medicaid rates will have to be cut even further for these beneficiaries or across the board, to pay for plaintiffs' lawsuit.

## I.    A COUNTER-SUPERSEDEAS ORDER IS SUBJECT TO ATTACK IN THE COURT OF APPEALS, IF IT COMMITS FUNDAMENTAL ERROR BY EXERCISING EXTRA-JUDICIAL AUTHORITY.

A supersedeas (or counter-supersedeas) order may be challenged on motion in the court of appeals on the ground that the underlying judgment or order should not be suspended. TEX. R. APP. P. 24.4(a)(4); *see In re State Bd. for Educator Certification*, 452 S.W.3d 802, 808-09 (Tex. 2014) (pointing out the separation-of-powers problems implicit in effecting a final judgment through supersedeas). Review is for abuse of discretion. *Devine v. Devine*, No. 07-15-00126-CV, 2015 WL 5228254, at *3 (Tex. App.—Amarillo, Sept. 2, 2015, no pet. h.) (per curiam) (collecting

3

authority). A district court abuses its discretion by entering a legally incorrect order. *E.g.*, *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) ("a trial court has no 'discretion' in determining what the law is or applying the law to the facts").

This motion is limited to fundamental constitutional limitations transgressed by the trial court's order and leaves the other jurisdictional bars to plaintiffs' suit—such as lack of provider standing, failure to describe an *ultra vires* claim, and improperly using § 2001.038 of the APA as a means of judicial review—for briefing in the combined interlocutory appeal. *See McCauley v. Consol. Underwriters*, 157 Tex. 421, 477, 304 S.W.2d 265, 266 (1957) (per curiam) (fundamental error includes orders that transgress public policy determinations made in Constitution). Medicaid is a Spending Clause program, created as a contract between the United States and Texas. Absent an unambiguous grant of a private right of action, the only remedy for the State's rate-setting actions is withholding of federal funds by the Secretary. 42 U.S.C. § 1396c. The counter-supersedeas order is inconsistent with the Medicaid Act's remedial provision regarding rates and, as a result, violates both the United States and Texas Constitutions by imposing a separate judge-made mechanism for reviewing Medicaid rates parallel to review by the Secretary.

**II. THE MEDICAID PROGRAM DOES NOT INCLUDE A JUDICIALLY-ENFORCEABLE CAUSE OF ACTION BASED ON PLAINTIFFS' CLAIMS REGARDING "ACCESS" TO CARE—THE EXCLUSIVE REMEDY IS IN THE HANDS OF THE UNITED STATES SECRETARY OF HEALTH AND HUMAN SERVICES.**

Medicaid is a Spending Clause program that subsidizes state provision of medical services to the economically disadvantaged. 42 U.S.C. § 1396-1; *see Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1382 (2015) (Appendix Tab E). The program functions as a contract: in order to qualify for funding, the federal government approves a Medicaid "plan," *see* 42 U.S.C. § 1396a(a), to be administered by the State. *See Douglas v. Indep. Living Ctr. of S. Calif.*, 132 S. Ct. 1204, 1210 (2012) (federal agency's acceptance of Medicaid plan, within its expertise, precluded any basis for claim in state court). The remedy for the State's violation of the plan is the withholding of Medicaid funds by the Secretary of Health and Human Services. 42 U.S.C. § 1396c (Appendix Tab H).

There is no implicit right to challenge Medicaid rates in court. *Armstrong*, 125 S. Ct. at 1384 (dismissing Medicaid rate challenge brought under Constitution); *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 599 (Tex. 2001) (there is no implicit right to judicial review of statutory administrative determinations). Any right to judicial action regarding Medicaid fees must be related to an express grant of a judicially enforceable right by Congress, *Armstrong*, 135 S. Ct. at 1385, 1387, or, by

5

extension, a State legislature, *id.* at 1387-88 (concluding that judicial right of action must be "unambiguously conferred" in Spending Clause context (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)).

One reason it makes sense that rates are not subject to judicial review is that they must be reset periodically according to the amount appropriated to the program by Congress and the Legislature. 42 U.S.C. § 1396b (setting amount to be distributed to states "From the sums appropriated therefor"); *e.g.*, TEX. HUM. RES. CODE § 32.028; 1 TEX. ADMIN. CODE § 355.201(c)(4) (requiring consideration of "levels of appropriated state . . . funds . . . that limit, restrict, or condition the availability of appropriated funds for medical assistance"). If a court could issue an order imposing higher rates, it would in effect be countermanding the legislative branch's budget determinations. Given that the definition of the statutory rates includes a factor to account for varying amounts of appropriation—such as the rider decreasing funding for the treatments at issue in this case—judicially imposed Medicaid rates based on provider preferences would constantly clash with the separation of powers.

In accepting the federal contract, Texas has not added an additional right to judicial relief regarding rate setting for these particular services. When a statute or rule requires such review, the requirement is usually explicit. *E.g.*, 1 TEX. ADMIN. CODE § 355.8063 (2010) (Tex. Health and Human Servs. Comm'n, Medicaid Health

6

Serv.), *repealed by* 35 Tex. Reg. 6511, 6513 (2010) (formerly providing administrative appeal process for hospital inpatient Medicaid reimbursement rates). As explained below, moreover, while plaintiffs hang their hats on the concept of "access," suggesting that judicial intervention is appropriate because these particular patients might not be able to continue to receive services from these particular providers, the Medicaid Act defines the term "access" more narrowly. Rates must be:

> sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(30)(A) (Appendix Tab H). The Fifth Circuit, relying on the precedent applied in *Armstrong*, has held that this language does not create an individual right. *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 701 (5th Cir. 2007) (Appendix Tab F).

To be clear, the Legislature has created an entitlement to bring suit in state court to the extent it has promulgated standards for the adoption of rules governing administrative rates and made those rules subject to the judicial-review mechanisms of the Administrative Procedure Act. *See El Paso Hosp. Dist. v. Tex. Health & Human Servs. Comm'n*, 247 S.W.3d 709, 711, 714-15 (Tex. 2008) (reviewing agency's practice of calculating "cutoff date" as improper failure to adopt administrative rule when agency was required to engage in formal rulemaking); *see also* TEX. HUMAN

provides inherent judicial review of agency acts affecting vested property rights, *e.g.*, *SSC Mo. City Operating Co., LP v. Tex. Dep't of Aging & Disability Servs.*, No. 03-09-00299-CV, 2009 WL 4725286, at \*6 (Tex. App.—Austin 2009, pet. denied) (mem. op.) (mere expectation of providing services insufficient to trigger providers' inherent review claim). But, absent an additional requirement created by the Legislature (which there is not) or a vested right (which plaintiffs do not claim), there is no remedy related to Medicaid rate setting available to the Texas courts.[1] *E.g.*, *Little-Tex Insulation Co.*, 39 S.W.3d at 599.

## III. THE TEXAS STATUTES AND RULES DO NOTHING TO CHANGE THE EXCLUSIVE REMEDIES IMPOSED BY THE MEDICAID REGIME REGARDING THE AMOUNT OF RATES.

Plaintiffs' allegations point to nothing in Texas law that adds a substantive right to the core of the Medicaid contractual arrangement. The Legislature enacted a rider to the budget requiring $50,000,000 budget savings through rate reductions for acute care therapy services, including physical, occupational, and speech therapies, in each fiscal year of the current biennium. 2016-17 General Appropriations Act, 84th Leg., R.S., 2015 (Article II, Health & Human Servs. Comm'n), Rider 50(c) (Appendix Tab G) ("Rider 50(c)"). The Commission has been attempting to adopt new reimbursement rates to account for this decrease since

---

[1] Plaintiffs appear to believe that the *ultra vires* cause of action implicitly allows judicial review of actions taken under statute. As explained below, this is untrue. The *ultra vires* cause of action does allow judicial review, because it does not apply retroactively and because, per *Little-Tex*, there *is no* common-law right to judicial review. *See infra*, n.3.

8

Appropriations Act, 84th Leg., R.S., 2015 (Article II, Health & Human Servs. Comm'n), Rider 50(c) (Appendix Tab G) ("Rider 50(c)"). The Commission has been attempting to adopt new reimbursement rates to account for this decrease since before the beginning of the fiscal year, although it has withdrawn some of those proceedings. The current rates became effective on October 1, 2015, but cannot be applied because of the interlocutory relief in this case. *See* CR.351-73 (Appendix Tab C).

Plaintiffs are Medicaid recipients and providers. CR.338-39 (Appendix Tab B). They claim that the rate reductions at issue in this case will force providers out of business, violating unspecified "state-mandated access standards." *Id.* at 342-43 ¶ 24, see also id. ¶ 27 (rates "deny" named plaintiffs "access to providers and services"). Their legal theory is that the rates could not have been adopted consistent with certain procedural administrative rules and, therefore, that the rate-adoption process constitutes the implicit amendment of the governing administrative rules under the APA and an *ultra vires* act. CR.345-46 ¶¶ 30-34. They further argue that the statutory obligation to "maximize" the Medicaid finance system imposes a separate, judicially enforceable obligation on the Commission. CR.343-44 ¶ 26, and attempt (but fail) to plead a due-course-of-law claim, CR.344-

9

45 ¶ 28. In short, they imply that Texas law creates a substantive right to challenge Medicaid rates even though the Medicaid Act does not.

This argument is a mirage, because the relevant administrative rules merely incorporate the contractual terms of the Medicaid arrangement into Texas law. There is no right to access services as a general matter, nor to provide them. Rather, under the federal standard, there is a requirement that rates be set so that there is similar access to treatment for Medicaid beneficiaries as there is for individuals with private insurance within a given geographic area. Plaintiffs misread the relevant Texas statutes and rules when they attempt to derive a judge-made right of "access" to care that reaches over and beyond the requirements of the Medicaid program. 42 U.S.C. § 1396a(30)(A)

Thus, the relevant administrative rule requiring "reasonable availability and accessibility of specialists for all covered services requiring specialty care," 1 TEX. ADMIN. CODE § 353.411(a)(5), merely incorporates the term "access" from the federal Medicaid act. Plaintiffs attempt to impute a broader grant of a substantive right than the Medicaid Act, because there is no geographic limitation in the cherry-picked language they quote. But that reading ignores context. Section 353.411(a)(5) is in the standards for provision of Medicaid through a "Managed Care Organization" or "MCO." *E.g.*, *id.* § 353.411(a); *see* TEX. GOV'T CODE

§ 533.001(4), (5). MCOs are limited to particular geographic service areas. Tex. Gov't Code § 533.004(a) (requiring MCOs be regional or tied to particular hospital district).

The rules on which plaintiffs rely are geographically limited, consistent with the Medicaid Act.[2] As the Fifth Circuit has held, there is no judicially enforceable individual right to challenge Medicaid rates based on "access," because rates are based on the Secretary's assessment of services available to private insureds, a matter that is outside of judicial cognizance. *Equal Access*, 509 F.3d at 701 (discussing 42 U.S.C. § 1396a(30)(A)). Thus, there is no additional "access" right in Texas law that supersedes the limitations placed on the concept of "access" by the Medicaid Act, or Texas's acceptance of the terms of the Medicaid program.

Nor can the "optimization" language of § 531.02113 of the Government Code create a legal basis for attacking Medicaid rates under Texas law, because it does not create a judicially enforceable standard for intervening in the contractual arrangement that is continuously negotiated between the federal and state executive

---

[2] Plaintiffs also cite provisions of the Government Code requiring that the MCOs assure a "sufficient number of . . . . specialty pediatric providers of home and community-based services" and provide that "health care services will be accessible through the . . . provider network to a comparable extent that health care services would be available to recipients [under other methods of distributing Medicaid funds]." CR.344 ¶27 (invoking Tex. Gov't Code § 533.005(a)(21)). These requirements are, likewise, geographically limited and, therefore, merely track the requirements of federal law.

departments. After all, the total amount of funding available for Medicaid is always subject to appropriation, 42 U.S.C. § 1396b; 1 TEX. ADMIN. CODE § 355.201(c)(4). Section 531.02113 cannot be construed as creating a separate right to obtain a judicial order requiring the Commission to spend more state money than the Legislature appropriated.[3] Such a rule would create a running separation-of-powers problem for

---

[3] Plaintiffs' procedural argument—which the Commission addresses here only to forestall any argument that there is a substantive right hidden in the procedural provisions—likewise provides no substantive Texas-law right to trigger an ability to substitute the Court's order for that of the Secretary. Texas law allows challenges to the content of the rules by which rates are set, but not the rates themselves. Plaintiffs cite the recited list of bases for rate setting to challenge the rates. *See* CR.343 ¶ 25 (invoking 1 TEX. ADMIN. CODE §§ 355.8021; 355.8441; 355.8085; *see also* 1 TEX. ADMIN. CODE § 355.201(e), (f) (notice requirements for ratemaking). But the causes of action they invoke would entitle them, at most, to a prospective declaration regarding the underlying rules, not to undo an already-adopted rate. This result is compelled not only by the existence of an exclusive federal remedy, but also by two general propositions of Texas administrative law on which plaintiffs rely. *See* CR.345-46, ¶¶ 31 & 34. First, § 2001.038 of the Government Code cannot be used to challenge specific *applications* of rules, as in rate making or contested-case orders. TEX. GOV'T CODE § 2001.038(a) (allowing challenge to "applicability"—not *application*—of administrative rules). Second, the *ultra vires* cause of action cannot reach back and undo specific executive acts; it is prospective only. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 376 (Tex. 2007). Plaintiffs' invocation of the Uniform Declaratory Judgments Act is necessarily premised on the *ultra vires* claim, because it does not waive immunity for such claims, *id.* at 369, and it cannot be used parallel to a § 2001.038 request for declaratory judgment because their claim stems entirely from supposed amendments to the relevant administrative rules and is therefore an impermissible redundant remedy, *Tex. Dep't of State Health Services v. Balquinta*, 429 S.W.3d 726, 746-47 (Tex. App.—Austin 2014, pet. dism'd).

Other provisions on which plaintiffs rely do not apply to rate making at all, but are principles that govern the rules under which rates are calculated. *E.g.*, TEX. GOV'T CODE § 2006.002 ("Adoption of *Rules* With Adverse Economic Effect" (emphasis added)). As in *El Paso Hospital District*, to the extent suit is available regarding the rules, it is created by a separate entitlement to particular standards of rulemaking—not ratemaking.

In its previous briefing, the Commission relied on a provision that does not apply to this case, which requires contested-case proceedings to determine certain Medicaid rates. *See* TEX. HUM. RES. CODE § 32.0281(e). That statute does not apply to the current rate-setting regime, which does not take place through contested-case proceedings. *See* CR.684-89 (affidavit of Pam

the hundreds of fee schedules and millions of dollars overseen by the Commission's rates department.

* * *

Plaintiffs can point to nothing in Texas law that purports to create greater substantive rights regarding access or rates in the Medicaid program. Accordingly, the only appropriate remedy regarding rates is the Secretary's power to withhold Medicaid funds. The district court's actions in contravention of that exclusive authority constitute fundamental error.

## IV. THE TRIAL COURT'S ISSUANCE OF COUNTER-SUPERSEDEAS, LIKE THE ISSUANCE OF ANY JUDICIAL RELIEF RELATED TO MEDICAID RATES, VIOLATES THE UNITED STATES AND TEXAS CONSTITUTIONS.

The trial court accepted plaintiffs' legal characterizations and issued a temporary injunction, in which it included a counter-supersedeas finding and order. CR.587-97 (Appendix Tab A). As a basis for plaintiffs' harm and probable right of recovery, the district court recited, among other things, that minor children would "probably be deprived" of critical services, multiple providers (not necessarily the plaintiff providers) would "probably . . . go out of business/or stop providing Medicaid services," the quality of care would "probably decrease," there "probably" would be "disincentives for Medicaid providers to use preventive care,"

_____

McDonald) (Appendix Tab D); *see also* CR.688-89 ¶¶ 14-16 (setting out $5.6 million cost increase that would be required to handle therapy ratemaking under plaintiffs' theory).

13

and the new rates would "probably prevent Texas Medicaid beneficiaries from receiving critical services." CR.595 ¶ 33. All of these concerns are in the Secretary's purview—not that of Texas courts. In short, the district court's counter-supersedeas order implements a remedy inconsistent with the Secretary's authority. That defect is fundamental error under the United States and Texas Constitutions.

A. **The Order Violates the Supremacy Clause and is Inconsistent with Limitations on Spending Clause Power.**

Because exclusive remedial power over rates and access claims is vested with the Secretary, the assertion of a judicially enforceable right to change those rates violates:

1. **The Supremacy Clause of the United States Constitution preempts the district court's order.**

As the United States Supreme Court and the Fifth Circuit have pointed out, absent an unambiguous grant of judicial power, the Medicaid Act creates an exclusive remedy regarding rate amounts and access to care: withdrawal of funding by the Secretary. *Armstrong*, 135 S. Ct. at 1384; *Equal Access*, 509 F.3d at 701. Any additional requirements of a spending program cannot be implemented without giving the State the ability to decide whether to participate in the program as constituted. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2606 (2012) (holding that § 1396a would be unconstitutional as applied to withhold funding from

14

states based on failure to comply with newly imposed requirements of the Medicaid system, absent voluntary state participation). Thus, to the extent that Texas has signed on to accept Medicaid based on the content of the Medicaid contract—which does not include exposure to judicial review regarding Medicaid rates—federal law mandates that there be no judicial interference with the exclusive, executive-department remedy provided by the Medicaid Act.

The Supremacy Clause makes federal law "the supreme Law of the Land." U.S. CONST. art. VI, cl.2. While state obligations under a Spending Clause program are triggered by accepting federal funds, the requirements of the program remain binding on the states once adopted. Spending Clause legislation can have preemptive effect under the Supremacy Clause. *See Pharm. Research & Mfrs. of Amer. v. Walsh*, 538 U.S. 644, 661-69 (2003) (plurality op.) (Supremacy Clause provisions preempt state law, although statute in question not preempted); *id.* at 684-690 (O'Connor, J., dissenting on ground that statute was preempted); *id.* at 675 (Scalia, J., concurring on ground that exclusive remedy of termination by Secretary preempts contrary laws); *id.* at 683 (Thomas, J., concurring, expressing doubt that private parties can enforce Spending Clause program provision in any circumstance). Justice Scalia's view prevailed with regard to rate setting and § 1983 in *Armstrong*: the only remedy in federal law for these claims is recourse to the Secretary, and the only legal recourse

is that which federal law provides against the Secretary. Nothing in Texas law changes that allocation of authority.

Such federal grants of exclusive jurisdiction, to the courts or federal executive entities, preempt contrary state action. *E.g.*, *Entergy Gulf States, Inc. v. Pub. Util. Comm'n*, 173 S.W.3d 199, 207 (Tex. App.—Austin 2005, pet. denied) (Texas agency's failure to give effect to federal agency's action was preempted). The existence of an exclusive federal forum deprives the Texas courts of jurisdiction. *See Mills v. Warner Lambert Co.*, 157 S.W.3d 424, 427-28 (Tex. 2005). The district court's counter-supersedeas order is preempted by federal law because it attempts to prevent implementation of published Medicaid rates in the absence of constitutional power to do so.

### 2. The District Court's order is likewise incompatible with Spending Clause precedent.

Not only does *Armstrong* compel the result that the Secretary has exclusive jurisdiction to review rates, but there is a potential constitutional defect in allowing third parties to enforce Spending Clause requirements at all. *See Walsh*, 538 U.S. at 683 (Thomas, J., concurring). As Justice Thomas pointed out in his *Walsh* concurrence, the Secretary's power to terminate Medicaid funding carries with it the power to forgive or accept policy outcomes for the purpose of encouraging the state to perform better in other areas, or as a recognition of the particular health

16

challenges facing individual states. *Id.* at 680-81 (discussing nature of Secretary's discretion and pointing out that Secretary had adopted policy allowing states more latitude in implementing Medicaid than plaintiffs alleged).

The Medicaid rate system—in which review of rates is in the hands of the Secretary—is in substance a series of negotiations between the federal and state executive departments. Because the Medicaid program is in the form of a federal-state contract, recognizing a Texas cause of action to review rates or stop their adoption would, as Justice Thomas explained, undermine Medicaid's contractual nature deriving from the requirements of the Spending Clause. *Armstrong*, 135 S. Ct. at 1387 (Scalia, J.) (plurality op.) (citing *Walsh*, 538 U.S. at 683 (Thomas, J., concurring) (concluding that contractual nature of Medicaid forecloses third-party beneficiaries of contracts between two governments to sue)). Texas has contracted to satisfy the Secretary's view of Medicaid requirements, not the separate interpretation of the Medicaid Act by the federal and/or state judiciaries.

### B. The Order Likewise Violates Article II, § 1 and Article IV, § 10 of the Texas Constitution.

The Texas Constitution contains cognate provisions that require Texas courts not to take action to interpret the access provision of the Medicaid Act, and Texas laws implementing that Act in lieu of the Secretary's exercise of discretion.

1. **The District Court's order violates the separation-of-power requirement not only by improperly restraining the executive department, but by, in effect, vetoing a budget rider without any constitutional basis for doing so.**

The Texas Constitution affirmatively mandates the separation of powers among the three branches of government. TEX. CONST. art. II, § 1. The Texas statutes and rules are structured to mirror the requirements of the Medicaid Act, which, in turn, creates an exclusive remedy in the Secretary. Implying a judicial cause of action in contravention of the Legislature's choice not to create one would violate the separation of powers. *E.g.*, *In re Entergy Corp.*, 142 S.W.3d 316, 321-22 (Tex. 2004) (rejecting separation-of-powers argument regarding executive exercise of putatively judicial determination on ground that there is no general right to judicial review of administrative action). Some executive-department actions are unreviewable by the courts. *E.g.*, *Gulf Land Co. v. Atl. Ref. Co.*, 134 Tex. 59, 73-74, 131 S.W.2d 73, 82 (1939). This is particularly true when a procedure is created by statute, because a statute that creates rights can place them outside of judicial review. *Houston Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 157-58 (Tex. 2007).[4]

---

[4] Similarly, there are constitutional limitations on the Legislature's power to impose remedies on the Legislative branch. The suspension of laws provision, TEX. CONST. art. I, § 28, affirmatively limits the power of the judiciary to exercise policy discretion to avoid executive branch action. *E.g.*, *Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1966) (striking down statute allowing court to determine the public good by preponderance of the evidence); *see also* 1 GEORGE D. BRADEN ET. AL., THE

One manifestation of the separation-of-powers clause is the exclusive-jurisdiction doctrine, under which lawsuits must be dismissed if the subject-matter or remedy sought is conferred by law on an executive-branch agency. *E.g.*, *In re Entergy Corp.*, 142 S.W.3d at 321-22. The Secretary's exclusive power to impose orders related to the adoption of Medicaid rates is subject to this doctrine.

As explained above, the Texas-law provisions regarding access do not purport to create greater rights than the Medicaid Act or provide judicial review of ratemaking. It would violate the separation of powers to ignore this legislative grant of discretion to the executive department.

There is also a legislative problem. Medicaid rates are subject to the amount of appropriations. 42 U.S.C. § 1396b; 1 TEX. ADMIN. CODE § 355.201(c)(4). In this case, the rate cuts have been triggered by a rider requiring particular reductions in funding in each year of the current biennium. The counter-supersedeas order effectively renders null a budget provision without any triggering constitutional determination or statutory grant of authority.[5] The courts lack power to change the

---

CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS, 93-94 (1977).

[5] Thus, plaintiffs could bring suit under the Texas constitution if they had established a vested property interest. *Little-Tex*, 39 S.W.3d at 599. But plaintiffs allege no property rights that are not subject to future appropriations and cannot, therefore, asserted a *vested* right in the current levels of reimbursement. *See Eldercare Properties, Inc. v. Dep't of Hum. Servs.*, 63 S.W.3d 551, 556 (Tex. App.—Austin 2001, pet. denied) (nursing home lacked vested property right in economic impact

budget absent a predicate constitutional violation. *E.g.*, *Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593, 601-02 (Tex. 1975) (declining to change effect of constitutionally valid rider). And plaintiffs' only asserted constitutional claim, based on due course of law, is legally defective because none of the plaintiffs has a vested property interest in a particular level of Medicaid rate, much less a right to rates not subject to reduction by appropriation.[6]

### 2. The District Court's order ignores the substantive effect of the Business-With-the-United-States Clause of the Texas Constitution.

The Texas Constitution requires that the Governor "conduct, in person, or in such manner as shall be prescribed by law, all intercourse and business of the State with other States and with the United States." TEX. CONST. art. IV, § 10. The Texas Medicaid statutes and rules specify that the business of interfacing with the Secretary shall be carried out by the Commission. TEX. HUM. RES. CODE § 32.021.

---

of funding other service providers*); see also Pers. Care Prods. v. Hawkins*, 635 F.3d 155, 158-59 (5th Cir. 2011) (providers have no property interest in amount of future rates). And the beneficiaries' interest in the program are not impacted at all: they are still entitled to receive reimbursed care if there is a provider in the system who will accept Medicaid as payment.

[6] Plaintiffs cite the due-course provision. CR.344-45 ¶ 28. But due course of law does not require judicial action in all cases; it must be triggered by a vested right. *E.g.*, *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 15-16 (Tex. 2015) (dismissing due-course claims because face of complaint showed that plaintiffs had no vested property interest). Because rates are conditioned both on executive-department action by the Secretary and appropriation by the Legislature, any interest in a particular Medicaid rate is contingent on the executive process and cannot be the basis of a due-course claim. There are no vested rights at issue in this lawsuit. *See supra*, n. 5.

20

That statutory provision is, necessarily, a delegation of authority to interact with the United States on the Governor's behalf. If the Governor or his designee acts within the scope of federal and state law, the decision is binding on the courts. *See, e.g.*, *Adams v. Calvert*, 396 S.W.2d 948, 950 (Tex. 1965) (Governor's decisions within gap between requirements of state law and of federal law unassailable by law); *see also* 1 BRADEN ET AL, at 318-320.

This is the flip side of the Secretary's discretion. The Commission, as the Governor's designee, has discretion to implement the federal-state contract from the state side. Any judicial remedy that is not entered pursuant to a statutory grant of authority or a finding of unconstitutionality is, necessarily, an improper impairment of gubernatorial authority under Article IV, § 10.

## V. IN THE ALTERNATIVE, THE COURT SHOULD REDUCE THE COUNTER-SUPERSEDEAS BOND.

Even if counter-supersedeas is within the district court's power, the bond of $500, CR.596-97 ("$500 . . . shall serve as the security for this Order declining to permit the Temporary Injunction to be superseded"), fails to take into account either the total amount by which the rider requires expenditures to be reduced, *see* Rider 50(c), or the expense of almost $5.6 million annual cost to the State and the Commission of potentially having to adopt other rules in the counter-statutory

21

method advanced by plaintiffs, CR.699-89 ¶¶ 14-16. The $500 amount has no relationship whatsoever to the total fiscal impact of this order on the State of Texas.

Plaintiffs provided no justification for the amount of the $500 bond, apart from counsel's preference that the bond be "nominal" to account for plaintiffs' already-expended litigation costs. 4.RR.264 (basing bond amount on counsel's experience and the identity of the parties), 5.RR.7 ("more than a nominal bond wouldn't make sense to me"). While plaintiffs' counsel referred to deposition testimony that shortfalls in the Medicaid budget are often made up at the end of the fiscal year, *see* 5.RR.7, it does not follow that there is no harm to the taxpayers. Moving $100,000,000 from other programs to Medicaid hurts the public fisc. Ignoring that fact in setting a supersedeas bond represents an abuse of discretion, because Rule 24.4 does not contemplate a nominal bond to support counter supersedeas.

A counter-supersedeas bond must "secure the judgment debtor against any loss or damage caused by the relief granted the judgment creditor." Tex. R. App. P. 24.2(3). The bond should have been set at $100,000,000, the amount that will have to be moved from other portions of the budget to cover Medicaid expenditures that the Legislature intended to cut from the budget during the next biennium, on the face of Rider 50(c). That amount would likely subsume the damage to the state

22

budget from a court requiring the Commission to hire 50.7 new FTEs to comply with the injunction, then release them again after the Commission prevails on appeal. See CR.688-89 ¶ 16.

The counter-supersedeas bond is not a down payment on relief; it is a pledge to make the appellant entirely whole if it ultimately prevails, offsetting the fact that the bond serves to *change*, rather than maintain, the *status quo*. *Cf. In re Estate of Hernandez*, No. 04-14-00046-CV, 2014 WL 1713566, at *2 (Tex. App.—San Antonio 2014, pet. denied) (mem. op.) (purpose of supersedeas is to maintain the *status quo*). This point is important: a supersedeas bond covers the risk of maintaining the *status quo*, but a counter-supersedeas bond must cover the harm caused by changing the *status quo* before litigation concludes. Rule 24 makes no allowance for litigation costs, nor does it allow the court to take into account the identity of the parties: to issue counter-supersedeas, the Court must ensure that no harm comes from changing the *status quo* during the appeal. $100,000,000 of taxpayer money will potentially be withheld from other programs because plaintiffs obtained a change in the *status quo*.

Put another way, it is improper for a supersedeas order to, in effect, resolve the core issues in a case prior to appeal. *See Hydroscience Techs., Inc. v. Hydroscience, Inc.*, 358 S.W.3d 759, 761 (Tex. App.—Dallas 2011) (orig. motion). If this litigation

lasts through the biennium, which seems likely, the rider will never have been given effect. In the event the Court does not vacate the counter-supersedeas order, it should set the bond at the value of the potential harm to the State if the State prevails on appeal: $100,000,000, to be applied to any budget shortfall in the biennium.

## VI. THE COMMISSION ASKS THE COURT TO ACT QUICKLY TO AVOID THE POTENTIAL NECESSITY FOR EVEN LARGER CUTS THAT MIGHT, IN THE END, EXACERBATE THE RATE CUTS ABOUT WHICH PLAINTIFFS COMPLAIN.

The Court should resolve this issue quickly to preserve public funds and prevent frustration of the Legislature's intent.

This case is urgent because the cuts mandated by Rider 50(c) are supposed to take effect in the current fiscal year. In addition to its obligation to hear this motion "at the earliest practicable time," TEX. R. APP. P. 24.4(d), the Court should take into account the effects a stay will have on the Commission's ability to comply with the Rider. If the Commission were forced to comply with the total amount of reduction required by the rider in less than a fiscal year, it could ultimately be forced to cut rates even lower than the rates about which plaintiffs complain in order to make up the requested amount of funding within the present biennium.

The Commission has gone to great lengths to expedite this process and implement Rider 50(c) as quickly as possible. To that end, it has waived the automatic stay of proceedings that would otherwise have been triggered by its

interlocutory appeal of its plea to the jurisdiction, and is moving towards the earliest possible trial setting. CR.735-36. Its goal is to put the matter before the appellate courts in time to obtain meaningful relief from the trial court's unconstitutional order. The Commission asks that the Court hear this motion as early as possible, as required by rule, and give it relief from the improper counter-supersedeas order, so that it can put Rider 50(c) into effect as soon as possible and avoid a judicially mandated budget increase.

* * *

The counter-supersedeas order constitutes an impairment of the rate making process that is completely inconsistent with the Secretary's exclusive jurisdiction to determine whether state Medicaid rates comport with public policy. Under both the Texas and United States Constitutions, the entry of counter-supersedeas constitutes fundamental error. The order is, in fact, even more intrusive than it might be, because it makes it impossible to comply with a budget rider and could ultimately result in greater rate decreases in order to comply with state law. Moreover, the amount of the counter-supersedeas bond is wholly unrelated to the facial value of the cuts contemplated by the rider and the expense to the State of proceeding under the apparent limitations of the temporary injunction. Consistent with Rule 24.4, the

25

Court should vacate the counter-supersedeas order and allow the Commission's automatic supersedeas to go into effect.

## PRAYER

The Court should vacate the counter-supersedeas order or, in the alternative, order the bond amount necessary to comply with Rule 24's requirement that the party who is denied supersedeas be made entirely whole for any harm caused by changing the *status quo*—$100,000,000 to cover both the amount of general revenue Rider 50(c) was intended to remove from the Medicaid program and the cost of hiring 50 new employees to comply with the injunction's requirements.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

SCOTT A. KELLER
Solicitor General

 /s/ Kristofer Monson
KRISTOFER S. MONSON
Assistant Solicitor General
State Bar No. 24037129

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
*kristofer.monson@texasattorneygeneral.gov*

COUNSEL FOR APPELLANTS

## CERTIFICATE OF CONFERENCE

I certify that on October 26, 2015, and again on October 27, 2015 I contacted opposing counsel by electronic mail. Counsel opposes this motion.

## CERTIFICATE OF SERVICE

On October 27, 2015 this document was served via File&Serve Xpress on:

Ben Hathaway
Dan Richards
Richards Rodriguez & Skeith
816 Congress Avenue
Suite 1200
*drichards@rrsfirm.com*
*bhathaway@rrsfirm.com*

Kristofer S. Monson
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78701
*kristofer.monson@texasattorneygeneral.gov*

COUNSEL FOR APPELLEES

COUNSEL FOR APPELLANT

 /s/ Kristofer S. Monson

# APPENDIX

# TABLE OF CONTENTS

**Tab**

CR.587-97 Order Granting Temporary Injunction and Denying
Supersedeas ................................................................................A

CR.338-39 Plaintiffs' Second Amended Original Petition ...........................B

CR.351-73 Tex. Health & Human Servs. Comm'n Rate Analysis Dep't:
Notice of Proposed Adjustments........................................................C

CR.684-89 Affidavit of Pam McDonald ......................................................D

*Armstrong v. Exception Child Ctr., Inc.,* 135 S. Ct. 1382 (2015) ..................E

*Equal Access for El Paso, Inc. v. Hawkins,* 509 F.3d 697 (2007)..................F

2016-17 General Appropriations Act, 84th Leg., R.S., 2015 (Article II,
Health Human Services Comm'n), Rider 50(c) ............................................ G

Relevant Federal Statutes.............................................................. H



CAUSE NO. D-1-GN-15-003263

| | | |
|---|---|---|
| DIANA D., as next of friend of KD, a child, | § | IN THE DISTRICT COURT |
| KAREN G., as next friend of TG and ZM, | § | |
| children, GUADALUPE P., as next of friend | § | |
| of LP, a child, SALLY L., as next of friend of | § | |
| CH, DENA D., as next friend of BD, a child, | § | Filed in The District Court |
| OCI ACQUISITION, LLC d/b/a | § | of Travis County, Texas |
| CARE OPTIONS FOR KIDS, | § | |
| CONNECTCARE SOLUTIONS, LLC | § | SEP 25 2015 |
| d/b/a CONNECTCARE THERAPY FOR | § | At_____ 4:20 p.M. |
| KIDS, ATLAS PEDIATRIC THERAPY | § | Velva L. Price, District Clerk |
| CONSULTANTS LLC, and PATHFINDER | § | |
| PEDIATRIC HOME CARE, INC., | § | |
| | § | |
| Plaintiffs, | § | 200th JUDICIAL DISTRICT OF |
| | § | |
| v. | § | |
| | § | |
| CHRIS TRAYLOR, as EXECUTIVE | § | |
| COMMISSIONER of TEXAS | § | |
| HEALTH AND HUMAN SERVICES | § | |
| COMMISSION, and TEXAS | § | |
| HEALTH AND HUMAN SERVICES | § | |
| COMMISSION, | § | |
| | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## ORDER GRANTING TEMPORARY INJUNCTION AND DENYING SUPERSEDEAS

On the 21st and 22nd days of September, 2015 the Court held a hearing on Plaintiffs' application for temporary injunction in the above entitled and numbered cause. The Court has considered the testimony, documentary evidence, pleadings, briefs, and arguments of counsel and GRANTS the Temporary Injunction based on the following:

**General History:**

1) Plaintiffs include the parents as next friends of several minor children who suffer from severe and disabling conditions, including seizure disorders, delayed development, autism, speech developmental delays, epilepsy, cerebral palsy, and other conditions. These Plaintiffs and

1 | P a g e



004236981



587

many other minor children suffering from similar conditions across the State of Texas can exhibit a wide variety of disabling symptoms, including:

    a. nonverbal

    b. non-ambulatory

    c. difficulty with speech

    d. uncontrolled behavioral outbursts

    e. difficulty with motor control over their limbs

    f. difficulty with mental processing of information.

2) Because of these disabling conditions and symptoms, these children depend on home-health providers for physical, occupational, and speech therapy services under the Texas Medicaid program to develop basic skills such as walking, talking, dressing themselves, feeding themselves, understanding simple communications, and maintaining control over their own behavior. The Plaintiffs include several home health service providers who deliver physical, occupational, and speech therapy services under the Texas Medicaid program to the children of Texas who depend on such services.

3) Texas Health and Human Services Commission ("HHSC") and Chris Traylor, as Executive Commissioner of HHSC ("Commissioner Traylor") have developed proposed decreases to the reimbursement rates for physical, occupational, and speech therapy services that will probably result in a decrease, or complete elimination, of available home health services for Medicaid-dependent children across Texas.

**Proposed Rate Changes:**

4) On or about July 20, 2015, HHSC and Commissioner Traylor held a hearing regarding new proposed reimbursement rates to be implemented on September 1, 2015 for physical,

occupational, and speech therapy services under the Texas Medicaid program (the "July 20, 2015 Proposed Rates"). A copy of the July 20, 2015 Proposed Rates is attached hereto as *Exhibit A*.

5)      Following the commencement of this lawsuit, on or about August 20, 2015, HHSC and Commissioner Traylor produced a different set of new proposed reimbursement rates to be implemented on September 1, 2015 for physical, occupational, and speech therapy services under the Texas Medicaid program (the "August 20, 2015 Proposed Rates"). A copy of the August 20, 2015 Proposed Rates is attached hereto as *Exhibit A-1*.

6)      Prior to a temporary injunction hearing at which Plaintiffs sought to enjoin HHSC and Commissioner Traylor from implementing either the July 20, 2015 Proposed Rates or the August 20, 2015 Proposed Rates, HHSC and Commissioner Traylor withdrew both sets of rates and advised the Court that they would start over with a new rate proposal.

7)      Nine days later, on September 4, 2015, HHSC and Commissioner Traylor proposed new rates to be implemented on October 1, 2015 for physical, occupational, and speech therapy services under the Texas Medicaid program (the "September 4, 2015 Proposed Rates"). A copy of the September 4, 2015 Proposed Rates is attached hereto as *Exhibit A-2*.

8)      Defendants have exhibited a pattern of behavior attempting to impose new rates, and have withdrawn the rates or taken other steps, resulting in Plaintiffs' challenge to the rates arguably becoming moot. This issue is appropriate for the Court to adjudicate, however, based on the "capable of repetition yet evading review" exception to the mootness doctrine. *Davis v. Burnam*, 137 S.W.3d 325, 333 (Tex. App.—Austin 2004, no pet.). Defendants' actions withdrawing the proposed rates demonstrate that the action is too short in duration to be litigated fully before the action ceases or expires. *Id.* Defendants' choice to withdraw the rates and propose similar ones as soon as a hearing has passed creates a reasonable expectation that the

same complaining parties will be subjected to the same action again should the Defendants withdraw the currently pending rates and assert that this case is moot. *Id.*

9)   Pursuant to 1 TAC §355.8021(a)(2)(A), reimbursement rates must be based on:

   a.   an analysis of the Centers for Medicare and Medicaid Services fees for similar services;

   b.   Medicaid fees paid by other states;

   c.   a survey of costs reported by Medicaid home health agencies;

   d.   the Medicare Low Utilization Payment Adjustment (LUPA) fees;

   e.   previous Medicaid payments for Medicaid-reimbursable therapy, nursing, and aide services; or

   f.   some combination thereof.

10)   Pursuant to 1 TAC §355.8021(a)(2)(B), periodic rate reviews conducted by HHSC must include, but will not be limited to, consideration of the payments for, as well as all costs associated with, providing these Medicaid-reimbursable therapy services.

11)   Any proposed reimbursement rates that modify or disregard the key components of the methodology set forth in 1 TAC §355.8021(a)(2) could constitute a rule change. *Accord, El Paso Hosp. Dist. v. Tex. HHS Comm'n*, 247 S.W.3d 709, 714–15 (Tex. 2008). To be valid, rates resulting from a rule change must be adopted through proper rule-making procedures. *Id.* at 715.

12)   Those rule-making procedures include:

   a.   Determining whether a rule may affect a local economy before proposing the rule for adoption. If so, preparing a local employment impact statement for the proposed rule. TEX. GOV'T CODE § 2001.022(a).

   b.   Providing at least 30 days' notice of the intention to adopt the new rule. TEX. GOV'T CODE § 2001.023(a). The notice must comply with section 2001.024 of the Texas Government Code. This includes, among other things, a note about the public benefits and costs associated with the new rule. TEX. GOV'T CODE § 2001.024(a)(5).

   c.   Preparing, for rules that may have an adverse economic impact on small businesses,:

    i. an economic impact statement that estimates the number of small businesses subject to the proposed rule, projects the economic impact of the rule on small businesses, and describes alternative methods of achieving the purpose of the proposed rule; and

    ii. a regulatory flexibility analysis that includes the agency's consideration of alternative methods of achieving the purpose of the proposed rule.

TEX. GOV'T CODE § 2006.002(c).

**The September 4, 2015 Proposed Rates:**

13) The September 4, 2015 Proposed Rates affect at least one local economy.

14) The September 4, 2015 Proposed Rates may have an adverse impact on small businesses.

15) The September 4, 2015 Proposed Rates were probably not determined in compliance with 1 TAC §355.8021(a)(2)(A).

16) The September 4, 2015 Proposed Rates are the result of a periodic rate review under 1 TAC §355.8021(a)(2)(B) that was probably not in compliance with adequate or appropriate consideration of payments for, as well as the costs associated with, providing these Medicaid-reimbursable therapy services.

17) Defendants probably did not adequately or appropriately consider the impact that the September 4, 2015 Proposed Rates would have on access to care if implemented.

**Failure to Comply with Rule 355.8021(a)(2):**

18) The Proposed Rates are probably not adequately or appropriately based on the formula set forth in 1 TAC §355.8021(a)(2)(A); therefore, they may constitute a rule change, which must be adopted through proper rule-making procedures.

19) The September 4, 2015 Proposed Rates are also not based on any identifiable documented criteria. The Truven Data is not data representing Medicaid fees paid by other states, so even if the September 4, 2015 Proposed Rates are based on Truven Data, the September 4,

2015 Proposed Rates are based on something other than the key components of the formula set forth in 1 TAC §355.8021(a)(2)(A).

20)     Should it be determined that any of the Proposed Rates comply with the methodology and formula in 1 TAC §355.8021(a)(2)(A), those Proposed Rates could still amount to a rule change because they are probably the result of a periodic rate review that failed to adequately or appropriately consider payments for, as well as all costs associated with, providing these Medicaid-reimbursable therapy services. 1 TAC §355.8021(a)(2)(B).

21)     The margins analysis conducted by Texas A&M University is seriously flawed and not sufficient to meet the requirements of 1 TAC §355.8021(a)(2)(B). Defendants appear to have performed no other competent cost analysis. Defendants' own purported analysis fails to include overhead, administrative, benefits, employer taxes, therapy materials, testing kits and other costs of providing these Medicaid-reimbursable therapy services.

22)     In proposing to promulgate each set of Proposed Rates, Defendants did not follow proper rule-making procedures. Defendants did not:

    a. determine whether the rule would affect a local economy or prepare a local employment impact statement;

    b. provide at least 30 days' proper notice of the intention to adopt the new rule. The notice provided did not comply with section 2001.024 of the Texas Government Code;

    c. prepare an economic impact statement or a regulatory flexibility analysis.

23)     The September 4, 2015 Proposed Rates are likely a rule that HHSC did not properly promulgate. They may be invalid and may be enjoined. *El Paso Hosp. Dist.*, 247 S.W.3d at 715.

**Access to Care:**

24)     In addition to the above violations of the rule-making process, Texas law requires that HHSC provide Medicaid recipients with proper access to care. Pursuant to the provisions of 1

TAC 353.411(a)(5), 1 TAC 353.413(a), and 1 TAC 353.413(d), Texas law requires: that service providers ensure the reasonable availability and accessibility of speech, occupational, and physical therapist specialists for all Medicaid service recipients; that service providers must provide comprehensive and timely speech, occupational and physical therapy services for all Medicaid service recipients; and that HHSC will not delegate its responsibility to deliver speech, occupational, and physical therapy services to all eligible children.

25)     HHSC likely neither conducted nor received an adequate, appropriate, or reliable study or analysis on the impact of any of the Proposed Rates on access to care as required by the above regulations.

26)     The implementation of the Proposed Rates will likely result in service providers being unable to deliver speech, occupational, and physical therapy services to all eligible children. Because HHSC only provides services to eligible children through service providers, the implementation of either of the proposed rates will probably render service providers unable to comply with 1 TAC 353.411(a)(5), and/or 1 TAC 353.413(a), and will probably result in HHSC failing to comply with its responsibility to deliver speech, occupational, and physical therapy services to all eligible children.

27)     Any proposed change to reimbursement rates for physical, occupational, and speech therapy services under the Texas Medicaid program during the pendency of this lawsuit would constitute a periodic rate review pursuant to 1 TAC §355.8021(a)(2)(B) and which will include a review of payments for providing Medicaid-reimbursable therapy services and which will include a review of costs associated with providing Medicaid-reimbursable therapy services.

**Additional Violations:**

28)    In addition to the above violations of the rule-making process, each set of Proposed Rates will likely violate Defendants' statutory duty to maximize the Medicaid finance system. TEX. GOV'T CODE §531.02113.

29)    HHSC must optimize the Medicaid finance system to:

    a.  maximize the state's receipt of federal funds;

    b.  create incentives for providers to use preventive care;

    c.  increase and retain providers in the system to maintain an adequate provider network;

    d.  more accurately reflect the costs borne by providers; and

    e.  encourage the improvement of the quality of care.

*Id.*

30)    If implemented, the Proposed Rates will likely not create incentives for providers to use preventive care, dramatically decrease the number of providers in the system, fail to accurately reflect the costs borne by the providers, and not encourage the improvement of the quality of care.

31)    The September 4, 2015 Proposed Rates are probably based on arbitrary criteria that lack adequate or appropriate consideration for the impact on service providers or recipients, and probably lack adequate or appropriate consideration for the legal obligations of Commissioner Traylor and HHSC with regard to the adoption of reimbursement rates. Therefore the September 4, 2015 Proposed Rates are likely in violation of the due course of law provision of the Texas Constitution Art. I, §19.

**Need for Temporary Injunction:**

32)    Plaintiffs have shown a probable right to recovery on their claim for all the above reasons.

33)     If a temporary injunction is not granted, Plaintiffs will probably suffer irreparable injury because:

    a. the minor children represented in this lawsuit, plus thousands of other Texas children receiving pediatric services under the Texas Medicaid program, will probably be deprived of those critical services;

    b. Defendants' actions will probably cause multiple Texas Medicaid providers to go out of business and/or stop providing Medicaid services;

    c. Defendants' actions will probably create disincentives for Medicaid providers to use preventive care;

    d. Defendants' actions will probably decrease the quality of care provided to Medicaid recipients in Texas; and

    e. Defendants' actions will probably prevent Texas Medicaid beneficiaries from receiving critical services.

34)     The probable harm is imminent because the September 4, 2015 Proposed Rates are set to take effect on October 1, 2015, likely immediately cutting off care for Medicaid beneficiaries. The adoption or implementation of any of the Proposed Rates may be *ultra vires* violations of Texas law. Therefore the issuance of a temporary injunction causes less prejudice or harm to the State of Texas, Commissioner Traylor, or HHSC, and the balance of the equities weighs in favor of granting a temporary injunction.

**Temporary Injunction:**

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that a Temporary Injunction is GRANTED to Plaintiffs, and that Commissioner Traylor and HHSC are commanded forthwith to desist and refrain from taking any action to implement the reimbursement rates described in ***Exhibit A-2*** from the date of entry of this Order until final trial in this lawsuit or until further order of this Court.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that a Temporary Injunction is GRANTED to Plaintiffs, and that Commissioner Traylor and HHSC are commanded forthwith

to desist and refrain from taking any action to propose or implement any change in reimbursement rates for physical, occupational, and speech therapy services under the Texas Medicaid program without conducting a review of payments for providing Medicaid-reimbursable therapy services and conducting a review of costs associated with providing Medicaid-reimbursable therapy services as required by 1 TAC §355.8021(a)(2)(B) from the date of entry of this Order until final trial in this lawsuit or until further order of this Court.

This Order does not affect HHSC's ability to seek CMS's approval of the State Plan Amendment.

It is further ORDERED that trial on the merits of this cause is set for January 18, 2016.

The Court GRANTS Plaintiffs leave to deposit a check with the trial court clerk in lieu of bond. Five hundred of the $1000.00 deposited by Plaintiffs into the Court's registry on September 23, 2015 shall satisfy the bond requirement to make this Temporary Injunction effective.

It is the Court's understanding that the Defendants intend to file a Notice of Appeal and may assert that pursuant to Civil Practice & Remedies Code §6.001 and Texas Rules of Appellate Procedure 24.1 and 25.1, the filing of a Notice of Appeal constitutes automatic supersedeas of this Court's Temporary Injunction. *See, In re State Bd. for Educator Certification*, 452 S.W.3d 802, 804 (Tex. 2014). The Plaintiffs have requested that the Court decline to permit the Temporary Injunction to be superseded. The Court finds and concludes that permitting the Defendants to supersede the Temporary Injunction would render any relief in this matter ineffective. *In re State Bd. for Educator Certification*, 452 S.W.3d 802, 808 (Tex. 2014). Accordingly, it is ORDERED, ADJUDGED and DECREED that pursuant to Texas Rule of Appellate Procedure 24.2(a)(3), the Court DECLINES to permit the Temporary Injunction to be superseded. Pursuant to Texas Rule of Appellate Procedure 24.2(a)(3), the additional $500.00

paid in the above-described deposited check in the amount of $1,000.00 shall serve as the security for this Order declining to permit the Temporary Injunction to be superseded.

The clerk of the above-entitled Court shall forthwith, on the filing by Plaintiffs of the bond required, and on approving the same according to the law, issue a Temporary Injunction in conformity with the law and the terms of this Order.

SIGNED on this day 25th of September, 2015. at 4:15 p.m.

_____
TIM SULAK
JUDGE PRESIDING

**B**

9/8/2015 2:49:47 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-15-003263
Shaun Glasson

CAUSE NO. D-1-GN-15-003263

| | | |
|---|---|---|
| DIANA D., as next of friend of KD, a child, | § | IN THE DISTRICT COURT |
| KAREN G., as next friend of TG and ZM, | § | |
| children, GUADALUPE P., as next of friend | § | |
| of LP, a child, SALLY L., as next of friend of | § | |
| CH, DENA D., as next friend of BD, a child, | § | |
| OCI ACQUISITION, LLC d/b/a | § | |
| CARE OPTIONS FOR KIDS, | § | |
| CONNECTCARE SOLUTIONS, LLC | § | |
| d/b/a CONNECTCARE THERAPY FOR | § | |
| KIDS, ATLAS PEDIATRIC THERAPY | § | |
| CONSULTANTS LLC, and PATHFINDER | § | |
| PEDIATRIC HOME CARE, INC., | § | |
| | § | 200TH JUDICIAL DISTRICT OF |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| CHRIS TRAYLOR, as EXECUTIVE | § | |
| COMMISSIONER of TEXAS | § | |
| HEALTH AND HUMAN SERVICES | § | |
| COMMISSION, and TEXAS | § | |
| HEALTH AND HUMAN SERVICES | § | |
| COMMISSION, | § | |
| | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## PLAINTIFFS' SECOND AMENDED ORIGINAL PETITION AND APPLICATION FOR INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

Although entrusted with the responsibility of operating the Texas Medicaid system in accordance with applicable Texas and federal law, Defendants Chris Traylor, as Executive Commissioner of the Texas Health and Human Services Commission, and the Texas Health and Human Services Commission promulgated and then abruptly withdrew, in the face of a temporary injunction hearing requested by Plaintiffs, two illegal sets of cuts to the reimbursement rates for providers of physical, occupational, and speech therapy services to

1826.002
435836

Texas Medicaid beneficiaries. Nine days after withdrawing the first two sets of illegal rate cuts, Defendants continued their inexplicable rush to implement destructive cuts to critical Medicaid rates by publishing a third set of illegal cuts, to be effective October 1, 2015. As with the first two sets of rates proposed by Defendants, this newest set of rates violates Article I, §19 of the Texas Constitution and numerous Texas statutes and regulations. If implemented, the newest cuts will force Texas Medicaid providers to cease providing services critical to the health and development of Texas' most vulnerable residents, its children. Plaintiffs Diana D., Karen G., Guadalupe P., Sally L., and Dena D. are the mothers and next friends of children receiving speech, occupational, and therapy services from home health agencies under the Texas Medicaid program. Plaintiffs OCI Acquisition, LLC d/b/a Care Options for Kids, ConnectCare Solutions, LLC d/b/a ConnectCare Therapy for Kids, Atlas Pediatric Therapy Consultants LLC, and Pathfinder Pediatric Home Care, Inc. are duly licensed home health agencies providing pediatric speech, occupational, and physical therapy services under the Texas Medicaid program. Because Defendants' actions are unlawful and will cause immediate and irreparable injury to the children whose mothers are bringing this suit, to thousands of other Texas children receiving services under the Texas Medicaid program, and to Texas Medicaid providers, Plaintiffs are requesting that the Court grant a declaratory judgment that the proposed rates are void and injunctive relief preventing the implementation of those rates.

## I. DISCOVERY CONTROL PLAN

1. Plaintiffs intend to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4 and will seek a Court Order in accordance with the requirements of such Rule.

2

## II. PARTIES

2. Plaintiff Diana D. is the mother and next friend of KD, who is nine years old. Both are residents of Travis County, Texas.

3. Plaintiff Karen G. is the mother and next friend of TG, who is fifteen years old, and ZM, who is thirteen years old. All are residents of Williamson County, Texas.

4. Plaintiff Guadalupe P. is the mother and next friend of LP, who is two years old. Both are residents of Travis County, Texas.

5. Plaintiff Sally L. is the mother and next friend of CH, who is four years old. Both are residents of Travis County, Texas.

6. Plaintiff Dena D. is the mother and next friend of BD, who is eight years old. Both are residents of Hays County, Texas.

7. Plaintiffs OCI Acquisition, LLC d/b/a Care Options for Kids and ConnectCare Solutions LLC d/b/a ConnectCare Therapy for Kids (collectively "Care Options for Kids" or "COFK"), are affiliated entities and duly licensed Texas pediatric home health agencies that provide speech, occupational, and physical therapy services to children across the State of Texas, including in Travis County, Texas. COFK's headquarters and principal place of business is in Dallas, Dallas County, Texas.

8. Plaintiff Atlas Pediatric Therapy Consultants LLC ("Atlas") is a duly licensed Texas pediatric home health agency that provides speech, occupational, and physical therapy services to children in North Texas. Its headquarters and principal place of business is in Arlington, Tarrant County, Texas.

9. Plaintiff Pathfinder Pediatric Home Care, Inc. ("Pathfinder") is a duly licensed, family-owned Texas pediatric home health agency that provides speech, occupational, and

3

338

physical therapy services to children in 115 Texas counties, primarily in East Texas. Pathfinder's headquarters and principal place of business in The Woodlands, Montgomery County, Texas.

10.     Care Options for Kids, Atlas, and Pathfinder are referred to collectively as "Provider Plaintiffs".

11.     Defendant Chris Traylor, as Executive Commissioner of the Texas Health and Human Services Commission ("Commissioner Traylor") has appeared and answered.

12.     Defendant Texas Health and Human Services Commission ("HHSC") is an agency of the State of Texas, and has appeared and answered.

### III.  JURISDICTION AND VENUE

13.     Jurisdiction and venue are appropriate in this Court under TEX. CIV. PRAC. & REM. CODE §37.002(b) and TEX. GOV'T CODE §2001.038(b).

### IV.  FACTUAL BACKGROUND

14.     Medicaid is a health insurance program, jointly operated and funded by the federal and state governments, for the medical care of low-income and other eligible persons. While federal law establishes Medicaid's basic parameters, each state, including Texas, decides the types and ranges of services, payment levels for services, and administrative services it will provide. Specifically, each state, including Texas, prepares a written plan ("State Plan") describing the nature and scope of its Medicaid program. Once the State Plan is approved by the U.S. Secretary of Health and Human Services, the state is responsible for operating the program to conform to that plan.

15.     Although recently described by the governor of Texas as "riddled with operational, managerial, structural and procedural problems," HHSC is the agency responsible for the Texas Medicaid program. HHSC arranges for the delivery of most Medicaid services

4

through contracts with managed care organizations ("MCOs") licensed by the Texas Department of Insurance. MCOs contract directly with doctors and other health care providers to create provider networks for Medicaid beneficiaries. HHSC pays each MCO a monthly amount to coordinate and deliver health services for the Medicaid members enrolled in the MCO's health plan. The MCOs are required to provide to their members all medically necessary services mandated by the Texas State Plan, including pediatric occupational, speech, and physical therapy services ("Pediatric Services").

16. Diana D. is the mother and next friend of a child currently receiving Pediatric Services from Care Options for Kids. KD, her nine year old daughter, suffers from Rett syndrome, delayed development, and a seizure disorder. KD is nonverbal, non-ambulatory, suffers from swallowing seizures, and has difficulty using her hands and feet. Due to her condition, KD is unable to receive therapy outside her home. Because Diana D. is unable to afford the rates of a commercial provider, the Texas Medicaid program is the only source of the Pediatric Services her daughter requires.

17. Karen G. is the mother and next friend of two children currently receiving Pediatric Services from Care Options for Kids. TG, her fifteen year old son, was born with a brain injury and suffers from autism and speech developmental delay. ZM, her thirteen year old son, suffers from multiple issues, including seizure disorder, mesial temporal sclerosis disorder, and autism. Due to their conditions, TG and ZM are unable to receive therapy outside their home. Because Karen G. is unable to afford the rates of a commercial provider, the Texas Medicaid program is the only source of the Pediatric Services her sons require.

18. Guadalupe P. is the mother and next friend of a child currently receiving Pediatric Services from Care Options for Kids. LP, her two year old daughter, is diagnosed with Williams

5

syndrome and subglottic stenosis, and as a result, has developmental delays, aortic stenosis, and a heart murmur. Due to these conditions, LP is unable to receive therapy outside her home. Because Guadalupe P. is unable to afford the rates of a commercial provider, the Texas Medicaid program is the only source of the Pediatric Services her daughter requires.

19. Sally L. is the mother and next friend of a child currently receiving Pediatric Services from Care Options for Kids. CH, her four year old son, is diagnosed with moderate autism and, as a result, has challenges with speech, applied behavior, outbursts, transitions, and following directions. Due to these conditions, CH is unable to receive therapy outside his home. Because Sally L. is unable to afford the rates of a commercial provider, the Texas Medicaid program is the only source of the Pediatric Services her son requires.

20. Dena D. is the mother and next friend of a child currently receiving Pediatric Services. BD, her eight year old daughter, is diagnosed with Cerebral Palsy and post-traumatic epilepsy. Due to these conditions, BD is unable to receive therapy outside her home. Because Dena D. is unable to afford the rates of a commercial provider, the Texas Medicaid program is the only source of the Pediatric Services her daughter requires.

21. Care Options for Kids is a duly-licensed Texas pediatric home health agency that provides Pediatric Services to Texas children from birth through twenty-one years of age in the children's homes. It is the largest pediatric home health organization in the state of Texas; of all children who receive therapy services in a home environment, approximately nine percent of them receive their services from Care Options for Kids. COFK has over 400 employees, and all of its revenues are generated from services provided to children under the Medicaid program.

6

341

22. Atlas and Pathfinder are also duly-licensed Texas pediatric home health agencies providing Pediatric Services to Texas children. Pathfinder is a family-owned business. Atlas is a small business under the definition in Tex. Govt. Code 2006.001.

23. Provider Plaintiffs deliver a wide range of critical services to the children served by the Texas Medicaid program, including required Pediatric Services. The Provider Plaintiffs' pediatric physical therapists assist children with mild to severe defects in gross motor skills, specializing in the treatment and management of a variety of congenital, developmental, neuromuscular, skeletal, and acquired disorders and diseases. The therapists' goals are to promote overall wellness and independence for the children and their families. The Provider Plaintiffs' speech language pathologists focus on helping their patients with language development, articulation skills, and oral/motor feeding challenges, working to remediate communication disorders that interfere with or impede the child's effective communication. The goals of those professionals are to increase the child's communication skills to an age-appropriate or functional ability level. The Provider Plaintiffs' pediatric occupational therapists are trained to assist children with their individual physical and development issues, and work with the children to teach them how to perform daily activities, interact socially, and become functional and independent adults.

24. Defendants have promulgated new proposed reimbursement rates to be implemented October 1, 2015 for physical, occupational, and speech therapy services, including Pediatric Services, under the Texas Medicaid program ("the Rates"). A copy of the Rates is attached as *Exhibit A.* The Rates, which are the third set of rates that Defendants have promulgated in less than sixty days, will impose severe cuts to the current Medicaid reimbursement rates for speech, occupational, and physical therapy services. If the Rates are

7

allowed to take effect, numerous Medicaid providers, including the Provider Plaintiffs, will be unable to continue providing Medicaid services. Many providers will be forced to cease operations entirely. The forced closure of multiple Medicaid providers, particularly those providing services to children, will make it impossible for Texas to comply with state-mandated access standards. Such closures will deny needed services to children, including KD, TG, ZM, LP, CH, and BD, who are now served by the Texas Medicaid program. Accordingly, the Rates, if implemented, will cause imminent and irreparable harm to the children of Texas, the most vulnerable of Medicaid beneficiaries.

25.     Defendants have promulgated the Rates without complying with, and in direct violation of, multiple Texas statutes and regulations. First, Defendants have promulgated the Rates in violation of 1 TAC §§355.8021, 355.8441, and 355.8085. Second, Defendants have promulgated the Rates without conducting the economic impact analysis or regulatory flexibility analysis required by TEX. GOV'T CODE §2006.002. Third, Defendants have not prepared the local employment impact statement required by TEX. GOV'T CODE §2001.022(a). Fourth, Defendants have not published the notice required by 1 TAC §355.201(e) and (f). In addition, Defendants have not complied with TEX. GOV'T CODE §2001.023(a), which requires that a state agency promulgating a new rule must provide information about the costs and benefits of the new rule, as well as all other statements required by law.

26.     Defendants' actions also violate their statutory duty to maximize the Medicaid finance system. TEX. GOV'T CODE §531.02113 requires Defendants to maximize the Medicaid finance system by, among other things: a) creating incentives for providers to use preventive care; b) increasing and retaining providers to maintain an adequate provider network; c) encouraging the improvement of the quality of care; and d) insuring that the system accurately

8

reflects the costs borne by the providers. If implemented, the Rates will have exactly the opposite impact on the Texas Medicaid system because they will create disincentives for preventive care, dramatically decrease the number of providers, impair the quality of care, and fail to accurately reflect the costs borne by the providers. If allowed to go into effect, the promulgated Rates, or other Pediatric Services rates implemented in violation of applicable law, will cause immediate and irreparable damage to each of the Plaintiffs, other children receiving Pediatric Services under the Texas Medicaid program, and other Texas Medicaid providers.

27.     Defendants' actions additionally deny KD, TG, ZM, LP, CH, BD, and other Texas Medicaid beneficiaries the access to providers and services required by applicable Texas statutes and regulations.   HHSC's regulations require that each MCO must "ensure the reasonable availability of specialists for all covered services requiring specialty care." 1 TAC §353.411(a)(5). Furthermore, each contract between an MCO and the state must provide for a "sufficient number of…specialty pediatric providers of home and community-based services" and provide that "health care services will be accessible to recipients through the [MCO's] provider network to a comparable extent that health care services would be available to recipients under a fee-for-service or primary care case management model of Medicaid managed care." TEX. GOV'T CODE §533.005(a)(21). The Rates will eliminate the sole provider of Medicaid Pediatric Services available to KD, TG, ZM, LP, CH, and BD, as well as numerous other Medicaid providers, thus denying those children and thousands of other children access to critical Medicaid services mandated by state law. Accordingly, the proposed Rates will prevent the access to services and providers required by Texas law.

28.     Finally, Defendants' efforts to implement the Rates violate the due course of law provision of the Texas Constitution Art. I, §19. If implemented, the Rates will deprive KD, TG,

9

344

ZM, LP, CH, and BD of mandated and necessary services and destroy the economic viability of the Provider Plaintiffs. The Rates are arbitrary, capricious, and not based on fact. The Rates cannot arguably be rationally related to a legitimate governmental interest. When considered as a whole, the actual, real-world effect of the Rates as applied to Plaintiffs cannot arguably be rationally related to a government interest. Finally, the Rates are so burdensome as to be oppressive in light of any governmental interest. The Rates therefore deny Plaintiffs, citizens of Texas, the right not to be deprived "of life, liberty, property, privileges or immunities…except by the due course of the law of the land." Tex. Const. art. I, §19.

## V. CLAIMS AGAINST DEFENDANTS

A.      Declaratory Relief

29.     Plaintiffs reallege and incorporate herein by reference paragraphs 1–28 above.

30.     Plaintiffs' legal rights, status, and legal relations are affected by the Rates and Defendants' actions in promulgating the Rates. Pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code, Plaintiffs seek a judgment declaring that the Rates are invalid, void, and of no force or effect because (1) Defendants have promulgated the Rates in violation of applicable Texas law, (2) Commissioner Traylor's actions in promulgating the rates are *ultra vires*, and (3) the Rates violate the due course of law provision of the Texas Constitution.

31.     In addition, the Rates and their threatened application interfere with or impair, or threaten to interfere with or impair, Plaintiffs' legal rights or privileges. Plaintiffs therefore seek a declaratory judgment pursuant to TEX. GOV'T CODE §2001.038 declaring that the Rates are invalid, void, and of no force or effect because (1) Defendants have promulgated the Rates in violation of applicable Texas law, (2) Commissioner Traylor's actions in promulgating the Rates

10

<span style="color:blue">345</span>

are *ultra vires*, and (3) the Rates violate the due course of law provision of the Texas Constitution.

32. Plaintiffs request that the Court award them their reasonable and necessary attorneys' fees and costs incurred herein as allowed by TEX. CIV. PRAC. & REM. CODE §37.009 and other applicable law.

B. Request for Temporary and Permanent Injunctive Relief

33. Plaintiffs reallege and incorporate herein by reference paragraphs 1-32 above.

34. As set forth above, the actions of Commissioner Traylor are *ultra vires* in that his actions taken in promulgating the Rates are outside his statutory and legal authority, and HHSC's actions are in violation of applicable Texas law. Because Defendants have acted and are acting without legal authority, this Court can and must enjoin Commissioner Traylor and HHSC from taking any further actions to implement the Rates. Plaintiffs believe, moreover, that Defendants, if they are prevented from implementing the Rates, intend to implement new reimbursement rates for Pediatric Services and other physical, occupational, and speech therapy services under the Texas Medicaid program without complying with the requirements of applicable statutes and regulations, including without limitation, TEX. GOV'T CODE §§ 531.02113, 533.005(a)(21), 2001.022(a), 2001.023(a), and 2006.002, and 1 TAC §§ 353.411(a)(5), 355.201(e), (f), 355.8021, 355.8085, and 355.8441.

35. Plaintiffs will suffer imminent, irreparable harm without court intervention and have no adequate remedy at law if Defendants are not immediately enjoined from (1) taking any action to implement the Rates and (2) taking any action to implement any other new reimbursement rates for physical, occupational, or speech therapy services under the Texas Medicaid program without complying with the requirements of applicable Texas statutes and

11

346

regulations, including without limitation TEX. GOV'T CODE §§ 531.02113, 533.005(a)(21), 2001.022(a), 2001.023(a), and 2006.002, and 1 TAC §§ 353.411(a)(5), 355.201(e), (f), 355.8021, 355.8085, and 355.8441.

36. If not so enjoined, Commissioner Traylor will continue to take actions outside his legal authority, and HHSC will continue to take actions in violation of applicable Texas law. If Defendants are not enjoined as requested, KD, TG, ZM, LP, CH, BD, and thousands of other Texas children receiving Pediatric Services under the Texas Medicaid program will be deprived of those critical services. Defendants' actions will cause multiple Texas Medicaid providers to go out of business and/or stop providing Medicaid services. Those actions will, in addition, create disincentives for Medicaid providers to use preventive care, decrease the quality of care provided to Medicaid recipients in Texas, and prevent Texas Medicaid beneficiaries from receiving critical services. If allowed to go into effect, the Rates, or other reimbursement rates for physical, occupational, or speech therapy services under the Texas Medicaid program implemented without complying with Texas law, will cause immediate and irreparable damage to each of the Plaintiffs, other children receiving Pediatric Services under the Texas Medicaid program, and other Texas Medicaid providers.

37. Plaintiffs are willing to post the necessary reasonable bond to facilitate the injunctive relief requested. Plaintiffs believe that a bond in a nominal amount would be appropriate.

38. The only adequate, effective and complete relief for Plaintiffs is for the Court to grant injunctive relief immediately restraining and prohibiting Commissioner Traylor and HHSC and their agents, servants, employees, independent contractors, attorneys, representatives, and those persons or entities in active concert or participation with them from (1) taking any action to

12

implement the Rates and (2) taking any action to implement any other reimbursement rates for physical, occupational, and speech therapy services under the Texas Medicaid program without complying with the requirements of applicable statutes and regulations, including without limitation TEX. GOV'T CODE §§ 531.02113, 533.005(a)(21), 2001.022(a), 2001.023(a), and 2006.002, and 1 TAC §§ 353.411(a)(5), 355.201(e), (f), 355.8021, 355.8085, and 355.8441 (the "Injunctive Relief).

39. Pursuant to Texas Rules of Civil Procedure 680 *et. seq.*, and Texas Civil Practice and Remedies Code §65.001 *et. seq.*, and in order to preserve the *status quo* during the pendency of this action, Plaintiffs request (1) a temporary restraining order granting the requested Injunctive Relief, (2) alternatively, a temporary injunction hearing and an order requiring Defendants to appear at such hearing and show cause why a temporary injunction should not be issued, (3) upon hearing, a temporary injunction granting the requested Injunctive Relief, and (4) upon final hearing, a permanent injunction granting the requested Injunctive Relief.

40. Plaintiffs are willing to post the necessary reasonable bond to facilitate the injunctive relief requested. Plaintiffs believe that a bond in a nominal amount would be appropriate.

41. Plaintiffs incorporate herein by reference the affidavits of Diana D., Karen G., Guadalupe P., and Sally L. attached as Exhibits B through E, respectively to *Plaintiffs' Original Petition and Application for Injunctive Relief* previously filed herein,[1] and the affidavits of Michael Reiswig on behalf of Care Options for Kids, Joshua Adams on behalf of Atlas, and J.

---

[1] To protect the privacy of the children named as Plaintiffs, the original affidavits of their next friends attached to such petition and filed in the records of the Court were redacted to eliminate identifying information, such as the next friends' last names and addresses. Non-redacted copies of such affidavits are available and will be provided to the Court and Defendants if deemed appropriate by the Court.

13

Adam Wilcox on behalf of Pathfinder, attached as Exhibits A-1 through A-3, respectively, to this Petition.

## VI. CONCLUSION & PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that they be granted:

(a)     the declaratory relief as set forth above;

(b)     the injunctive relief as set forth above;

(c)     their reasonable and necessary attorneys' fees and expenses; and

(d)     all other relief to which they may be justly entitled.

Respectfully submitted,

**RICHARDS RODRIGUEZ & SKEITH**
816 Congress Avenue, Suite 1200
Austin, Texas 78701
Telephone: 512-476-0005
Facsimile:  512-476-1513

By: _____
DANIEL R. RICHARDS
State Bar No. 00791520
drichards@rrsfirm.com
BENJAMIN H. HATHAWAY
State Bar No. 09224500
bhathaway@rrsfirm.com
CLARK RICHARDS
State Bar No. 90001613
crichards@rrsfirm.com
CHASE C. HAMILTON
State Bar No. 24059881
chamilton@rrsfirm.com

**ATTORNEYS FOR PLAINTIFFS**

14

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been delivered to the following counsel of records on this, the 8th day of September 2015 by fax and e-mail:

Eugene A. Clayborn
Andrew Lutostanski
Assistant Attorney General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Facsimile: (512) 457-4614

Benjamin H. Hathaway

15

350

C

351

# TEXAS HEALTH AND HUMAN SERVICES COMMISSION
# RATE ANALYSIS DEPARTMENT

# Notice of Proposed Adjustments to Fees, Rates or Charges for Physical, Occupational, and Speech Therapy provided by Comprehensive Outpatient Rehabilitation Facilities/Outpatient Rehabilitation Facilities (CORF/ORF), Home Health Agencies (HHA), and Independent Therapists

# Adjustments are proposed to be effective
# October 1, 2015

351

## SUMMARY OF PROPOSED ADJUSTMENTS

### To Be Effective October 1, 2015

352

Included in this document is information relating to the proposed adjustments to Medicaid payment rates for Physical, Occupational, and Speech Therapy provided by Comprehensive Outpatient Rehabilitation Facilities/Outpatient Rehabilitation Facilities (CORF/ORF), Home Health Agencies (HHA), and Independent Therapists. The rates are proposed to be effective October 1, 2015.

### Hearing

The Health and Human Services Commission (HHSC) will conduct a public hearing to receive comments regarding the proposed adjustments to Medicaid rates detailed in this document on September 18, 2015, at 9:00 a.m. in the Public Hearing Room of the John H. Winters Building at 701 West 51st Street, Austin, Texas. Entry is through security at the main entrance of the building facing West 51st Street. HHSC will consider concerns expressed at the hearing prior to final rate approval. This public hearing is held in compliance with the provisions of Human Resources Code §32.0282 and the Texas Administrative Code, Title 1 (1 TAC), §355.201, which require a public hearing on proposed payment rate adjustments. Should you have any questions regarding the information in this document, please contact:

Megan Wolfe, Rate Analysis for Acute Care Services
Texas Health and Human Services Commission
(512) 730-7456; FAX: (512) 730-7475
E-mail: megan.wolfe@hhsc.state.tx.us

### Background

HHSC is responsible for the reimbursement determination functions for the Texas Medicaid Program. The proposed rate adjustments presented in this document are based on direction provided by the 2016-2017 General Appropriations Act, 84th Legislature, Regular Session, Article II, Rider 50, at pages II-96 through II-98 (Health and Human Services Section, Health and Human Services Commission).

### Methodology

The specific administrative rules that govern the establishment of the fees in this proposal include these rules in 1 TAC:

- §355.201(d)(1)(A) and (D), which authorize HHSC to adjust rates for medical assistance if state law is enacted requiring a rate reduction or restricting the availability of appropriated funds.

- §355.8021, which addresses the reimbursement methodology for home health services and durable medical equipment, prosthetics, orthotics, and supplies;

- §355.8085, which addresses the reimbursement methodology for physicians and other practitioners;

- §355.8441, which addresses the reimbursement methodology for Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) services (known in Texas as Texas Health Steps).

## Proposed Rate Adjustments

As indicated above, the proposed rate adjustments are based on direction provided by the 2016-2017 General Appropriations Act, 84th Legislature, Regular Session, Article II, Rider 50, at pages II-96 through II-98.

Proposed rate adjustments were calculated based on an analysis of Medicaid fees paid by other states and previous Texas Medicaid payments for Medicaid-reimbursable therapy services. Where current Texas Medicaid rates exceed 150 percent of the median of other states' rates for the same service, a percentage reduction is applied. An alternative percentage reduction is applied to Texas Medicaid rates that do not exceed 150 percent of the median of other states' rates for the same service and in cases where information on other states' rates is not available.

Specific proposed payment rate adjustments are listed in the attachments outlined below:

Att 1 – CORFORF Therapies
Att 2 – HHA Therapies
Att 3 – Independent Therapists

## Written Comments

Written comments regarding the proposed payment rate adjustments may be submitted in lieu of, or in addition to, oral testimony until 5 p.m. the day of the hearing. Written comments may be sent by U.S. mail to the Texas Health and Human Services Commission, Attention: Rate Analysis, Mail Code H-400, P.O. Box 149030, Austin, Texas 78714-9030; by fax to Rate Analysis at (512) 730-7475; or by e-mail to RADAcuteCare@hhsc.state.tx.us. In addition, written comments may be sent by overnight mail or hand delivered to Texas Health and Human Services Commission, Attention: Rate Analysis, Mail Code H-400, Brown-Heatly Building, 4900 North Lamar, Austin, Texas 78751.

Persons with disabilities who wish to attend the hearing and require auxiliary aids or services should contact Rate Analysis at (512) 730-7401 at least 72 hours in advance,

354

so appropriate arrangements can be made.

354

**ATTACHMENT 1 - COMPREHENSIVE OUTPATIENT REHABILITATION FACILITY/OUTPATIENT REHABILITATION FACILITY (CORF/ORF) (proposed to be effective October 1, 2015)**

| TOS* | Procedure Code | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|
| | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 92507 | ** | 0-20 | $39.78 | $39.78 | $28.67 | $28.67 |
| 1 | 92507 | ** | 21-999 | $39.78 | $39.78 | $28.67 | $28.67 |
| 1 | 92508 | ** | 0-20 | $19.90 | $19.90 | $14.93 | $14.93 |
| 1 | 92508 | ** | 21-999 | $19.90 | $19.90 | $14.93 | $14.93 |
| 1 | 92521 | ** | 0-20 | $140.62 | $140.62 | $105.47 | $105.47 |
| 1 | 92521 | ** | 21-999 | $140.62 | $140.62 | $105.47 | $105.47 |
| 1 | 92522 | ** | 0-20 | $175.77 | $175.77 | $131.83 | $131.83 |
| 1 | 92522 | ** | 21-999 | $175.77 | $175.77 | $131.83 | $131.83 |
| 1 | 92523 | ** | 0-20 | $234.36 | $234.36 | $175.77 | $175.77 |
| 1 | 92523 | ** | 21-999 | $234.36 | $234.36 | $175.77 | $175.77 |
| 1 | 92524 | ** | 0-20 | $117.18 | $117.18 | $87.89 | $87.89 |
| 1 | 92524 | ** | 21-999 | $117.18 | $117.18 | $87.89 | $87.89 |
| 1 | 92526 | ** | 0-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 92610 | ** | 0-999 | $234.36 | $234.36 | $226.27 | $226.27 |
| 1 | 97001 | ** | 0-20 | $167.40 | $167.40 | $125.55 | $125.55 |
| 1 | 97001 | ** | 21-999 | $167.40 | $167.40 | $125.55 | $125.55 |
| 1 | 97002 | ** | 0-20 | $150.66 | $150.66 | $113.00 | $113.00 |
| 1 | 97002 | ** | 21-999 | $150.66 | $150.66 | $113.00 | $113.00 |
| 1 | 97003 | ** | 0-20 | $167.40 | $167.40 | $125.55 | $125.55 |
| 1 | 97003 | ** | 21-999 | $167.40 | $167.40 | $125.55 | $125.55 |
| 1 | 97004 | ** | 0-20 | $150.66 | $150.66 | $113.00 | $113.00 |
| 1 | 97004 | ** | 21-999 | $150.66 | $150.66 | $113.00 | $113.00 |
| 1 | 97012 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97012 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97014 | ** | 0-20 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97014 | ** | 21-999 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97016 | ** | 0-20 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97016 | ** | 21-999 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97018 | ** | 0-20 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97018 | ** | 21-999 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97022 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97022 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97024 | ** | 0-20 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97024 | ** | 21-999 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97026 | ** | 0-20 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97026 | ** | 21-999 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97028 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97028 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97032 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97032 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97033 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97033 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97034 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97034 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97035 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |

## to Plaintiffs' Second Amended Original Petition and Application for Injunctive Relief

**ATTACHMENT 1 - COMPREHENSIVE OUTPATIENT REHABILITATION FACILITY/OUTPATIENT REHABILITATION FACILITY (CORF/ORF) (proposed to be effective October 1, 2015)**

| TOS* | Procedure Code | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|
| | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97035 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97036 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97036 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97039 | ** | 0-20 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97039 | ** | 21-999 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97110 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97110 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97112 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97112 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97113 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97113 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97116 | ** | 0-20 | $39.78 | $39.78 | $30.08 | $30.08 |
| 1 | 97116 | ** | 21-999 | $39.78 | $39.78 | $30.08 | $30.08 |
| 1 | 97124 | ** | 0-20 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97124 | ** | 21-999 | $39.78 | $39.78 | $29.84 | $29.84 |
| 1 | 97139 | ** | 0-20 | $39.78 | $39.78 | $39.00 | $39.00 |
| 1 | 97139 | ** | 21-999 | $39.78 | $39.78 | $39.00 | $39.00 |
| 1 | 97140 | ** | 0-20 | $39.78 | $39.78 | $30.84 | $30.84 |
| 1 | 97140 | ** | 21-999 | $39.78 | $39.78 | $30.84 | $30.84 |
| 1 | 97150 | ** | 0-20 | $19.90 | $19.90 | $19.21 | $19.21 |
| 1 | 97150 | ** | 21-999 | $19.90 | $19.90 | $19.21 | $19.21 |
| 1 | 97530 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97530 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97535 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97537 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97542 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97750 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97750 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97760 | ** | 0-20 | $39.78 | $39.78 | $38.87 | $38.87 |
| 1 | 97761 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97762 | ** | 0-20 | $40.36 | $40.36 | $35.09 | $35.09 |
| 1 | 97799 | ** | 0-20 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | 97799 | ** | 21-999 | $39.78 | $39.78 | $38.41 | $38.41 |
| 1 | S8990 | Physical or manipulative therapy performed for maintenance rather than restoration | 0-999 | $52.33 | $52.33 | $39.00 | $39.00 |
| 1 | S9152 | Speech therapy, re-evaluation | 0-999 | $210.92 | $210.92 | $203.64 | $203.64 |

| *Type of Service (TOS) | |
|---|---|
| 1 | Medical Services |

**Required Notice: The five-character code included in this notice is obtained from the Current Procedural Terminology (CPT®),

Exhibit A
to Plaintiffs' Second Amended Original Petition and Application for Injunctive Relief

**ATTACHMENT 1 - COMPREHENSIVE OUTPATIENT REHABILITATION FACILITY/OUTPATIENT REHABILITATION FACILITY (CORF/ORF) (proposed to be effective October 1, 2015)**

| TOS* | Procedure Code | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|------|----------------|---------------------|-----------|---------|---|----------|---|
| | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |

copyright 2015 by the American Medical Association (AMA). CPT is developed by the AMA as a listing of descriptive terms and five character identifying codes and modifiers for reporting medical services and procedures performed by physicians. The responsibility for the content of this notice is with HHSC and no endorsement by the AMA is intended or should be implied. The AMA disclaims responsibility for any consequences or liability attributable or related to any use, nonuse or interpretation of information contained in this notice. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained.

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 92507 | | | ** | 0-20 | $135.14 | $135.14 | $100.34 | $100.34 |
| 1 | 92507 | | | ** | 21-999 | $115.46 | $115.46 | $100.34 | $100.34 |
| 1 | 92508 | | | ** | 0-20 | $67.57 | $67.57 | $50.68 | $50.68 |
| 1 | 92508 | | | ** | 21-999 | $67.57 | $67.57 | $50.68 | $50.68 |
| 1 | 92521 | | | ** | 0-20 | $120.00 | $120.00 | $90.00 | $90.00 |
| 1 | 92521 | | | ** | 21-999 | $70.33 | $70.33 | $67.90 | $67.90 |
| 1 | 92522 | | | ** | 0-20 | $150.00 | $150.00 | $112.50 | $112.50 |
| 1 | 92522 | | | ** | 21-999 | $87.92 | $87.92 | $84.89 | $84.89 |
| 1 | 92523 | | | ** | 0-20 | $200.00 | $200.00 | $150.00 | $150.00 |
| 1 | 92523 | | | ** | 21-999 | $117.22 | $117.22 | $113.18 | $113.18 |
| 1 | 92524 | | | ** | 0-20 | $100.00 | $100.00 | $75.00 | $75.00 |
| 1 | 92524 | | | ** | 21-999 | $58.61 | $58.61 | $56.59 | $56.59 |
| 1 | 92526 | | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 92526 | | | ** | 21-999 | $115.46 | $115.46 | $111.48 | $111.48 |
| 1 | 92610 | | | ** | 0-20 | $200.00 | $200.00 | $193.10 | $193.10 |
| 1 | 92610 | | | ** | 21-999 | $117.22 | $117.22 | $113.18 | $113.18 |
| 1 | 97001 | | | ** | 0-20 | $137.20 | $137.20 | $102.90 | $102.90 |
| 1 | 97001 | | | ** | 21-999 | $114.03 | $114.03 | $85.52 | $85.52 |
| 1 | 97001 | AT | | ** | 0-20 | $114.03 | $114.03 | $85.52 | $85.52 |
| 1 | 97001 | AT | | ** | 21-999 | $114.03 | $114.03 | $85.52 | $85.52 |
| C | 97001 | | | ** | 0-20 | $114.03 | $114.03 | $85.52 | $85.52 |
| C | 97001 | | | ** | 21-999 | $114.03 | $114.03 | $85.52 | $85.52 |
| 1 | 97002 | | | ** | 0-20 | $123.48 | $123.48 | $92.61 | $92.61 |
| 1 | 97002 | | | ** | 21-999 | $102.63 | $102.63 | $76.97 | $76.97 |
| 1 | 97002 | AT | | ** | 0-20 | $102.63 | $102.63 | $76.97 | $76.97 |
| 1 | 97002 | AT | | ** | 21-999 | $102.63 | $102.63 | $76.97 | $76.97 |
| C | 97002 | | | ** | 0-20 | $102.63 | $102.63 | $76.97 | $76.97 |
| C | 97002 | | | ** | 21-999 | $102.63 | $102.63 | $76.97 | $76.97 |
| 1 | 97003 | | | ** | 0-20 | $137.20 | $137.20 | $102.90 | $102.90 |
| 1 | 97003 | | | ** | 21-999 | $116.25 | $116.25 | $89.21 | $89.21 |
| 1 | 97003 | AT | | ** | 0-20 | $116.25 | $116.25 | $89.21 | $89.21 |
| 1 | 97003 | AT | | ** | 21-999 | $116.25 | $116.25 | $89.21 | $89.21 |
| C | 97003 | | | ** | 0-20 | $116.25 | $116.25 | $89.21 | $89.21 |
| C | 97003 | | | ** | 21-999 | $116.25 | $116.25 | $89.21 | $89.21 |
| 1 | 97004 | | | ** | 0-20 | $123.48 | $123.48 | $92.61 | $92.61 |
| 1 | 97004 | | | ** | 21-999 | $104.63 | $104.63 | $78.47 | $78.47 |
| 1 | 97004 | AT | | ** | 0-20 | $104.63 | $104.63 | $78.47 | $78.47 |
| 1 | 97004 | AT | | ** | 21-999 | $104.63 | $104.63 | $78.47 | $78.47 |
| C | 97004 | | | ** | 0-20 | $104.63 | $104.63 | $78.47 | $78.47 |
| C | 97004 | | | ** | 21-999 | $104.63 | $104.63 | $78.47 | $78.47 |
| 1 | 97012 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97012 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97012 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97012 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97012 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97012 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97012 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97012 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97012 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97012 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97012 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97012 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97012 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97012 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97012 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97012 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97012 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97014 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97014 | AT | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97014 | AT | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97014 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97014 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97014 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97014 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97014 | GO | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97014 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97014 | GP | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97014 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97014 | | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| C | 97014 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| C | 97014 | GO | | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97014 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97014 | GP | | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97014 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97016 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97016 | AT | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97016 | AT | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97016 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97016 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97016 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97016 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97016 | GO | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97016 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97016 | GP | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97016 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97016 | | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| C | 97016 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| C | 97016 | GO | | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97016 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97016 | GP | | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97016 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97018 | | | ** | 21-999 | $113.05 | $113.05 | $91.08 | $91.08 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97018 | AT | | ** | 0-20 | $113.05 | $113.05 | $91.08 | $91.08 |
| 1 | 97018 | AT | | ** | 21-999 | $113.05 | $113.05 | $91.08 | $91.08 |
| 1 | 97018 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $91.08 | $91.08 |
| 1 | 97018 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $91.08 | $91.08 |
| 1 | 97018 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $91.08 | $91.08 |
| 1 | 97018 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $91.08 | $91.08 |
| 1 | 97018 | GO | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97018 | GO | | ** | 21-999 | $114.51 | $114.51 | $91.08 | $91.08 |
| 1 | 97018 | GP | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97018 | GP | | ** | 21-999 | $112.32 | $112.32 | $91.08 | $91.08 |
| C | 97018 | | | ** | 0-20 | $113.05 | $113.05 | $91.08 | $91.08 |
| C | 97018 | | | ** | 21-999 | $113.05 | $113.05 | $91.08 | $91.08 |
| C | 97018 | GO | | ** | 0-20 | $114.51 | $114.51 | $91.08 | $91.08 |
| C | 97018 | GO | | ** | 21-999 | $114.51 | $114.51 | $91.08 | $91.08 |
| C | 97018 | GP | | ** | 0-20 | $112.32 | $112.32 | $91.08 | $91.08 |
| C | 97018 | GP | | ** | 21-999 | $112.32 | $112.32 | $91.08 | $91.08 |
| 1 | 97022 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97022 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97022 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97022 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97022 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97022 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97022 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97022 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97022 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97022 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97022 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97022 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97022 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97022 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97022 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97022 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97022 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97024 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97024 | AT | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97024 | AT | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97024 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97024 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97024 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97024 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97024 | GO | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97024 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97024 | GP | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97024 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97024 | | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| C | 97024 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| C | 97024 | GO | | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97024 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97024 | GP | | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97024 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97026 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97026 | AT | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97026 | AT | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97026 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97026 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97026 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97026 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97026 | GO | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97026 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97026 | GP | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97026 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97026 | | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| C | 97026 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| C | 97026 | GO | | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97026 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97026 | GP | | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97026 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97028 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97028 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97028 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97028 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97028 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97028 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97028 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97028 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97028 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97028 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97028 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97028 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97028 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97028 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97028 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97028 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97028 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97032 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97032 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97032 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97032 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97032 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97032 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97032 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97032 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97032 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97032 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97032 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97032 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97032 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97032 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97032 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97032 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97032 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97033 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97033 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97033 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97033 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97033 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97033 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97033 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97033 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97033 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97033 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97033 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97033 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97033 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97033 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97033 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97033 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97033 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97034 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97034 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97034 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97034 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97035 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97035 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97035 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97035 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97035 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97035 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97035 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97035 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97035 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97035 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97035 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97035 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97035 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97035 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97035 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97035 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| C | 97035 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97036 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97036 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97036 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97036 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97039 | | | ** | 21-999 | $112.32 | $112.32 | $90.00 | $90.00 |
| 1 | 97039 | AT | | ** | 0-20 | $112.32 | $112.32 | $90.00 | $90.00 |
| 1 | 97039 | AT | | ** | 21-999 | $112.32 | $112.32 | $90.00 | $90.00 |
| 1 | 97039 | GO | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97039 | GP | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| C | 97039 | | | ** | 0-20 | $112.32 | $112.32 | $90.00 | $90.00 |
| C | 97039 | | | ** | 21-999 | $112.32 | $112.32 | $90.00 | $90.00 |
| 1 | 97110 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97110 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97110 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97110 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97110 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97110 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97110 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97110 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97110 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97110 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97110 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97110 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97110 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97110 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97110 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97110 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97110 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97112 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97112 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97112 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97112 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97112 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97112 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97112 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97112 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97112 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97112 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97112 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97112 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97112 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97112 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97112 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97112 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97112 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97116 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97116 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97116 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97116 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97116 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97116 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97116 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97116 | GO | | ** | 0-20 | $135.14 | $135.14 | $120.30 | $120.30 |
| 1 | 97116 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97116 | GP | | ** | 0-20 | $135.14 | $135.14 | $120.30 | $120.30 |
| 1 | 97116 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97116 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97116 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97116 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97116 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97116 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97116 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97124 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97124 | AT | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97124 | AT | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| 1 | 97124 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97124 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97124 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97124 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97124 | GO | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97124 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| 1 | 97124 | GP | | ** | 0-20 | $135.14 | $135.14 | $101.36 | $101.36 |
| 1 | 97124 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97124 | | | ** | 0-20 | $113.05 | $113.05 | $84.79 | $84.79 |
| C | 97124 | | | ** | 21-999 | $113.05 | $113.05 | $84.79 | $84.79 |
| C | 97124 | GO | | ** | 0-20 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97124 | GO | | ** | 21-999 | $114.51 | $114.51 | $85.88 | $85.88 |
| C | 97124 | GP | | ** | 0-20 | $112.32 | $112.32 | $84.24 | $84.24 |
| C | 97124 | GP | | ** | 21-999 | $112.32 | $112.32 | $84.24 | $84.24 |
| 1 | 97139 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97139 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97139 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97139 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97139 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97139 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97139 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97139 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97139 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97139 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97139 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97139 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| C | 97139 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97139 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97139 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97139 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97139 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97140 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97140 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97140 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97140 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97140 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97140 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97140 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97140 | GO | | ** | 0-20 | $135.14 | $135.14 | $123.36 | $123.36 |
| 1 | 97140 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97140 | GP | | ** | 0-20 | $135.14 | $135.14 | $123.36 | $123.36 |
| 1 | 97140 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97140 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97140 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97140 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97140 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97140 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97140 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97150 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97150 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97150 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97150 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97150 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97150 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97150 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97150 | GO | | ** | 0-20 | $67.57 | $67.57 | $65.24 | $65.24 |
| 1 | 97150 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97150 | GP | | ** | 0-20 | $67.57 | $67.57 | $65.24 | $65.24 |
| 1 | 97150 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97150 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97150 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97150 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97150 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97150 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97150 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97530 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97530 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97530 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97530 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97530 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97530 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97530 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97530 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97530 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97530 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97530 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97530 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97530 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97530 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97530 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97530 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97530 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97535 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97535 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97535 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97535 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97535 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97535 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97535 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97535 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97535 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97535 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97535 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97535 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97535 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97535 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97535 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97535 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97535 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97537 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97537 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97537 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97537 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97537 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97537 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97537 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97537 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97537 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97537 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97537 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97537 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97537 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97537 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97537 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97537 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97537 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97542 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97542 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97542 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97542 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97542 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97542 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97542 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97542 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97542 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97542 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97542 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97542 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97542 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97542 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97542 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97542 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97542 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97542 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97750 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97750 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97750 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97750 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97760 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97760 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97761 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97761 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97762 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97762 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97799 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97799 | AT | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97799 | AT | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| 1 | 97799 | AT | GO | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97799 | AT | GO | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97799 | AT | GP | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97799 | AT | GP | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| 1 | 97799 | GO | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97799 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| 1 | 97799 | GP | | ** | 0-20 | $135.14 | $135.14 | $130.48 | $130.48 |
| 1 | 97799 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97799 | | | ** | 0-20 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97799 | | | ** | 21-999 | $113.05 | $113.05 | $109.15 | $109.15 |
| C | 97799 | GO | | ** | 0-20 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97799 | GO | | ** | 21-999 | $114.51 | $114.51 | $110.56 | $110.56 |
| C | 97799 | GP | | ** | 0-20 | $112.32 | $112.32 | $108.44 | $108.44 |
| C | 97799 | GP | | ** | 21-999 | $112.32 | $112.32 | $108.44 | $108.44 |

**ATTACHMENT 2 - HOME HEALTH AGENCY (HHA) (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Modifier 1 | Modifier 2 | Long Description ** | Age Range | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | S8990 | | | Physical or manipulative therapy performed for maintenance rather than restoration | 0-999 | $57.14 | $57.14 | $55.17 | $55.17 |
| 1 | S9152 | | | Speech therapy, re-evaluation | 0-20 | $180.00 | $180.00 | $173.79 | $173.79 |
| 1 | S9152 | | | Speech therapy, re-evaluation | 21-999 | $105.50 | $105.50 | $101.86 | $101.86 |

| *Type of Service (TOS) | |
|---|---|
| 1 | Medical Services |
| C | Home Health Agency |
| **Modifiers** | |
| AT | Acute Treatment |
| GO | Occupational Therapy |
| GP | Physical Therapy |

**Required Notice: The five-character code included in this notice is obtained from the Current Procedural Terminology (CPT®), copyright 2015 by the American Medical Association (AMA). CPT is developed by the AMA as a listing of descriptive terms and five character identifying codes and modifiers for reporting medical services and procedures performed by physicians. The responsibility for the content of this notice is with HHSC and no endorsement by the AMA is intended or should be implied. The AMA disclaims responsibility for any consequences or liability attributable or related to any use, nonuse or interpretation of information contained in this notice. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained.

**ATTACHMENT 3 - INDEPENDENT THERAPIST** (proposed to be effective October 1, 2015)

| TOS * | Procedure Code | Long Description ** | Age Range | Place of Service | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 92507 | ** | 0-20 | | $31.25 | $31.25 | $28.67 | $28.67 |
| 1 | 92507 | ** | 0-20 | P2 | $33.79 | $33.79 | $28.67 | $28.67 |
| 1 | 92507 | ** | 21-999 | | $31.25 | $31.25 | $28.67 | $28.67 |
| 1 | 92507 | ** | 21-999 | P2 | $33.79 | $33.79 | $28.67 | $28.67 |
| 1 | 92508 | ** | 0-20 | | $15.63 | $15.63 | $11.72 | $11.72 |
| 1 | 92508 | ** | 0-20 | P2 | $15.63 | $15.63 | $11.72 | $11.72 |
| 1 | 92508 | ** | 21-999 | | $15.63 | $15.63 | $11.72 | $11.72 |
| 1 | 92508 | ** | 21-999 | P2 | $15.63 | $15.63 | $11.72 | $11.72 |
| 1 | 92521 | ** | 0-20 | | $117.18 | $117.18 | $87.89 | $87.89 |
| 1 | 92521 | ** | 0-20 | P2 | $120.00 | $120.00 | $90.00 | $90.00 |
| 1 | 92521 | ** | 21-999 | | $117.18 | $117.18 | $87.89 | $87.89 |
| 1 | 92521 | ** | 21-999 | P2 | $120.00 | $120.00 | $90.00 | $90.00 |
| 1 | 92522 | ** | 0-20 | | $146.48 | $146.48 | $109.86 | $109.86 |
| 1 | 92522 | ** | 0-20 | P2 | $150.00 | $150.00 | $112.50 | $112.50 |
| 1 | 92522 | ** | 21-999 | | $146.48 | $146.48 | $109.86 | $109.86 |
| 1 | 92522 | ** | 21-999 | P2 | $150.00 | $150.00 | $112.50 | $112.50 |
| 1 | 92523 | ** | 0-20 | | $195.30 | $195.30 | $146.48 | $146.48 |
| 1 | 92523 | ** | 0-20 | P2 | $200.00 | $200.00 | $150.00 | $150.00 |
| 1 | 92523 | ** | 21-999 | | $195.30 | $195.30 | $146.48 | $146.48 |
| 1 | 92523 | ** | 21-999 | P2 | $200.00 | $200.00 | $150.00 | $150.00 |
| 1 | 92524 | ** | 0-20 | | $97.65 | $97.65 | $73.24 | $73.24 |
| 1 | 92524 | ** | 0-20 | P2 | $100.00 | $100.00 | $75.00 | $75.00 |
| 1 | 92524 | ** | 21-999 | | $97.65 | $97.65 | $73.24 | $73.24 |
| 1 | 92524 | ** | 21-999 | P2 | $100.00 | $100.00 | $75.00 | $75.00 |
| 1 | 92526 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 92526 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 92526 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 92526 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 92610 | ** | 0-999 | | $195.30 | $195.30 | $188.56 | $188.56 |
| 1 | 92610 | ** | 0-999 | P2 | $200.00 | $200.00 | $193.10 | $193.10 |
| 1 | 97001 | ** | 0-20 | | $130.20 | $130.20 | $97.65 | $97.65 |
| 1 | 97001 | ** | 0-20 | P2 | $137.20 | $137.20 | $102.90 | $102.90 |
| 1 | 97001 | ** | 21-999 | | $130.20 | $130.20 | $97.65 | $97.65 |
| 1 | 97001 | ** | 21-999 | P2 | $137.20 | $137.20 | $102.90 | $102.90 |
| 1 | 97002 | ** | 0-20 | | $117.18 | $117.18 | $87.89 | $87.89 |
| 1 | 97002 | ** | 0-20 | P2 | $123.48 | $123.48 | $92.61 | $92.61 |
| 1 | 97002 | ** | 21-999 | | $117.18 | $117.18 | $87.89 | $87.89 |
| 1 | 97002 | ** | 21-999 | P2 | $123.48 | $123.48 | $92.61 | $92.61 |
| 1 | 97003 | ** | 0-20 | | $130.20 | $130.20 | $97.65 | $97.65 |
| 1 | 97003 | ** | 0-20 | P2 | $137.20 | $137.20 | $102.90 | $102.90 |
| 1 | 97003 | ** | 21-999 | | $130.20 | $130.20 | $97.65 | $97.65 |
| 1 | 97003 | ** | 21-999 | P2 | $137.20 | $137.20 | $102.90 | $102.90 |
| 1 | 97004 | ** | 0-20 | | $117.18 | $117.18 | $87.89 | $87.89 |
| 1 | 97004 | ** | 0-20 | P2 | $123.48 | $123.48 | $92.61 | $92.61 |

**ATTACHMENT 3 - INDEPENDENT THERAPIST** (proposed to be effective October 1, 2015)

| TOS * | Procedure Code | Long Description ** | Age Range | Place of Service | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97004 | ** | 21-999 | | $117.18 | $117.18 | $87.89 | $87.89 |
| 1 | 97004 | ** | 21-999 | P2 | $123.48 | $123.48 | $92.61 | $92.61 |
| 1 | 97012 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97012 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97012 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97012 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97014 | ** | 0-20 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97014 | ** | 0-20 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97014 | ** | 21-999 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97014 | ** | 21-999 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97016 | ** | 0-20 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97016 | ** | 0-20 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97016 | ** | 21-999 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97016 | ** | 21-999 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97018 | ** | 0-20 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97018 | ** | 0-20 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97018 | ** | 21-999 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97018 | ** | 21-999 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97022 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97022 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97022 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97022 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97024 | ** | 0-20 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97024 | ** | 0-20 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97024 | ** | 21-999 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97024 | ** | 21-999 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97026 | ** | 0-20 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97026 | ** | 0-20 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97026 | ** | 21-999 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97026 | ** | 21-999 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97028 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97028 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97028 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97028 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97032 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97032 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97032 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97032 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97033 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97033 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97033 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97033 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97034 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97034 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |

**ATTACHMENT 3 - INDEPENDENT THERAPIST** (proposed to be effective October 1, 2015)

| TOS * | Procedure Code | Long Description ** | Age Range | Place of Service | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97034 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97034 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97035 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97035 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97035 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97035 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97036 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97036 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97036 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97036 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97039 | ** | 0-20 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97039 | ** | 0-20 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97039 | ** | 21-999 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97039 | ** | 21-999 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97110 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97110 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97110 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97110 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97112 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97112 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97112 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97112 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97113 | ** | 0-20 | | $36.70 | $36.70 | $35.43 | $35.43 |
| 1 | 97113 | ** | 0-20 | P2 | $39.69 | $39.69 | $38.32 | $38.32 |
| 1 | 97113 | ** | 21-999 | | $36.70 | $36.70 | $35.43 | $35.43 |
| 1 | 97113 | ** | 21-999 | P2 | $39.69 | $39.69 | $38.32 | $38.32 |
| 1 | 97116 | ** | 0-20 | | $31.25 | $31.25 | $30.08 | $30.08 |
| 1 | 97116 | ** | 0-20 | P2 | $33.79 | $33.79 | $30.08 | $30.08 |
| 1 | 97116 | ** | 21-999 | | $31.25 | $31.25 | $30.08 | $30.08 |
| 1 | 97116 | ** | 21-999 | P2 | $33.79 | $33.79 | $30.08 | $30.08 |
| 1 | 97124 | ** | 0-20 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97124 | ** | 0-20 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97124 | ** | 21-999 | | $31.25 | $31.25 | $23.44 | $23.44 |
| 1 | 97124 | ** | 21-999 | P2 | $33.79 | $33.79 | $25.34 | $25.34 |
| 1 | 97139 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97139 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97139 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97139 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97140 | ** | 0-20 | | $31.25 | $31.25 | $30.84 | $30.84 |
| 1 | 97140 | ** | 0-20 | P2 | $33.79 | $33.79 | $30.84 | $30.84 |
| 1 | 97140 | ** | 21-999 | | $31.25 | $31.25 | $30.84 | $30.84 |
| 1 | 97140 | ** | 21-999 | P2 | $33.79 | $33.79 | $30.84 | $30.84 |
| 1 | 97150 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97150 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |

**ATTACHMENT 3 - INDEPENDENT THERAPIST  (proposed to be effective October 1, 2015)**

| TOS * | Procedure Code | Long Description ** | Age Range | Place of Service | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |
| 1 | 97150 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97150 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97530 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97530 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97530 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97530 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97535 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97535 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97537 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97537 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97542 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97542 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97750 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97750 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97750 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97750 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97760 | ** | 0-20 | | $32.76 | $32.76 | $31.63 | $31.63 |
| 1 | 97760 | ** | 0-20 | P2 | $35.42 | $35.42 | $34.20 | $34.20 |
| 1 | 97761 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97761 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97762 | ** | 0-20 | | $39.73 | $39.73 | $35.09 | $35.09 |
| 1 | 97762 | ** | 0-20 | P2 | $42.97 | $42.97 | $35.09 | $35.09 |
| 1 | 97799 | ** | 0-20 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97799 | ** | 0-20 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | 97799 | ** | 21-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | 97799 | ** | 21-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | S8990 | Physical or manipulative therapy performed for maintenance rather than restoration | 0-999 | | $31.25 | $31.25 | $30.17 | $30.17 |
| 1 | S8990 | Physical or manipulative therapy performed for maintenance rather than restoration | 0-999 | P2 | $33.79 | $33.79 | $32.62 | $32.62 |
| 1 | S9152 | Speech therapy, re-evaluation | 0-20 | | $180.00 | $180.00 | $173.79 | $173.79 |
| 1 | S9152 | Speech therapy, re-evaluation | 0-20 | P2 | $180.00 | $180.00 | $173.79 | $173.79 |
| 1 | S9152 | Speech therapy, re-evaluation | 21-999 | | $175.77 | $175.77 | $169.71 | $169.71 |

| *Type of Service (TOS) | |
|---|---|
| 1 | Medical Services |
| **Place of Service** | |
| P2 | Home |

**ATTACHMENT 3 - INDEPENDENT THERAPIST** (proposed to be effective October 1, 2015)

| | | | | | CURRENT | | PROPOSED | |
|---|---|---|---|---|---|---|---|---|
| TOS * | Procedure Code | Long Description ** | Age Range | Place of Service | Current Medicaid Fee | Current Adjusted Medicaid Fee | Proposed Medicaid Fee | Proposed Adjusted Medicaid Fee |

**Required Notice: The five-character code included in this notice is obtained from the Current Procedural Terminology (CPT®), copyright 2015 by the American Medical Association (AMA). CPT is developed by the AMA as a listing of descriptive terms and five character identifying codes and modifiers for reporting medical services and procedures performed by physicians. The responsibility for the content of this notice is with HHSC and no endorsement by the AMA is intended or should be implied. The AMA disclaims responsibility for any consequences or liability attributable or related to any use, nonuse or interpretation of information contained in this notice. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained.

**D**

EXHIBIT 1

**STATE OF TEXAS**                                      §
                                                        §
                                                        §
**TRAVIS COUNTY**                                       §

## AFFIDAVIT OF PAM McDONALD

On this day, Pam McDonald appeared before me, the undersigned notary public. After I administered an oath to her, she said the following:

1. My name is Pam McDonald. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am director of the Rate Analysis Department ("RAD" or "Rate Analysis") for the Texas Health and Human Services Commission ("HHSC"). I have been employed with HHSC Rate Analysis since June of 1992 and prior to June 1992, I was employed with the Rate Analysis Department of the legacy Department of Human Services from January 1989 through May 1992. I have been the Director of Rate Analysis since December 2011. I am familiar with general statutory and regulatory provisions controlling HHSC's authority and obligation to set payment rates for Medicaid providers, including, for example, 42 U.S. Code § 1396a(a)(30)(A); Texas Government Code 531.021; Texas Human Resources Code §§ 32.028, 32.0281, and 32.0282; and state rules at 1 Texas Administrative Code §§ 355.201, 355.8021, 355.8085, and 355.8441.

3. I am familiar with the lawsuit *Diana D. et al. v. Traylor and HHSC*, the plaintiff's major allegations in this case, and the Court's recent order (September 25, 2015) granting a Temporary Injunction in this case.

4. Along with my staff, I was directly involved in proposing the therapy rates which are the subject of Plaintiffs' allegations in this lawsuit. I have read the Temporary Injunction in this case. HHSC respectfully disagrees with many conclusions expressed in the Temporary Injunction. More importantly, I believe that the HHSC Rate Analysis Department will be unable to carry out current HHSC obligations while constrained by the directives in the Temporary Injunction, specifically the paragraph at pp. 9-10 ordering HHSC "desist and refrain from taking any action to propose or implement any change in reimbursement rates for physical, occupational, and speech therapy services under the Texas Medicaid program without

EXHIBIT 1

conducting a review of payments for providing Medicaid-reimbursable therapy services and conducting a review of costs associated with providing Medicaid-reimbursable therapy services."

5. Moreover, the Temporary Injunction uses and applies rate-making terminology and regulatory provisions in ways which are inconsistent and fundamentally at odds with the rules as written and with HHSC's usage of these terms and rules, and in a way which creates confusion and interferes with HHSC's duties in administering the Texas Medicaid program.

**Basis for HHSC's Action; Rider 50 versus Periodic Rate Review**

6. As an initial example, as I have previously testified, the rate change at the center of the dispute in this case is the result of HHSC's attempt to implement the legislative direction in Rider 50. It is not the result of a periodic rate review. As such, the rate change would be governed by 1 TAC § 355.201, not 1 TAC §355.8021. Even if the rate change was governed by 1 TAC § 355.8021, the Temporary Injunction applies HHSC's rules regarding basic rate-making in a fundamentally different and opposing fashion than has been consistently applied by the HHSC itself.

7. Pursuant to 1 TAC § 355.201, notwithstanding any other provision of this chapter, HHSC may adjust rates if the Legislature enacts or implements any state law to restrict, limit, or condition the availability of appropriated funds.

8. The Court found that the proposed rates in this case are the result of a "periodic rate review," and therefore required an analysis of the payments and costs associated with providing Medicaid-reimbursable therapy services pursuant to 1 TAC § 355.8021(a)(2)(B). However, since 2010, this rule has provided that the decision to conduct a periodic rate review is permissive and discretionary ("HHSC *may* conduct periodic rate reviews...")(emphasis added), which includes the decision to perform a cost analysis. HHSC can and does distinguish between periodic rate reviews and other rate reviews; a chart identifying periodic rate reviews (identified herein as "Calendar Fee Reviews") is attached as Exhibit "1-A". The Court also describes 1 TAC § 355.8021(a)(2)(A) as being a "formula." From a rate-setting and mathematical perspective, it is inaccurate to describe the methodology described under 1 TAC § 355.8021(a)(2)(A) as a "formula" because it lacks the necessary precision. The rule was amended in 2010 to clarify the discretionary nature of this task. At that time, the rule was also

EXHIBIT 1

amended to reflect that, "Payment for these services will be adjusted within available funding." 1 TAC § 355.8021(a)(3).

9. From an implementation standpoint, the Temporary Injunction has the effect of rewriting HHSC's administrative rule in several important respects. According to the terms of the Temporary Injunction, there is no longer a distinction between periodic rate reviews and other types of rate reviews HHSC conducts. Instead, according paragraph 27 of the Temporary Injunction, 1 TAC § 355.8021(a)(2)(B) governs all therapy rate changes for physical, occupational, and speech services under the Texas Medicaid program during the pendency of this lawsuit. Likewise, the cost analysis referenced in 1 TAC § 355.8021(a)(2)(B) is a mandatory requirement of all therapy rate changes. Under the terms of the Temporary Injunction, HHSC no longer controls when to conduct a periodic rate review process, as distinct from other types of rate reviews. All therapy rate reviews are now subject to the heretofore discretionary cost analysis referenced in § 355.8021(a)(2)(B).

**Managed Care Rules Do Not Apply to Fee for Service**

10. The Temporary Injunction also mistakenly cites several provisions from 1 Texas Administrative Code Chapter 353. As the title of this chapter suggests, the rules in this chapter involve the Medicaid managed care program. Under the Medicaid Managed Care program, HHSC pays various managed care organizations (MCOS) a capitated payment, based on a "per member per month" (PMPM) fee, to take care of the medical needs of that client. It is my understanding that Chapter 353 rules control the MCOs general responsibilities to the HHSC and to the client, and that Chapter 353 rules do not control the fee for service program, or the Medicaid program as a whole. As a rule, Rate Analysis does not and to my knowledge has never incorporated Chapter 353 requirements into its analyses or development of rates governing the fee for service program. The implementation of the Temporary Injunction appears to cast this practice into doubt.

**Terms of the Court's Order**

11. Under paragraph 27 of the Temporary Injunction, HHSC is ordered to take no action to propose or implement any other change in Medicaid reimbursement rates for physical, occupational, and speech therapy services without conducting a review of payments for providing Medicaid-reimbursable therapy services and conducting a review of costs associated with providing Medicaid-reimbursable therapy services.

3 | P a g e

EXHIBIT 1

12. This injunction will hamper and obstruct HHSC Rate Analysis in its rate-making process in the immediate future, including in some of the following ways:

- **HCPCS:** "HCPCS" refers to the Healthcare Common Procedure Coding System. In terms of Rate Analysis' responsibility, during the last few months of the year, HHSC faces an annual task of updating hundreds of HCPCS billing codes. Each code represents a separate service for which HHSC must set a payment rate. Typically a few dozen of these will be therapy codes. This process can be understood as weeding out obsolete codes and adding new codes. Under federal CMS regulations and guidance, at the start of each year, HHSC must pay under the current and active codes, and cannot continue to pay under an old discontinued code. HHSC is only able to pay on a new code if a rate has been adopted and set into our payment system. (By way of illustration, an excerpt of a 2015 HCPCS Special Bulletin is attached as Exhibit "1-B".)

- **NCCI (National Correct Coding Initiative):** HHSC is currently in the midst of complying with NCCI, which for certain codes requires a switch or conversion of the billing unit of service between time-based increments and visits and associated rate-making activities. For example, a code may currently be billed as a 15 minutes increment, but be required to be billed as a visit under NCCI.

- **Therapy Assistant Code:** HHSC is in the process of exploring the need for a distinct rate for Therapy Assistants. If it is determined that a distinct rate for services provided by Therapy Assistants is appropriate, a rate will need to be adopted and set into our payment system.

- **Waiver Programs:** A strict reading of the order would also require HHSC to apply §355.8021(a)(2)(B) in setting rates for physical, occupational, and speech therapy services used in Texas Medicaid waiver programs such as Community Living Assistance and Support Services (CLASS), Home and Community-based Services (HCS) and Texas Home Living (TxHmL). These programs provide physical, occupational, and speech therapy services, and HHSC Rate Analysis currently sets separate hourly rates for each type of therapy under §355.502 (Reimbursement Methodology for Common Services in Home and Community-Based Services Waivers).

13. Each of the tasks listed above involve an analysis of one or more therapy rates and a corresponding rate-setting process. Therefore, under a strict reading of the Temporary

4 | P a g e

EXHIBIT 1

Injunction, HHSC is now required to perform a cost analysis of each new code. A cost analysis is likely to take twelve to twenty-four months to conduct, depending on the type of cost analysis to be conducted. If a cost analysis involves implementation of a full cost report procedure, with audits required, then 24 months or more is realistic. If a cost report procedure is implemented without an audit procedure, then the results will be more susceptible to fraud. Implementation of dozens or hundreds of therapy rates under these new restrictions is not feasible.

14. I have requested that Rate Analysis staff attempt to quantify the expense of complying with the Temporary Injunction, and specifically to implement a cost report procedure for these therapy services. An increase in staff would be required. Currently, Rate Analysis Department has 123 employees. Three (3) employees work on therapy codes.

15. By way of background, the total paid amount in State Fiscal Year (SFY) 2014 for all therapy services including hospitals, nursing homes and other providers was $722,363,905. The total paid amount in SFY 2014 for only HHA's (home health agencies), ORFs (Outpatient Rehabilitation Facilities), CORFs (Comprehensive Outpatient Rehabilitation Facilities) (CORF/ORFs), and Independent Therapists (including Early Childhood Intervention and physicians) ("Independents"), was $680,972,826. The division in total paid amount is shown below for the 3 provider types.

|  | Total Paid Amount 2014 |
| --- | --- |
| HHA | $360,951,215 |
| Independent Therapist | $157,159,307 |
| CORF/ORF | $162,862,303 |
| TOTAL | $680,972,826 |

16. Most of the therapy services which are at the center of the rate dispute are provided by several provider types, including ORFs, CORFs, HHA's, and Independents. Based on data provided by HHSC Statistical Data Services, in 2014, HHSC had 261 CORF and ORF providers, 1,616 HHA's, and 2,400 Independents enrolled in Medicaid, for a total of 4,277 providers providing therapy services in this class. Based on previous experience, it is reasonable to assume that in any given year, HHSC would excuse a fair number of providers from submitting cost reports

5 | P a g e

EXHIBIT 1

for various reasons. Based on these assumptions, HHSC Rate Analysis Department has worked up an estimate of the cost of designing and automating cost report forms, training providers on cost report completion, processing and auditing submitted cost reports, and analyzing data bases built from cost report data to calculate rates. The estimated total annual cost would be $5.6 million, all funds, split 50/50 between General Revenue and federal funds. The Rate Analysis Department would require an estimated 50.7 full time employees (FTEs) to perform these new duties. The vast majority of the new staff and associated costs would be required for audit staff to ensure the accuracy of the submitted cost reports. Historically, the high administrative costs of using cost reports to calculate rates is one of the many reasons HHSC has moved away from that approach to rate-setting for these services.

Executed on October 14, 2015.

PAM McDONALD

SWORN TO AND SUBSCRIBED before me on the 14th day of October, 2015.

Notary Public in and for State of Texas

Katrina Shanks
Notary's Printed Name

KATRINA SHANKS
Notary Public
STATE OF TEXAS
Commission Exp. AUG. 26, 2019
Notary without Bond

6 | P a g e

689

E

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

135 S.Ct. 1378
Supreme Court of the United States

Richard ARMSTRONG et al., Petitioners

v.

EXCEPTIONAL CHILD CENTER, INC., et al.

No. 14–15.    |    Argued Jan. 20, 2015.    |    Decided March 31, 2015.

**Synopsis**

**Background:** Providers of residential habilitation services to Medicaid-eligible individuals brought action against Director and Deputy Director of Idaho's Department of Health and Welfare (IDHW) and former IDHW Division of Medicaid Administrator, challenging IDHW's failure to amend existing Medicaid reimbursement rates, and seeking injunctive relief. The United States District Court for the District of Idaho, B. Lynn Winmill, Chief Judge, 835 F.Supp.2d 960, granted summary judgment to providers. Defendants appealed. The United States Court of Appeals for the Ninth Circuit, 567 Fed.Appx. 496, affirmed. Certiorari was granted in part.

**Holdings:** The Supreme Court, Justice Scalia, held that:

[1] the ability to sue to enjoin unconstitutional actions by state officers does not rest upon an implied right of action contained in the Supremacy Clause, and

[2] Medicaid Act did not authorize providers' private action for injunctive relief to enforce against a State the Act's reimbursement-rate standard.

Reversed.

Justice Breyer filed an opinion concurring in part and concurring in the judgment.

Justice Sotomayor filed a dissenting opinion, in which Justices Kennedy, Ginsburg, and Kagan joined.

West Headnotes (20)

**[1]    States** 🔑 Conflicting or conforming laws or regulations

The Supremacy Clause creates a rule of decision, under which courts must not give effect to state laws that conflict with federal laws. U.S.C.A. Const. Art. 6, cl. 2.

4 Cases that cite this headnote

**[2]    Civil Rights** 🔑 Other particular rights
**Civil Rights** 🔑 Private Right of Action

**WestlawNext** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

The Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action; it instructs courts what to do when state and federal law clash, but it is silent regarding who may enforce federal laws in court, and in what circumstances they may do so. U.S.C.A. Const. Art. 6, cl. 2.

7 Cases that cite this headnote

**[3]** **United States** 🗝️ Necessary and Proper Clause

Article I vests Congress with broad discretion over the manner of implementing its enumerated powers, by giving it authority to make all laws which shall be necessary and proper for carrying them into execution. U.S.C.A. Const. Art. 1, § 8, cl. 18.

1 Cases that cite this headnote

**[4]** **United States** 🗝️ Necessary and Proper Clause

The Necessary and Proper Clause confers upon Congress that discretion, with respect to the means by which the powers the Constitution confers are to be carried into execution, which will enable that body to perform the high duties assigned to it. U.S.C.A. Const. Art. 1, § 8, cl. 18.

1 Cases that cite this headnote

**[5]** **Criminal Law** 🗝️ States

**States** 🗝️ Offenses and punishments

Under the Supremacy Clause, a court may not convict a criminal defendant of violating a state law that federal law prohibits. U.S.C.A. Const. Art. 6, cl. 2.

2 Cases that cite this headnote

**[6]** **States** 🗝️ Conflicting or conforming laws or regulations

Under the Supremacy Clause, a court may not hold a civil defendant liable under state law for conduct that federal law requires. U.S.C.A. Const. Art. 6, cl. 2.

Cases that cite this headnote

**[7]** **Injunction** 🗝️ On ground of invalidity

If an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted.

2 Cases that cite this headnote

**[8]** **Federal Courts** 🗝️ Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** 🗝️ Agencies, officers, and public employees

**Injunction** 🗝️ Injunctions against government officials in general

Federal courts may in some circumstances grant injunctive relief against state officers or federal officers who are violating, or planning to violate, federal law.

3 Cases that cite this headnote

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

**[9]**   **Injunction** 🔑 Injunctions against government officials in general

In a proper case, injunctive relief may be given in a court of equity to prevent an injurious act by a public officer.

Cases that cite this headnote

**[10]**   **Injunction** 🔑 Equitable nature of remedy

**Injunction** 🔑 Injunctions against government officials in general

The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action.

1 Cases that cite this headnote

**[11]**   **Civil Rights** 🔑 Injunction

The ability to sue to enjoin unconstitutional actions by state officers does not rest upon an implied right of action contained in the Supremacy Clause, and instead is a judge-made remedy. U.S.C.A. Const. Art. 6, cl. 2.

3 Cases that cite this headnote

**[12]**   **Injunction** 🔑 Health care; Medicare and Medicaid

Providers of residential habilitation services to Medicaid-eligible individuals could not bring an action seeking injunctive relief to enforce against a State the Medicaid Act's requirement of setting reimbursement rates sufficient to enlist enough providers of health care services; Medicaid Act, by providing an administrative remedy, implicitly precluded such a private enforcement action, and the provision that the providers sought to enforce was judicially unadministrable. Medicaid Act, §§ 1902(a)(30)(A), 1904, 42 U.S.C.A. §§ 1396a(a)(30)(A), 1396c.

6 Cases that cite this headnote

**[13]**   **Federal Courts** 🔑 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Injunction** 🔑 Injunctions against government officials in general

The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.

2 Cases that cite this headnote

**[14]**   **Equity** 🔑 Equity follows the law

Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.

1 Cases that cite this headnote

**[15]**   **Action** 🔑 Statutory rights of action

**Action** 🔑 Cumulative or exclusive remedies

Express provision, in a federal statute, of one method of enforcing a substantive rule suggests that Congress intended to preclude others.

Cases that cite this headnote

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

**[16]**    **Statutes** 🗝 Language

A long-established practice does not justify a rule that denies statutory text its fairest reading.

Cases that cite this headnote

**[17]**    **Statutes** 🗝 Legislative Construction

Under the prior-construction canon of statutory interpretation, when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute is presumed to incorporate that interpretation.

2 Cases that cite this headnote

**[18]**    **Action** 🗝 Statutory rights of action

**Health** 🗝 Judicial Review;  Actions

The provision of the Medicaid Act, requiring States to set reimbursement rates sufficient to enlist enough providers of health care services, lacks the sort of rights-creating language needed to imply a private right of action to enforce the provision. (Per Justice Scalia, with three Justices concurring and one Justice concurring in the judgment.) Medicaid Act, § 1902(a)(30)(A), 42 U.S.C.A. § 1396a(a)(30)(A).

7 Cases that cite this headnote

**[19]**    **Health** 🗝 Medicaid and similar programs in general

**United States** 🗝 Spending

Spending Clause legislation like Medicaid is much in the nature of a contract. (Per Justice Scalia, with three Justices concurring and one Justice concurring in the judgment.) U.S.C.A. Const. Art. 1, § 8, cl. 1; Social Security Act, § 1901 et seq., 42 U.S.C.A. § 1396 et seq.

1 Cases that cite this headnote

**[20]**    **Action** 🗝 Statutory rights of action

A private right of action under federal law is not created by mere implication, but must be unambiguously conferred. (Per Justice Scalia, with three Justices concurring and one Justice concurring in the judgment.)

1 Cases that cite this headnote

*1380  *Syllabus*[*]

[*]    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Providers of "habilitation services" under Idaho's Medicaid plan are reimbursed by the State's Department of Health and Welfare. Section 30(A) of the Medicaid Act requires Idaho's plan to "assure that payments are consistent with efficiency, economy, and quality of care" while "safeguard[ing] against unnecessary utilization of ... care and services." 42 U.S.C. § 1396a(a)(30)(A). Respondents, providers of habilitation services, sued petitioners, Idaho Health and Welfare Department

officials, claiming that Idaho reimbursed them at rates lower than § 30(A) permits, and seeking to enjoin petitioners to increase these rates. The District Court entered summary judgment for the providers. The Ninth Circuit affirmed, concluding that the Supremacy Clause gave the providers an implied right of action, and that they could sue under this implied right of action to seek an injunction **\*1381** requiring Idaho to comply with § 30(a).

*Held* : The judgment is reversed.

567 Fed.Appx. 496, reversed.

Justice SCALIA delivered the opinion of the Court, except as to Part IV, concluding that the Supremacy Clause does not confer a private right of action, and that Medicaid providers cannot sue for an injunction requiring compliance with § 30(a). Pp. 1383 – 1387.

(a) The Supremacy Clause instructs courts to give federal law priority when state and federal law clash. *Gibbons v. Ogden, 9 Wheat. 1, 210, 6 L.Ed. 23.* But it is not the " 'source of any federal rights,' " *Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420,* and certainly does not create a cause of action. Nothing in the Clause's text suggests otherwise, and nothing suggests it was ever understood as conferring a private right of action. Article I vests Congress with broad discretion over the manner of implementing its enumerated powers. Art I., § 8; *McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579.* It is unlikely that the Constitution gave Congress broad discretion with regard to the enactment of laws, while simultaneously limiting Congress's power over the manner of their implementation, making it impossible to leave the enforcement of federal law to federal actors. Pp. 1383 – 1384.

(b) Reading the Supremacy Clause not to confer a private right of action is consistent with this Court's preemption jurisprudence. The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England. This Court has never held nor suggested that this judge-made remedy, in its application to state officers, rests upon an implied right of action contained in the Supremacy Clause. Pp. 1384 – 1385.

(c) Respondents' suit cannot proceed in equity. The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. See, *e.g., Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 74, 116 S.Ct. 1114, 134 L.Ed.2d 252.* Here, the express provision of a single remedy for a State's failure to comply with Medicaid's requirements —the withholding of Medicaid funds by the Secretary of Health and Human Services, 42 U.S.C. § 1396c—and the sheer complexity associated with enforcing § 30(A) combine to establish Congress's "intent to foreclose" equitable relief, *Verizon Md., Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 647, 122 S.Ct. 1753, 152 L.Ed.2d 871.* Pp. 1384 – 1387.

SCALIA, J., delivered the opinion of the Court with respect to Parts I, II, and III, in which ROBERTS, C.J., and THOMAS, BREYER, and ALITO, JJ., joined, and an opinion with respect to Part IV, in which ROBERTS, C.J., and THOMAS and ALITO, JJ., joined. BREYER, J., filed an opinion concurring in part and concurring in the judgment. SOTOMAYOR, J., filed a dissenting opinion, in which KENNEDY, GINSBURG, and KAGAN, JJ., joined.

**Attorneys and Law Firms**

Carl J. Withroe, Boise, ID, for Petitioners.

Edwin S. Kneedler for the United States as amicus curiae, by special leave of the Court, supporting the Petitioners.

James M. Piotrowski, Boise, ID, for Respondents.

Lawrence G. Wasden, Attorney General, Brian Kane, Assistant Chief Deputy, Attorney General, Steven L. Olsen, Chief of Civil Litigation, Boise, ID, Carl J. Withroe, **\*1382** Counsel of Record, Deputy Attorney General, Boise, ID, for Petitioners.

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

James M. Piotrowski, Counsel of Record, Herzfeld & Piotrowski, LLP, Boise, ID, Stephen P. Berzon, Stacey M. Leyton, Matthew J. Murray, Altshuler Berzon LLP, San Francisco, CA, for Respondents.

Lawrence G. Wasden, Attorney General, Steven L. Olsen, Chief of Civil Litigation, Carl J. Withroe, Deputy Attorney General, Boise, ID, Peg M. Dougherty, Deputy Attorney General, Idaho Dept. of Health & Welfare, Boise, ID, for Petitioners.

**Opinion**

Justice SCALIA delivered the opinion of the Court, except as to Part IV.

We consider whether Medicaid providers can sue to enforce § (30)(A) of the Medicaid Act. 81 Stat. 911 (codified as amended at 42 U.S.C. § 1396a(a)(30)(A)).

# I

Medicaid is a federal program that subsidizes the States' provision of medical services to "families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." § 1396–1. Like other Spending Clause legislation, Medicaid offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions.

In order to qualify for Medicaid funding, the State of Idaho adopted, and the Federal Government approved, a Medicaid "plan," § 1396a(a), which Idaho administers through its Department of Health and Welfare. Idaho's plan includes "habilitation services"—in-home care for individuals who, "but for the provision of such services ... would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan," § 1396n(c) and (c)(1). Providers of these services are reimbursed by the Department of Health and Welfare.

Section 30(A) of the Medicaid Act requires Idaho's plan to:

> "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area...." 42 U.S.C. § 1396a(a)(30)(A).

Respondents are providers of habilitation services to persons covered by Idaho's Medicaid plan. They sued petitioners—two officials in Idaho's Department of Health and Welfare—in the United States District Court for the District of Idaho, claiming that Idaho violates § 30(A) by reimbursing providers of habilitation services at rates lower than § 30(A) permits. They asked the court to enjoin petitioners to increase these rates.

The District Court entered summary judgment for the providers, holding that Idaho had not set rates in a manner consistent with § 30(A). *Inclusion, Inc. v. Armstrong,* 835 F.Supp.2d 960 (2011). The Ninth Circuit affirmed. **\*1383** 567 Fed.Appx. 496 (2014). It said that the providers had "an implied right of action under the Supremacy Clause to seek injunctive relief against the enforcement or implementation of state legislation." *Id.,* at 497 (citing *Independent Living Center of Southern Cal. v. Shewry,* 543 F.3d 1050, 1065 (C.A.9 2008)). We granted certiorari. 573 U.S. ——, 135 S.Ct. 44, 189 L.Ed.2d 897 (2014).

# II

 [1]    [2]    The Supremacy Clause, Art. VI, cl. 2, reads:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

It is apparent that this Clause creates a rule of decision: Courts "shall" regard the "Constitution," and all laws "made in Pursuance thereof," as "the supreme Law of the Land." They must not give effect to state laws that conflict with federal laws. *Gibbons v. Ogden,* 9 Wheat. 1, 210, 6 L.Ed. 23 (1824). It is equally apparent that the Supremacy Clause is not the " 'source of any federal rights,' " *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (quoting *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)), and certainly does not create a cause of action. It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so.

Hamilton wrote that the Supremacy Clause "only declares a truth, which flows immediately and necessarily from the institution of a Federal Government." The Federalist No. 33, p. 207 (J. Cooke ed.1961). And Story described the Clause as "a positive affirmance of that, which is necessarily implied." 3 Commentaries on the Constitution of the United States § 1831, p. 693 (1833). These descriptions would have been grossly inapt if the Clause were understood to give affected parties a constitutional (and hence congressionally unalterable) right to enforce federal laws against the States. And had it been understood to provide such significant private rights against the States, one would expect to find that mentioned in the preratification historical record, which contained ample discussion of the Supremacy Clause by both supporters and opponents of ratification. See C. Drahozal, The Supremacy Clause: A Reference Guide to the United States Constitution 25 (2004); The Federalist No. 44, at 306 (J. Madison). We are aware of no such mention, and respondents have not provided any. Its conspicuous absence militates strongly against their position.

 **[3]**  **[4]**  Additionally, it is important to read the Supremacy Clause in the context of the Constitution as a whole. Article I vests Congress with broad discretion over the manner of implementing its enumerated powers, giving it authority to "make all Laws which shall be necessary and proper for carrying [them] into Execution." Art. I, § 8. We have said that this confers upon the Legislature "that discretion, with respect to the means by which the powers [the Constitution] confers are to be carried into execution, which will enable that body to perform the high duties assigned to it," *McCulloch v. Maryland,* 4 Wheat. 316, 421, 4 L.Ed. 579 (1819). It is unlikely that the Constitution gave Congress such broad discretion with regard to the enactment of laws, while simultaneously limiting Congress's **\*1384** power over the manner of their implementation, making it impossible to leave the enforcement of federal law to federal actors. If the Supremacy Clause includes a private right of action, then the Constitution *requires* Congress to permit the enforcement of its laws by private actors, significantly curtailing its ability to guide the implementation of federal law. It would be strange indeed to give a clause that makes federal law supreme a reading that *limits* Congress's power to enforce that law, by imposing mandatory private enforcement—a limitation unheard-of with regard to state legislatures.

 **[5]**  **[6]**  **[7]**  To say that the Supremacy Clause does not confer a right of action is not to diminish the significant role that courts play in assuring the supremacy of federal law. For once a case or controversy properly comes before a court, judges are bound by federal law. Thus, a court may not convict a criminal defendant of violating a state law that federal law prohibits. See, *e.g., Pennsylvania v. Nelson,* 350 U.S. 497, 499, 509, 76 S.Ct. 477, 100 L.Ed. 640 (1956). Similarly, a court may not hold a civil defendant liable under state law for conduct federal law requires. See, *e.g., Mutual Pharmaceutical Co. v. Bartlett,* 570 U.S. ——, —— – ——, 133 S.Ct. 2466, 2476–2477, 186 L.Ed.2d 607 (2013). And, as we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted. *Ex parte Young,* 209 U.S. 123, 155–156, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

 **[8]**  **[9]**  Respondents contend that our preemption jurisprudence—specifically, the fact that we have regularly considered whether to enjoin the enforcement of state laws that are alleged to violate federal law—demonstrates that the Supremacy Clause creates a cause of action for its violation. They are incorrect. It is true enough that we have long held that federal courts may in

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. See, *e.g., Osborn v. Bank of United States,* 9 Wheat. 738, 838–839, 844, 6 L.Ed. 204 (1824); *Ex parte Young, supra,* at 150–151, 28 S.Ct. 441 (citing *Davis v. Gray,* 16 Wall. 203, 220, 21 L.Ed. 447 (1873)). But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials. See *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 110, 23 S.Ct. 33, 47 L.Ed. 90 (1902); see generally L. Jaffe, Judicial Control of Administrative Action 152–196 (1965). Thus, the Supremacy Clause need not be (and in light of our textual analysis above, cannot be) the explanation. What our cases demonstrate is that, "in a proper case, relief may be given in a court of equity ... to prevent an injurious act by a public officer." *Carroll v. Safford,* 3 How. 441, 463, 11 L.Ed. 671 (1845).

 **[10]**   **[11]**   The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England. See Jaffe & Henderson, Judicial Review and the Rule of Law: Historical Origins, 72 L.Q. Rev. 345 (1956). It is a judge-made remedy, and we have never held or even suggested that, in its application to state officers, it rests upon an implied right of action contained in the Supremacy Clause. That is because, as even the dissent implicitly acknowledges, *post,* at 1391 – 1392 (opinion of SOTOMAYOR, J.) it does not. The Ninth Circuit erred in holding otherwise.

## *1385  III

### A

 **[12]**   We turn next to respondents' contention that, quite apart from any cause of action conferred by the Supremacy Clause, this suit can proceed against Idaho in equity.

 **[13]**   **[14]**   The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. See, *e.g., Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 74, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). " 'Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.' " *I.N.S. v. Pangilinan,* 486 U.S. 875, 883, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988) (quoting *Hedges v. Dixon County,* 150 U.S. 182, 192, 14 S.Ct. 71, 37 L.Ed. 1044 (1893); brackets omitted). In our view the Medicaid Act implicitly precludes private enforcement of § 30(A), and respondents cannot, by invoking our equitable powers, circumvent Congress's exclusion of private enforcement. See *Douglas v. Independent Living Center of Southern Cal., Inc.,* 565 U.S. ——, —— – ——, 132 S.Ct. 1204, 1212–1213, 182 L.Ed.2d 101 (2012) (ROBERTS, C.J., dissenting).

 **[15]**   Two aspects of § 30(A) establish Congress's "intent to foreclose" equitable relief. *Verizon Md., Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 647, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). First, the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements—for the State's "breach" of the Spending Clause contract—is the withholding of Medicaid funds by the Secretary of Health and Human Services. 42 U.S.C. § 1396c. As we have elsewhere explained, the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval,* 532 U.S. 275, 290, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

The provision for the Secretary's enforcement by withholding funds might not, *by itself,* preclude the availability of equitable relief. See *Virginia Office for Protection and Advocacy v. Stewart,* 563 U.S. 247, —— – ——, n. 3, 131 S.Ct. 1632, 1638–1639, n. 3, 179 L.Ed.2d 675 (2011). But it does so when combined with the judicially unadministrable nature of § 30(A)'s text. It is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are "consistent with efficiency, economy, and quality of care," all the while "safeguard[ing] against unnecessary utilization of ... care and services." Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes, we think, that Congress "wanted to make the agency remedy that it provided exclusive," thereby achieving "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking," and avoiding "the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

application of the statute in a private action." *Gonzaga Univ. v. Doe,* 536 U.S. 273, 292, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (BREYER, J., concurring in judgment). The sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, § 1396c, shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts.

### B

The dissent agrees with us that the Supremacy Clause does not provide an implied right of action, and that Congress may displace the equitable relief that is traditionally available to enforce federal **\*1386** law. It disagrees only with our conclusion that such displacement has occurred here.

 **[16]**    The dissent insists that, "because Congress is undoubtedly aware of the federal courts' long-established practice of enjoining preempted state action, it should generally be presumed to contemplate such enforcement unless it *affirmatively* manifests a contrary intent." *Post,* at 1392 (emphasis added). But a "long-established practice" does not justify a rule that denies statutory text its fairest reading. Section 30(A), fairly read in the context of the Medicaid Act, "display[s] a[n] intent to foreclose" the availability of equitable relief. *Verizon, supra,* at 647, 122 S.Ct. 1753. We have no warrant to revise Congress's scheme simply because it did not "affirmatively" preclude the availability of a judge-made action at equity. See *Seminole Tribe, supra,* at 75, 116 S.Ct. 1114 (inferring, in the absence of an "affirmative" statement by Congress, that equitable relief was unavailable).

Equally unavailing is the dissent's reliance on § 30(A)'s history. Section 30(A) was amended, on December 19, 1989, to include what the dissent calls the "equal access mandate," *post,* at 1394—the requirement that reimbursement rates be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." § 6402(a), 103 Stat. 2260. There existed at the time another provision, known as the "Boren Amendment," that likewise imposed broad requirements on state Medicaid plans. 42 U.S.C. § 1396a(a)(13)(A) (1982 ed., Supp. V). Lower courts had interpreted the Boren Amendment to be privately enforceable under § 1983. From this, the dissent infers that, when Congress amended § 30(A), it could not "have failed to anticipate" that § 30(A)'s broad language—or at least that of the equal access mandate—would be interpreted as enforceable in a private action. Thus, concludes the dissent, Congress's failure to *expressly* preclude the private enforcement of § 30(A) suggests it intended *not to* preclude private enforcement. *Post,* at 1395.

 **[17]**    This argument appears to rely on the prior-construction canon; the rule that, when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute" is presumed to incorporate that interpretation. *Bragdon v. Abbott,* 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). But that canon has no application here. The language of the two provisions is nowhere near identical; and even if it had been, the question whether the Boren Amendment permitted private actions was far from "settled." When Congress amended § 30(A) in 1989, this Court had already granted certiorari to decide, but had not yet decided, whether the Boren Amendment could be enforced through a § 1983 suit. See *Baliles v. Virginia Hospital Assn.,* 493 U.S. 808, 110 S.Ct. 49, 107 L.Ed.2d 18 (1989) (granting certiorari). Our decision permitting a § 1983 action did not issue until June 14, 1990—almost six months after the amendment to § 30(A). *Wilder v. Virginia Hospital Assn.,* 496 U.S. 498, 110 S.Ct. 2510. [*] The existence of a granted petition for **\*1387** certiorari demonstrates quite clearly that the question whether the Boren Amendment could be privately enforced was *un*settled at the time of § 30(A)'s 1989 amendment—so that if Congress was aware of the parallel (which is highly doubtful) the course that awareness would have prompted (if any) would not have been legislative silence but rather express specification of the availability of private enforcement (if that was what Congress intended).

---

[*]    Respondents do not claim that *Wilder* establishes precedent for a private cause of action in this case. They do not assert a § 1983 action, since our later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified. See *Gonzaga Univ.*

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

*v. Doe,* 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (expressly "reject[ing] the notion," implicit in *Wilder,* "that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983").

Finally, the dissent speaks as though we leave these plaintiffs with no resort. That is not the case. Their relief must be sought initially through the Secretary rather than through the courts. The dissent's complaint that the sanction available to the Secretary (the cut-off of funding) is too massive to be a realistic source of relief seems to us mistaken. We doubt that the Secretary's notice to a State that its compensation scheme is inadequate will be ignored.

## IV

[18]    The last possible source of a cause of action for respondents is the Medicaid Act itself. They do not claim that, and rightly so. Section 30(A) lacks the sort of rights-creating language needed to imply a private right of action. *Sandoval, supra* at 286–287, 121 S.Ct. 1511. It is phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid. The Act says that the "Secretary shall approve any plan which fulfills the conditions specified in subsection (a)," the subsection that includes § 30(A). 42 U.S.C. § 1396a(b). We have held that such language "reveals no congressional intent to create a private right of action." *Sandoval, supra* at 289, 121 S.Ct. 1511; see also *Universities Research Assn., Inc. v. Coutu,* 450 U.S. 754, 772, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981). And again, the explicitly conferred means of enforcing compliance with § 30(A) by the Secretary's withholding funding, § 1396c, suggests that other means of enforcement are precluded, *Sandoval, supra,* at 290, 121 S.Ct. 1511.

[19]    [20]    Spending Clause legislation like Medicaid "is much in the nature of a contract." *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). The notion that respondents have a right to sue derives, perhaps, from the fact that they are beneficiaries of the federal-state Medicaid agreement, and that intended beneficiaries, in modern times at least, can sue to enforce the obligations of private contracting parties. See 13 R. Lord, Williston on Contracts §§ 37:12–37.13, pp. 123–135 (4th ed.2013). We doubt, to begin with, that providers are intended beneficiaries (as opposed to mere incidental beneficiaries) of the Medicaid agreement, which was concluded for the benefit of the infirm whom the providers were to serve, rather than for the benefit of the providers themselves. See *Pharmaceutical Research and Mfrs. of America v. Walsh,* 538 U.S. 644, 683, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (THOMAS, J., concurring in judgment). More fundamentally, however, the modern jurisprudence permitting intended beneficiaries to sue does not generally apply to contracts between a private party and the government, *Astra USA, Inc. v. Santa Clara County,* 563 U.S. ——, ——, 131 S.Ct. 1342, 1347–1348, 179 L.Ed.2d 457 (2011); see Williston, *supra,* at §§ 37:35–37:36, at 256–271; 9 J. Murray, Corbin on Contracts § 45.6, p. 92 (rev. ed.2007)—much less to contracts between two governments. Our precedents establish that a private right of action under federal law is not created by mere implication, but must **\*1388**  be "unambiguously conferred," *Gonzaga,* 536 U.S., at 283, 122 S.Ct. 2268. Nothing in the Medicaid Act suggests that Congress meant to change that for the commitments made under § 30(A).

\* \* \*

The judgment of the Ninth Circuit Court of Appeals is reversed.

*It is so ordered.*

Justice BREYER, concurring in part and concurring in the judgment.
I join Parts I, II, and III of the Court's opinion.

Like all other Members of the Court, I would not characterize the question before us in terms of a Supremacy Clause "cause of action." Rather, I would ask whether "federal courts may in [these] circumstances grant injunctive relief against state officers

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

who are violating, or planning to violate, federal law." *Ante,* at 1384; *post,* at 1391 – 1392 (SOTOMAYOR, J., dissenting). I believe the answer to this question is no.

That answer does not follow from the application of a simple, fixed legal formula separating federal statutes that may underlie this kind of injunctive action from those that may not. "[T]he statute books are too many, the laws too diverse, and their purposes too complex, for any single legal formula to offer" courts "more than general guidance." *Gonzaga Univ. v. Doe,* 536 U.S. 273, 291, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (BREYER, J., concurring in judgment). Rather, I believe that several characteristics of the federal statute before us, when taken together, make clear that Congress intended to foreclose respondents from bringing this particular action for injunctive relief.

For one thing, as the majority points out, § 30(A) of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A), sets forth a federal mandate that is broad and nonspecific. See *ante,* at 1385. But, more than that, § 30(A) applies its broad standards to the setting of rates. The history of ratemaking demonstrates that administrative agencies are far better suited to this task than judges. More than a century ago, Congress created the Interstate Commerce Commission, the first great federal regulatory rate-setting agency, and endowed it with authority to set "reasonable" railroad rates. Ch. 104, 24 Stat. 379 (1887). It did so in part because judicial efforts to maintain reasonable rate levels had proved inadequate. See I. Sharfman, Railway Regulation: An Analysis of the Underlying Problems in Railway Economics from the Standpoint of Government Regulation 43–44 (1915).

Reading § 30(A) underscores the complexity and nonjudicial nature of the rate-setting task. That provision requires State Medicaid plans to "assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers" to assure "care and services" equivalent to that "available to the general population in the geographic area." § 1396a(a)(30)(A). The methods that a state agency, such as Idaho's Department of Health and Welfare, uses to make this kind of determination may involve subsidiary determinations of, for example, the actual cost of providing quality services, including personnel and total operating expenses; changes in public expectations with respect to delivery of services; inflation; a comparison of rates paid in neighboring States for comparable services; and a comparison of any rates paid for comparable services in other public or private capacities. See App. to Reply to Brief in Opposition 16; Idaho Code Ann. § 56–118 (2012).

At the same time, § 30(A) applies broadly, covering reimbursements provided to approximately 1.36 million doctors, serving **\*1389** over 69 million patients across the Nation. See Dept. of Health and Human Servs., Office of Inspector General, Access to Care: Provider Availability in Medicaid Managed Care 1, 5 (Dec.2014). And States engage in time-consuming efforts to obtain public input on proposed plan amendments. See, *e.g.,* Kansas Medicaid: Design and Implementation of a Public Input and Stakeholder Consult Process (Sept. 16, 2011) (prepared by Deloitte Consulting, LLP) (describing public input on Kansas' proposed Medicaid amendments).

I recognize that federal courts have long become accustomed to reviewing for reasonableness or constitutionality the rate-setting determinations made by agencies. See 5 U.S.C. § 706; *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602–606, 64 S.Ct. 281, 88 L.Ed. 333 (1944). But this is not such an action. Instead, the lower courts here, relying on the rate-setting standard articulated in *Orthopaedic Hospital v. Belshe,* 103 F.3d 1491 (C.A.9 1997), required the State to set rates that "approximate the cost of quality care provided efficiently and economically." *Id.,* at 1496. See *Inclusion, Inc. v. Armstrong,* 835 F.Supp.2d 960, 963–964 (D.Idaho 2011), aff'd, 567 Fed.Appx. 496 (C.A.9 2014). To find in the law a basis for courts to engage in such direct rate-setting could set a precedent for allowing other similar actions, potentially resulting in rates set by federal judges (of whom there are several hundred) outside the ordinary channel of federal judicial review of agency decisionmaking. The consequence, I fear, would be increased litigation, inconsistent results, and disorderly administration of highly complex federal programs that demand public consultation, administrative guidance and coherence for their success. I do not believe Congress intended to allow a statute-based injunctive action that poses such risks (and that has the other features I mention).

I recognize that courts might in particular instances be able to resolve rate-related requests for injunctive relief quite easily. But I see no easy way to separate in advance the potentially simple sheep from the more harmful rate-making goats. In any event, this case, I fear, belongs in the latter category. See *Belshe, supra,* at 1496. Compare Brief for Respondents 2, n. 1 (claiming

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

that respondents seek only to enforce federally approved methodology), with Brief for United States as *Amicus Curiae* 5, n. 2 (the relevant methodology has not been approved). See also Idaho Code Ann. § 56–118 (describing in general terms what appears to be a complex rate-setting methodology, while leaving unclear the extent to which Idaho is bound to use, rather than merely consider, actual provider costs).

For another thing, like the majority, I would ask why, in the complex rate-setting area, other forms of relief are inadequate. If the Secretary of Health and Human Services concludes that a State is failing to follow legally required federal rules, the Secretary can withhold federal funds. See *ante,* at 1385 (citing 42 U.S.C. § 1396c). If withholding funds does not work, the federal agency may be able to sue a State to compel compliance with federal rules. See Tr. of Oral Arg. 23, 52 (Solicitor General and respondents acknowledging that the Federal Government might be able to sue a State to enjoin it from paying less than what § 30(A) requires). Cf., *e.g., Arizona v. United States,* 567 U.S. ——, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (allowing similar action in another context).

Moreover, why could respondents not ask the federal agency to interpret its rules to respondents' satisfaction, to modify those rules, to promulgate new rules or to enforce old ones? See **\*1390** 5 U.S.C. § 553(e). Normally, when such requests are denied, an injured party can seek judicial review of the agency's refusal on the grounds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." §§ 702, 706(2)(A). And an injured party can ask the court to "compel agency action unlawfully withheld or unreasonably delayed." §§ 702, 706(1). See also Tr. of Oral Arg. 15–16 (arguing that providers can bring an action under the Administrative Procedure Act (APA) whenever a waiver program is renewed or can seek new agency rulemaking); *Japan Whaling Assn. v. American Cetacean Soc.,* 478 U.S. 221, 230, n. 4, 231, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (APA challenge to the Secretary of Commerce's failure to act).

I recognize that the law may give the federal agency broad discretionary authority to decide when and how to exercise or to enforce statutes and rules. See *Massachusetts v. EPA,* 549 U.S. 497, 527, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). As a result, it may be difficult for respondents to prevail on an APA claim unless it stems from an agency's particularly egregious failure to act. But, if that is so, it is because Congress decided to vest broad discretion in the agency to interpret and to enforce § 30(A). I see no reason for this Court to circumvent that congressional determination by allowing this action to proceed.

Justice SOTOMAYOR, with whom Justice KENNEDY, Justice GINSBURG, and Justice KAGAN join, dissenting.

Suits in federal court to restrain state officials from executing laws that assertedly conflict with the Constitution or with a federal statute are not novel. To the contrary, this Court has adjudicated such requests for equitable relief since the early days of the Republic. Nevertheless, today the Court holds that Congress has foreclosed private parties from invoking the equitable powers of the federal courts to require States to comply with § 30(A) of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A). It does so without pointing to the sort of detailed remedial scheme we have previously deemed necessary to establish congressional intent to preclude resort to equity. Instead, the Court relies on Congress' provision for agency enforcement of § 30(A)—an enforcement mechanism of the sort we have already definitively determined *not* to foreclose private actions—and on the mere fact that § 30(A) contains relatively broad language. As I cannot agree that these statutory provisions demonstrate the requisite congressional intent to restrict the equitable authority of the federal courts, I respectfully dissent.

# I

## A

That parties may call upon the federal courts to enjoin unconstitutional government action is not subject to serious dispute. Perhaps the most famous exposition of this principle is our decision in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), from which the doctrine derives its usual name. There, we held that the shareholders of a railroad could seek an

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

injunction preventing the Minnesota attorney general from enforcing a state law setting maximum railroad rates because the Eleventh Amendment did not provide the officials with immunity from such an action and the federal court had the "power" in equity to "grant a temporary injunction." *Id.,* at 148, 28 S.Ct. 441. This Court had earlier recognized similar equitable authority in *Osborn v. Bank of United States,* 9 Wheat. 738, 6 L.Ed. 204 (1824), in which a federal court issued an injunction prohibiting an Ohio official from **\*1391** executing a state law taxing the Bank of the United States. *Id.,* at 838–839. We affirmed in relevant part, concluding that the case was "cognizable in a Court of equity," and holding it to be "proper" to grant equitable relief insofar as the state tax was "repugnant" to the federal law creating the national bank. *Id.,* at 839, 859. More recently, we confirmed the vitality of this doctrine in *Free Enterprise Fund v. Public Company Accounting Oversight Bd.,* 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). There, we found no support for the argument that a challenge to " 'governmental action under the Appointments Clause or separation-of-powers principles' " should be treated "differently than every other constitutional claim" for which "equitable relief 'has long been recognized as the proper means for preventing entities from acting unconstitutionally.' " *Id.,* at 491, n. 2, 130 S.Ct. 3138.

A suit, like this one, that seeks relief against state officials acting pursuant to a state law allegedly preempted by a federal statute falls comfortably within this doctrine. A claim that a state law contravenes a federal statute is "basically constitutional in nature, deriving its force from the operation of the Supremacy Clause," *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 271–272, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977), and the application of preempted state law is therefore "unconstitutional," *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 388, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); accord, *e.g., McCulloch v. Maryland,* 4 Wheat. 316, 436, 4 L.Ed. 579 (1819) (that States have "no power" to enact laws interfering with "the operations of the constitutional laws enacted by Congress" is the "unavoidable consequence of that supremacy which the constitution has declared"; such a state law "is unconstitutional and void"). We have thus long entertained suits in which a party seeks prospective equitable protection from an injurious and preempted state law without regard to whether the federal statute at issue itself provided a right to bring an action. See, *e.g., Foster v. Love,* 522 U.S. 67, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997) (state election law that permitted the winner of a state primary to be deemed the winner of election to Congress held preempted by federal statute setting date of congressional elections); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (state law preempted in part by the federal Employee Retirement Income Security Act of 1974); *Railroad Transfer Service, Inc. v. Chicago,* 386 U.S. 351, 87 S.Ct. 1095, 18 L.Ed.2d 143 (1967) (city ordinance imposing licensing requirements on motor carrier transporting railroad passengers held preempted by federal Interstate Commerce Act); *Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961) (state law requiring labeling of certain strains of tobacco held preempted by the federal Tobacco Inspection Act); *Railway Co. v. McShane,* 22 Wall. 444, 22 L.Ed. 747 (1875) (state taxation of land possessed by railroad company held invalid under federal Act of July 2, 1864). Indeed, for this reason, we have characterized "the availability of prospective relief of the sort awarded in *Ex parte Young* " as giving "life to the Supremacy Clause." *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985).

Thus, even though the Court is correct that it is somewhat misleading to speak of "an implied right of action contained in the Supremacy Clause," *ante,* at 1384, that does not mean that parties may not enforce the Supremacy Clause by bringing suit to enjoin preempted state action. As the Court also recognizes, we "have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning **\*1392** to violate, federal law." *Ante,* at 1384.

### B

Most important for purposes of this case is not the mere existence of this equitable authority, but the fact that it is exceedingly well established—supported, as the Court puts it, by a "long history." *Ante,* at 1384 – 1385. Congress may, if it so chooses, either expressly or implicitly preclude *Ex parte Young* enforcement actions with respect to a particular statute or category of lawsuit. See, *e.g.,* 28 U.S.C. § 1341 (prohibiting federal judicial restraints on the collection of state taxes); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 75–76, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (comprehensive alternative remedial scheme can establish Congress' intent to foreclose *Ex parte Young* actions). But because Congress is undoubtedly aware of the federal courts' long-established practice of enjoining preempted state action, it should generally be presumed to contemplate such enforcement

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

unless it affirmatively manifests a contrary intent. "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946).

In this respect, equitable preemption actions differ from suits brought by plaintiffs invoking 42 U.S.C. § 1983 or an implied right of action to enforce a federal statute. Suits for "redress designed to halt or prevent the constitutional violation rather than the award of money damages" seek "traditional forms of relief." *United States v. Stanley,* 483 U.S. 669, 683, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987). By contrast, a plaintiff invoking § 1983 or an implied statutory cause of action may seek a variety of remedies—including damages—from a potentially broad range of parties. Rather than simply pointing to background equitable principles authorizing the action that Congress presumably has not overridden, such a plaintiff must demonstrate specific congressional intent to *create* a statutory right to these remedies. See *Gonzaga Univ. v. Doe,* 536 U.S. 273, 290, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); see also *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 114, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (KENNEDY, J., dissenting) (Because a preemption claim does not seek to enforce a statutory right, "[t]he injured party does not need § 1983 to vest in him a right to assert that an attempted exercise of jurisdiction or control violates the proper distribution of powers within the federal system"). For these reasons, the principles that we have developed to determine whether a statute creates an implied right of action, or is enforceable through § 1983, are not transferable to the *Ex parte Young* context.

## II

In concluding that Congress has "implicitly preclude[d] private enforcement of § 30(A)," *ante,* at 1384 – 1385, the Court ignores this critical distinction and threatens the vitality of our *Ex parte Young* jurisprudence. The Court identifies only a single prior decision—*Seminole Tribe*—in which we have ever discerned such congressional intent to foreclose equitable enforcement of a statutory mandate. *Ante,* at 1384 – 1385. Even the most cursory review of that decision reveals how far afield it is from this case.

In *Seminole Tribe,* the plaintiff Indian Tribe had invoked *Ex parte Young* in seeking to compel the State of Florida to **\*1393** "negotiate in good faith with [the] tribe toward the formation of a compact" governing certain gaming activities, as required by a provision of the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(3). 517 U.S., at 47, 116 S.Ct. 1114. We rejected this effort, observing that "Congress passed § 2710(d)(3) in conjunction with the carefully crafted and intricate remedial scheme set forth in § 2710(d)(7)." *Id.,* at 73–74, 116 S.Ct. 1114. That latter provision allowed a tribe to sue for violations of the duty to negotiate 180 days after requesting such negotiations, but specifically limited the remedy that a court could grant to "an order directing the State and the Indian tribe to conclude a compact within 60 days," and provided that the only sanction for the violation of such an order would be to require the parties to "submit a proposed compact to a mediator." *Id.,* at 74, 116 S.Ct. 1114; §§ 2710(d)(7)(B)(i), (iii), (iv). The statute further directed that if the State should fail to abide by the mediator's selected compact, the sole remedy would be for the Secretary of the Interior, in consultation with the tribe, to prescribe regulations governing gaming. See 517 U.S., at 74–75, 116 S.Ct. 1114; § 2710(d)(7)(B)(vii). We concluded that Congress must have intended this procedural route to be the exclusive means of enforcing § 2710(d)(3). As we explained: "If § 2710(d)(3) could be enforced in a suit under *Ex parte Young,* § 2710(d)(7) would have been superfluous; it is difficult to see why an Indian tribe would suffer through the intricate scheme of § 2710(d)(7) when more complete and more immediate relief would be available under *Ex parte Young.*" 517 U.S., at 75, 116 S.Ct. 1114.

What is the equivalent "carefully crafted and intricate remedial scheme" for enforcement of § 30(A)? The Court relies on two aspects of the Medicaid Act, but, whether considered separately or in combination, neither suffices.

First, the Court cites 42 U.S.C. § 1396c, which authorizes the Secretary of Health and Human Services (HHS) to withhold federal Medicaid payments to a State in whole or in part if the Secretary determines that the State has failed to comply with the obligations set out in § 1396a, including § 30(A). See *ante,* at 1385 – 1386. But in striking contrast to the remedial provision set out in the Indian Gaming Regulatory Act, § 1396c provides no specific procedure that parties actually affected by a State's

violation of its statutory obligations may invoke in lieu of *Ex parte Young*—leaving them without any other avenue for seeking relief from the State. Nor will § 1396c always provide a particularly effective means for redressing a State's violations: If the State has violated § 30(A) by refusing to reimburse medical providers at a level "sufficient to enlist enough providers so that care and services are available" to Medicaid beneficiaries to the same extent as they are available to "the general population," agency action resulting in a reduced flow of federal funds to that State will often be self-defeating. § 1396a(30)(A); see Brief for Former HHS Officials as *Amici Curiae* 18 (noting that HHS is often reluctant to initiate compliance actions because a "state's non-compliance creates a damned-if-you-do, damned-if-you-don't scenario where the withholding of state funds will lead to depriving the poor of essential medical assistance"). Far from rendering § 1396c "superfluous," then, *Ex parte Young* actions would seem to be an anticipated and possibly necessary supplement to this limited agency-enforcement mechanism. *Seminole Tribe,* 517 U.S., at 75, 116 S.Ct. 1114. Indeed, presumably for these reasons, we recently rejected the very contention the Court now accepts, holding that "[t]he fact that the Federal Government can exercise oversight of a federal spending program **\*1394** and even withhold or withdraw funds ... does not demonstrate that Congress has displayed an intent not to provide the more complete and more immediate relief that would otherwise be available under *Ex parte Young*." *Virginia Office for Protection and Advocacy v. Stewart,* 563 U.S. 247, —— – ——, n. 3, 131 S.Ct. 1632, 1638–1639, n. 3, 179 L.Ed.2d 675 (2011) (internal quotation marks omitted).

Section 1396c also parallels other provisions scattered throughout the Social Security Act that likewise authorize the withholding of federal funds to States that fail to fulfill their obligations. See, *e.g.,* §§ 609(a), 1204, 1354. Yet, we have consistently authorized judicial enforcement of the Act. See *Maine v. Thiboutot,* 448 U.S. 1, 6, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (collecting cases). *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), provides a fitting illustration. There, we considered a provision of the Social Security Act mandating that, in calculating benefits for participants in the Aid to Families with Dependent Children Program, States make adjustments " 'to reflect fully changes in living costs.' " *Id.,* at 412, 90 S.Ct. 1207 (quoting § 602(a)(23) (1964 ed., Supp. IV)). We expressed no hesitation in concluding that federal courts could require compliance with this obligation, explaining: "It is ... peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use." *Id.,* at 422–423, 90 S.Ct. 1207. We so held notwithstanding the existence of an enforcement provision permitting a federal agency to "make a total or partial cutoff of federal funds." See *id.,* at 406, n. 8, 90 S.Ct. 1207 (citing § 1316).

Second, perhaps attempting to reconcile its treatment of § 1396c (2012 ed.) with this longstanding precedent, the Court focuses on the particular language of § 30(A), contending that this provision, at least, is so "judicially unadministrable" that Congress must have intended to preclude its enforcement in private suits. *Ante,* at 1385. Admittedly, the standard set out in § 30(A) is fairly broad, requiring that a state Medicaid plan:

"provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." § 1396a(a)(30)(A).

But mere breadth of statutory language does not require the Court to give up all hope of judicial enforcement—or, more important, to infer that Congress must have done so.

In fact, the contention that § 30(A)'s language was intended to foreclose private enforcement actions entirely is difficult to square with the provision's history. The specific equal access mandate invoked by the plaintiffs in this case—that reimbursement rates be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area"—was added to § 30(A) in 1989. 103 Stat. 2260. At that time, multiple Federal Courts of Appeals had held that the so-called Boren Amendment to the Medicaid Act was enforceable pursuant **\*1395** to § 1983—as we soon thereafter concluded it was. See *Wilder v. Virginia Hospital Assn.,* 496

U.S. 498, 504–505, 524, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). The Boren Amendment employed language quite similar to that used in § 30(A), requiring that a state plan:

> "provide ... for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality." § 1396a(a)(13)(A) (1982 ed., Supp. V).

It is hard to believe that the Congress that enacted the operative version of § 30(A) could have failed to anticipate that it might be similarly enforceable. Even if, as the Court observes, the question whether the Boren Amendment was enforceable under § 1983 was "unsettled at the time," *ante,* at 1386 (emphasis deleted), surely Congress would have spoken with far more clarity had it actually intended to preclude private enforcement of § 30(A) through not just § 1983 but also *Ex parte Young*.

Of course, the broad scope of § 30(A)'s language is not irrelevant. But rather than compelling the conclusion that the provision is wholly unenforceable by private parties, its breadth counsels in favor of interpreting § 30(A) to provide substantial leeway to States, so that only in rare and extreme circumstances could a State actually be held to violate its mandate. The provision's scope may also often require a court to rely on HHS, which is "comparatively expert in the statute's subject matter." *Douglas v. Independent Living Center of Southern Cal., Inc.,* 565 U.S. ——, ——, 132 S.Ct. 1204, 1214, 182 L.Ed.2d 101 (2012). When the agency has made a determination with respect to what legal standard should apply, or the validity of a State's procedures for implementing its Medicaid plan, that determination should be accorded the appropriate deference. See, *e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). And if faced with a question that presents a special demand for agency expertise, a court might call for the views of the agency, or refer the question to the agency under the doctrine of primary jurisdiction. See *Rosado,* 397 U.S., at 406–407, 90 S.Ct. 1207; *Pharmaceutical Research and Mfrs. of America v. Walsh,* 538 U.S. 644, 673, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (BREYER, J., concurring in part and concurring in judgment). Finally, because the authority invoked for enforcing § 30(A) is equitable in nature, a plaintiff is not entitled to relief as of right, but only in the sound discretion of the court. See *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Given the courts' ability to both respect States' legitimate choices and defer to the federal agency when necessary, I see no basis for presuming that Congress believed the Judiciary to be completely incapable of enforcing § 30(A). [*]

[*] That is not to say that the Court of Appeals in this case necessarily applied § 30(A) correctly. Indeed, there are good reasons to think the court construed § 30(A) to impose an overly stringent obligation on the States. While the Ninth Circuit has understood § 30(A) to compel States to "rely on responsible cost studies," and to reimburse for services at rates that "approximate the cost of quality care provided efficiently and economically," *Orthopaedic Hospital v. Belshe,* 103 F.3d 1491, 1496 (1997), other courts have read § 30(A) to require only that rates be high enough to ensure that services are *available* to Medicaid participants. See *Pennsylvania Pharmacists Assn. v. Houstoun,* 283 F.3d 531, 538 (C.A.3 2002); *Evergreen Presbyterian Ministries, Inc. v. Hood,* 235 F.3d 908, 928–929 (C.A.5 2000); *Methodist Hospitals, Inc. v. Sullivan,* 91 F.3d 1026, 1030 (C.A.7 1996). This Court declined to grant certiorari to address whether the Ninth Circuit's reading of § 30(A) is correct. See 573 U.S. ——, 135 S.Ct. 44, 189 L.Ed.2d 897 (2014). But Justice BREYER, in his concurrence, appears to mistake that question about the merits of the Ninth Circuit's standard for the question this Court actually granted certiorari to address—that is, whether § 30 is judicially enforceable at all. See *ante,* at 1389 – 1390 (opinion concurring in part and concurring in judgment). To answer that question, one need only recognize, as Justice BREYER does, that "federal courts have long become accustomed to reviewing for reasonableness or constitutionality the rate-setting determinations made by agencies." *Ante,* at 1389. A private party who invokes the jurisdiction of the federal courts in order to enjoin a state agency's implementation of rates that are so unreasonably low as to violate § 30(A) seeks a determination of exactly this sort.
* * *

**\*1396** In sum, far from identifying a "carefully crafted ... remedial scheme" demonstrating that Congress intended to foreclose *Ex parte Young* enforcement of § 30(A), *Seminole Tribe,* 517 U.S., at 73–74, 116 S.Ct. 1114 the Court points only to two provisions. The first is § 1396c, an agency-enforcement provision that, given our precedent, cannot preclude private actions.

**Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378 (2015)**

191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247...

The second is § 30(A) itself, which, while perhaps broad, cannot be understood to manifest congressional intent to preclude judicial involvement.

The Court's error today has very real consequences. Previously, a State that set reimbursement rates so low that providers were unwilling to furnish a covered service for those who need it could be compelled by those affected to respect the obligation imposed by § 30(A). Now, it must suffice that a federal agency, with many programs to oversee, has authority to address such violations through the drastic and often counterproductive measure of withholding the funds that pay for such services. Because a faithful application of our precedents would have led to a contrary result, I respectfully dissent.

**All Citations**

135 S.Ct. 1378, 191 L.Ed.2d 471, 83 USLW 4231, Med & Med GD (CCH) P 305,247, 15 Cal. Daily Op. Serv. 3122, 2015 Daily Journal D.A.R. 3598, 25 Fla. L. Weekly Fed. S 184

---

**End of Document**  
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

F

509 F.3d 697
United States Court of Appeals,
Fifth Circuit.

EQUAL ACCESS FOR EL PASO, INC.; Monica Rivero, as next friend of Kevin Rivero; Patricia
Duarte Melendez, in her individual capacity and as next friend of Orandie Jahssar Melendez–
Duarte; Jessilyn Nagel, as next friend of Heidi Armstrong and McKenna Armstrong; Ruth
Gallegos, in her individual capacity and as next friend of Amber Villegas, Plaintiffs–Appellees,

v.

Albert HAWKINS, Commissioner of the Texas Health and Human Services
Commission, individually and in his official capacity, Defendant–Appellant.

No. 06–50599.  |  Dec. 10, 2007.

**Synopsis**
**Background:** Medicaid recipients, providers and association purporting to represent interests of both such groups brought
action alleging that state health and human services commission (HHSC) set deficient Medicaid reimbursement rates in violation
of the Medicaid Act, the Supremacy Clause, and the Equal Protection Clause. The United States District Court for the Western
District of Texas, Philip R. Martinez, J., 428 F.Supp.2d 585, granted in part and denied in part HHSC's motion to dismiss.
HHSC appealed.

**Holdings:** The Court of Appeals, Dennis, Circuit Judge, held that:

[1] Medicaid recipients had standing to assert claim under Equal Access provision of Medicaid Act, and

[2] Medicaid Act's Equal Access provision does not confer individual private rights that are enforceable under § 1983.

Reversed and remanded.

West Headnotes (9)

[1]  **Health**  Standing

Medicaid recipients had standing to assert claim against state Health and Human Services Commission (HHSC) under
Equal Access provision of Medicaid Act, since asserted injury of insufficient access to medical care and service was
fairly traceable to HHSC's alleged conduct of setting Medicaid reimbursement rates too low. Social Security Act, §
1902(a)(30)(A), 42 U.S.C.A. § 1396a(a)(30)(A).

8 Cases that cite this headnote

[2]  **Federal Courts**  Jurisdiction

**Federal Courts**  Pleading

The Court of Appeals reviews *de novo* the district court's disposition of a motion to dismiss for lack of subject-matter
jurisdiction or for failure to state a claim. Fed.Rules Civ.Proc.Rules 12(b)(1), 12(b)(6), 28 U.S.C.A.

4 Cases that cite this headnote

**[3]**   **Civil Rights**   👉 Nature and elements of civil actions

Section 1983 imposes liability on anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution and laws. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[4]**   **Civil Rights**   👉 Rights Protected

The § 1983 remedy encompasses violations of rights secured by federal statutory as well as constitutional law. 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[5]**   **Civil Rights**   👉 Rights Protected

In order to seek redress through § 1983, a plaintiff must assert the violation of a federal right, not merely a violation of federal law. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[6]**   **Civil Rights**   👉 Rights Protected

A claim based on a statutory violation is enforceable under § 1983 only when the statute creates rights, privileges, or immunities in the particular plaintiff. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[7]**   **Civil Rights**   👉 Rights Protected

A statutory provision fails to confer enforceable rights under § 1983 when it entirely lacks the sort of rights-creating language critical to showing the requisite Congressional intent to create new rights, when it speaks only in terms of institutional policy and practice, not individual concerns, and when it has an aggregate focus and is not concerned with whether the needs of any particular person have been satisfied. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[8]**   **Civil Rights**   👉 Rights Protected

Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[9]**   **Civil Rights**   👉 Public Services, Programs, and Benefits

Medicaid Act's Equal Access provision does not confer individual private rights that are enforceable under § 1983. Social Security Act, § 1902(a)(30)(A), 42 U.S.C.A. § 1396a(a)(30)(A); 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*699** Thomas Hart Watkins (argued), Brown McCarroll, Austin, TX, for Plaintiffs–Appellees.

Miguel A. Torres, El Paso, TX, for Rivero.

Rance Lamar Craft, Austin, TX, for Hawkins.

Appeal from the United States District Court for the Western District of Texas.

Before DENNIS, CLEMENT and PRADO, Circuit Judges.

**Opinion**

DENNIS, Circuit Judge:

This case requires us to determine whether, in light of the Supreme Court's decision in *Gonzaga University v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), Medicaid recipients in El Paso County, Texas, may bring an action under 42 U.S.C. § 1983 [1] to challenge whether the methods and procedures of the Texas State Medicaid Plan ("Plan") assure that the payments for care and services available under the Plan are sufficient to provide them with access to medical assistance "at least to the extent that such care and services are available to the general population in the geographic area" as required by 42 U.S.C. § 1396a(a)(30)(A). More specifically, the question presented is whether the so-called "Equal Access" requirement of § 1396a(a)(30)(A) is enforceable in an action pursuant to § 1983 so as to afford declaratory and injunctive relief because the Medicaid payment rates for the El Paso area are deficiently priced to enlist enough providers to make medical assistance under the Plan available to the Medicaid recipients in the El Paso area at least to the extent that such care and services are available to the general (non-Medicaid) population in that area.

[1]  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

> 42 U.S.C. § 1983.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.

Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. *See* 42 U.S.C. § 1396 *et seq.* Although participation in the program is voluntary, participating states must comply with certain requirements imposed by the Medicaid Act, *id.,* and regulations promulgated by the Secretary of Health and Human Services ("Secretary"). To qualify for federal assistance, a state must submit to the Secretary and have approved a "plan for medical assistance," § 1396a(a), that contains a comprehensive statement describing the nature and scope of the state's Medicaid program. 42 C.F.R. § 430.10 (2007). The state plan is required to provide, among other things, methods and procedures for the payment of care and services under the plan necessary to assure their availability to the Medicaid population to the same extent as they are available to the general population in that geographic area. 42 U.S.C. § 1396a(a)(30)(A).

Section 1396a(a)(30)(A)of the Medicaid Act sets out the requirement that Medicaid **\*700** recipients must be assured of "equal access" to medical assistance with the general populace in respect to plan-specified care and services, in pertinent part, as follows:

> A State plan for medical assistance must ... provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary ... to assure that payments ... are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area ....

42 U.S.C. § 1396a(a)(30)(A).

The state of Texas has elected to participate in the Medicaid program and has designated the Health and Human Services Commission ("HHSC"), of which defendant Hawkins is the commissioner, to administer its Plan. The Texas Medicaid program is financed through a joint federal-state arrangement, in which every $1 of state funds disbursed for Medicaid is matched by approximately $2 of federal funds. The HHSC compensates Medicaid providers through two programs: (1) the traditional fee-for-service program; and (2) the managed care program. Under the fee-for-service program, health care professionals are reimbursed based on fee schedules established by HHSC. These fee schedules, which assign discrete codes, and in turn monetary values, to hundreds of different medical procedures, are in effect and consistent statewide. Under the managed care program, HHSC administers payments to participating managed care providers, such as health maintenance organizations, using capitation or per-head rates, which are fixed amounts paid to the participating providers on a per-member, per-month basis. The capitation rates vary according to market medical service prices in each geographic area.

## B.

Plaintiff Equal Access for El Paso is a nonprofit corporation located in El Paso County, Texas, composed of individuals interested in the provision of health care in the El Paso geographic area. Its purpose is to develop health care resources and access to health care in that area. On October 24, 2003, Equal Access for El Paso, on behalf of its members, many of whom it alleges are Medicaid recipients and health care professionals and other providers directly and adversely impacted by HHSC's actions, and on behalf of the patients of its member health care professionals and providers, brought suit in the United States District Court for the Western District of Texas against HHSC.[2] Also joining in this suit were several individual Medicaid recipients residing in El Paso, who sued as individuals on their own behalf and on behalf of their respective children, as well as three health care providers (a doctor, a hospital, and a health maintenance organization) suing on their own behalf and on behalf of their Medicaid recipient patients/enrollees.[3] Together, these plaintiffs allege that HHSC set deficient Medicaid reimbursement and capitation rates, resulting in inadequate access to medical services for Medicaid recipients who live in the El Paso area as compared **\*701** to the rest of the State and as compared to individuals covered by private insurance in the El Paso area. This follows, plaintiffs contend, because the inadequate reimbursement and capitation rates, when combined with the relatively high percentage of Medicaid recipients in the El Paso area, has created a financial incentive for physicians to relocate and practice in other communities in the State and for physicians practicing in the El Paso area to seek out patients covered by employer-sponsored insurance.

[2] Plaintiffs amended their complaint on June 24, 2004, but the named parties remain the same.

[3] The district court dismissed the claims of both the individual providers and the provider members of Equal Access for El Paso, finding that the providers did not have a private right of action under 42 U.S.C. § 1396a(a)(30)(A). The dismissal of those claims is not before this court on interlocutory appeal.

 [1]    In the district court, plaintiffs originally brought suit under § 1983, alleging violations of six provisions of the Medicaid Act, the Supremacy Clause, and the Equal Protection Clause of the Fourteenth Amendment. HHSC then filed a motion to

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and, in the alternative, Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The district court denied HHSC's 12(b)(1) motion, finding that the plaintiffs had standing, but granted its 12(b)(6) motion, dismissing all of the plaintiffs' claims with the exception of the recipients' claim under § 1396a(a)(30)(A)' s "Equal Access" provision. The district court denied the defendant's motion with respect to the Equal Access claim because the court determined that this particular statutory provision confers on Medicaid recipients an individual federal right enforceable through § 1983. [4] On interlocutory appeal, HHSC contends that, in light of the Supreme Court's decision in *Gonzaga,* the Equal Access provision does not create a federal right of action enforceable through § 1983. [5]

[4]     The district court was obliged to so decide by our prior decision in *Evergreen Presbyterian Ministries Inc. v. Hood,* 235 F.3d 908 (5th Cir.2000), in which we held that the Equal Access provision of § 1396a(30)(A) gave Medicaid recipients, but not providers, a federal statutory right enforceable under § 1983. In view of the fact that the Supreme Court's intervening decision in *Gonzaga,* 536 U.S. at 273, 122 S.Ct. 2268, may have partially overruled *Evergreen,* however, the district court elected to certify that question to us rather than to proceed immediately to determine whether declaratory and injunctive relief was appropriate.

[5]     HHSC also challenges on appeal the district court's determination that the Medicaid-recipient plaintiffs in this action have standing to assert a claim under the Equal Access provision. We agree with the district court's extensive analysis that plaintiffs' asserted injury —insufficient access to medical care and services—is fairly traceable to HHSC's conduct and will likely be redressed if they are granted the declaratory and injunctive relief that they have requested. Several courts have recognized the direct connection between Medicaid recipients' access to medical care and services and low reimbursement rates. *See, e.g., Okla. Chapter of the Am. Acad. of Pediatrics v. Fogarty,* 366 F.Supp.2d 1050, 1106–07 (N.D.Okla.2005); *Memisovski ex rel. Memisovski v. Maram,* No. 92–C–1982, 2004 WL 1878332, at *42 (N.D.Ill. Aug.23, 2004) (unreported); *Clayworth v. Bonta,* 295 F.Supp.2d 1110, 1116 (E.D.Cal.2003), *rev'd on other grounds,* 140 Fed.Appx. 677 (9th Cir.2005); *Clark v. Kizer,* 758 F.Supp. 572, 577 (E.D.Cal.1990), *aff'd in relevant part, Clark v. Coye,* 967 F.2d 585 (9th Cir.1992); *Thomas v. Johnston,* 557 F.Supp. 879, 903–04 (W.D.Tex.1983). Moreover, we take judicial notice of the fact that HHSC has itself expressly recognized this connection in its bi-annual Consolidated Budget that it submitted to the Texas Legislature in October 2006, wherein it argued that "[r]ate increases for physicians would promote access to care for Medicaid clients that would likely erode without the increase." TEX. HEALTH & HUMAN SERVS. COMM'N, CONSOL. BUDGET FINANCIAL YEAR R 2008–2009, at 54 (2006). We therefore have no difficulty concluding that the recipient plaintiffs have standing to assert their Equal Access provision claim.

## II. STANDARD OF REVIEW

 [2]     This court reviews *de novo* the district court's disposition of a motion to dismiss  **\*702**  under either Rule 12(b)(1) or Rule 12(b)(6). *See Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough,* 354 F.3d 348, 351 (5th Cir.2003).

## III. DISCUSSION

 [3]    [4]    [5]    " 'Section 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." ' " *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (internal quotations omitted). The § 1983 remedy encompasses violations of rights secured by federal statutory as well as constitutional law. *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). In order to seek redress through § 1983, therefore, "a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*" *Blessing,* 520 U.S. at 340, 117 S.Ct. 1353 (emphasis in original) (citing *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989)).

In *Gonzaga,* the Supreme Court noted that some language in its prior opinions had suggested that something less than an unambiguously conferred right is enforceable by § 1983. 536 U.S. at 282, 122 S.Ct. 2268. As an example, the Court quoted from

*Blessing*: " 'Congress must have intended that the provision in question benefit the plaintiff,' 'the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence,' and 'the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.' " *Id.* (quoting *Blessing,* 520 U.S. at 340–41, 117 S.Ct. 1353). On the other hand, the Court pointed out that *Blessing,* in the same paragraph, emphasized that "it is only violations of rights, not laws, which give rise to § 1983 actions." *Id.* at 283, 122 S.Ct. 2268 (citing *Blessing,* 520 U.S. at 340, 117 S.Ct. 1353). Consequently, the Court in *Gonzaga* concluded that "[t]his confusion has led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect ...." *Id.*

After reviewing its previous decisions in some detail, the Supreme Court in *Gonzaga* expressly rejected "the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* The Court then declared:

Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is *rights,* not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section.

*Id.* (emphasis in original).

[6]    Further, the Court in *Gonzaga* set forth some of the factors from its prior cases that are indications of Congressional intent to make statutory provisions enforceable under § 1983. "[A] claim based on a statutory violation is enforceable under § 1983 only when the statute creates 'rights, privileges, or immunities' in the particular plaintiff." *Id.* at 285, 122 S.Ct. 2268 (quoting *Golden State Transit Corp.,* 493 U.S. at 108 n. 4, 110 S.Ct. 444). Such inquiries simply require a determination as to whether Congress intended to confer individual rights upon a class of beneficiaries. *Id.* (citing *Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); **\*703** *Wright v. Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)).

[7]    On the contrary, the *Gonzaga* Court observed, a statutory provision fails to confer enforceable rights when it "entirely lack[s] the sort of 'rights-creating' language critical to showing the requisite Congressional intent to create new rights," *id.* at 287, 122 S.Ct. 2268 (citing *Alexander,* 532 U.S. at 288–289, 121 S.Ct. 1511; *Cannon v. Univ. of Chi.,* 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)); when it "speak [s] only in terms of institutional policy and practice, not individual" concerns, *id.* at 288, 122 S.Ct. 2268; and when it has "an 'aggregate' focus [and is] not concerned with 'whether the needs of any particular person have been satisfied,' " *id.* (citing *Blessing,* 520 U.S. at 343–44, 117 S.Ct. 1353).

[8]    In *Gonzaga,* the Court explained that plaintiffs under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. Thus, once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.[6] *Id.* at 284, 122 S.Ct. 2268.

[6]    The Court in *Gonzaga* further explained that "[t]he State may rebut this presumption by showing that Congress 'specifically foreclosed a remedy under § 1983.' " *Gonzaga Univ. v. Doe,* 536 U.S. 273, 285 n. 4, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (quoting *Smith v. Robinson,* 468 U.S. 992, 1004–05, n. 9, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)). "The State's burden is to demonstrate that Congress shut the door to private enforcement either expressly, through 'specific evidence from the statute itself,' [*Wright,* 479 U.S. at 423, 107 S.Ct. 766], or 'impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983,' [*Blessing,* 520 U.S. at 341, 117 S.Ct. 1353]. *See also Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)." *Id.* But the Court added that these questions did not arise in *Gonzaga* due to its conclusion that the Family Educational Rights and Privacy Act "confers no individual rights and thus cannot give rise to a presumption of enforceability under § 1983." *Id.*

Similarly, in the present case, the question of whether the State of Texas may rebut such a presumption does not arise due to our conclusion that the Equal Access provision confers no individual right within the context of this case enforceable under § 1983.

 **[9]** Applying the foregoing principles, we conclude that the Medicaid Act's Equal Access provision, 42 U.S.C. § 1396a(a)(30)(A), does not confer individual private rights that are enforceable under § 1983. The provision does not contain sufficient "rights-creating" language critical to showing unambiguously the requisite Congressional intent to create individualized rights for Medicaid recipients and health care providers. Even when read in the context of the entire statute, the Equal Access provision does not create rights for individuals or an identifiable class. It speaks only to the state and the Secretary in their functions of proposing and approving a state plan calculated to "enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." § 1396a(a)(30)(A). Thus, like the provisions at issue in *Gonzaga* and *Blessing,* the Equal Access provision speaks only in terms of institutional policy and practice, has an "aggregate" rather than an individualized focus, and is not concerned with whether the needs of any particular person or class of individuals have been satisfied. It therefore does not create a private individual right enforceable under § 1983.

 **\*704** Before *Gonzaga,* we held in *Evergreen,* 235 F.3d 908, 927–29 (5th Cir.2000), that Medicaid recipients, but not providers, may bring actions under § 1983 to enforce the Equal Access provision against a state administrator of a Medicaid state plan. It is evident, however, that the Supreme Court in *Gonzaga* abrogated *Evergreen* in respect to such suits by recipients while confirming it insofar as it disallows § 1983 actions by providers under the Equal Access provision.

We may no longer, as we did in *Evergreen,* resolve the ambiguities in *Blessing, Wilder,* and the Equal Access provision in favor of finding a Congressional intent to authorize Medicaid recipients to bring Equal Access provision suits under § 1983. We are forced by *Gonzaga* to abjure the notion that anything short of an unambiguously conferred private individual "right," rather than the broader or vaguer "benefits" or "interests," may be enforced under § 1983. Accordingly, we may not follow *Evergreen's* essential inference that, because Congress's aim in the Medicaid Act was to protect the interests of health care recipients as its primary, ultimate beneficiaries, Congress necessarily meant for recipients to enforce the Equal Access provision in private suits under § 1983. The Equal Access provision has a clearly aggregate and systemic focus that deals with institutional policy and procedures, rather than an individualized focus concerned with whether the needs of any particular person or class of recipients have been satisfied. Consequently, we conclude that the Equal Access provision, which plausibly invests the Secretary with the exclusive power and duty of carrying it into effect, does not necessarily or unambiguously create, in addition, private rights in recipients to enforce Equal Access by individual or class suits under § 1983. *Accord Mandy R. v. Owens,* 464 F.3d 1139, 1148 (10th Cir.2006); *Westside Mothers v. Olszewski,* 454 F.3d 532, 542–43 (6th Cir.2006); *Sanchez v. Johnson,* 416 F.3d 1051, 1059–61 (9th Cir.2005); *Long Term Care Pharmacy Alliance v. Ferguson,* 362 F.3d 50, 57 (1st Cir.2004). *Contra Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.,* 443 F.3d 1005, 1014–16 (8th Cir.2006), *vacated on other grounds, Selig v. Pediatric Specialty Care, Inc.,* 551 U.S. 1142, 127 S.Ct. 3000, 168 L.Ed.2d 724 (2007).

## IV. CONCLUSION

For these reasons, the district court's judgment partially denying the defendant's motion to dismiss the plaintiffs' Equal Access provision claim under § 1983 is REVERSED and the case is REMANDED to the district court with directions to enter a judgment dismissing all claims with prejudice.

**All Citations**

509 F.3d 697, Med & Med GD (CCH) P 302,254

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

G

# CONFERENCE COMMITTEE REPORT

**3RD Printing**

# H.B. NO. 1
# GENERAL APPROPRIATIONS
# BILL

# TABLE OF CONTENTS

**RECAPITULATION - ALL ARTICLES**................................................................................................ix

## ARTICLE I - GENERAL GOVERNMENT

Arts, Commission on the...........................................................................................................I-1
Attorney General, Office of the ...............................................................................................I-3
Bond Review Board...................................................................................................................I-12
Cancer Prevention and Research Institute of Texas..................................................................I-13
Comptroller of Public Accounts ...............................................................................................I-16
Fiscal Programs - Comptroller of Public Accounts ..................................................................I-22
    Informational Listing of Funds Appropriated to the Comptroller for Social Security BRP.......I-27
Emergency Communications, Commission on State..................................................................I-28
Emergency Services Retirement System, Texas........................................................................I-31
Employees Retirement System ..................................................................................................I-32
Ethics Commission, Texas.........................................................................................................I-36
Facilities Commission................................................................................................................I-38
Finance Authority, Public ..........................................................................................................I-46
Governor, Office of the..............................................................................................................I-51
Trusteed Programs within the Office of the Governor...............................................................I-52
Historical Commission...............................................................................................................I-61
Information Resources, Department of.......................................................................................I-66
Library & Archives Commission...............................................................................................I-72
Pension Review Board................................................................................................................I-76
Preservation Board.....................................................................................................................I-77
Risk Management, State Office of .............................................................................................I-80
Secretary of State ......................................................................................................................I-82
Veterans Commission ................................................................................................................I-85
Retirement and Group Insurance ..............................................................................................I-89
Social Security and Benefit Replacement Pay...........................................................................I-90
Bond Debt Service Payments.....................................................................................................I-90
Lease Payments..........................................................................................................................I-91
Recapitulation - Article I - General Revenue............................................................................I-92
Recapitulation - Article I - General Revenue - Dedicated ........................................................I-93
Recapitulation - Article I - Federal Funds ................................................................................I-94
Recapitulation - Article I - Other Funds ...................................................................................I-95
Recapitulation - Article I - All Funds .......................................................................................I-96

## ARTICLE II - HEALTH AND HUMAN SERVICES

Aging and Disability Services, Department of ...........................................................................II-1
Assistive and Rehabilitative Services, Department of ...............................................................II-18
Family and Protective Services, Department of..........................................................................II-30
State Health Services, Department of .........................................................................................II-47
Health and Human Services Commission...................................................................................II-76
Retirement and Group Insurance ...............................................................................................II-107
Social Security and Benefit Replacement Pay...........................................................................II-108
Bond Debt Service Payments.....................................................................................................II-108
Lease Payments..........................................................................................................................II-109
Special Provisions Relating to All Health and Human Services Agencies.................................II-109
Recapitulation - Article II - General Revenue ..........................................................................II-135
Recapitulation - Article II - General Revenue - Dedicated.......................................................II-136
Recapitulation - Article II - Federal Funds ..............................................................................II-137
Recapitulation - Article II - Other Funds .................................................................................II-138
Recapitulation - Article II - All Funds......................................................................................II-139

## ARTICLE III - EDUCATION

Education Agency, Texas ...........................................................................................................III-1
Blind and Visually Impaired, School for the .............................................................................III-21
Deaf, School for the ...................................................................................................................III-25
Special Provisions for the School for the Blind and Visually Impaired /
School for the Deaf.....................................................................................................................III-27
Teacher Retirement System .......................................................................................................III-28
Optional Retirement Program ....................................................................................................III-33
Group Insurance Contributions, Higher Education Employees..................................................III-34
Higher Education Coordinating Board .......................................................................................III-39
Higher Education Fund...............................................................................................................III-56
The University of Texas System Administration........................................................................III-56
Available University Fund..........................................................................................................III-58

i

Available National Research University Fund.................................................................................III-61
Permanent Fund Supporting Military and Veterans Exemptions ....................................................III-62
The University of Texas at Arlington ............................................................................................III-62
The University of Texas at Austin.................................................................................................III-65
The University of Texas at Dallas.................................................................................................III-69
The University of Texas at El Paso...............................................................................................III-71
The University of Texas at Rio Grande Valley.............................................................................III-74
The University of Texas of the Permian Basin .............................................................................III-78
The University of Texas at San Antonio.......................................................................................III-80
The University of Texas at Tyler..................................................................................................III-83
Texas A&M University System Administrative and General Offices............................................III-85
Texas A&M University...................................................................................................................III-86
Texas A&M University at Galveston.............................................................................................III-88
Prairie View A&M University.......................................................................................................III-90
Tarleton State University ...............................................................................................................III-93
Texas A&M University - Central Texas ........................................................................................III-95
Texas A&M University - Corpus Christi .......................................................................................III-97
Texas A&M University - Kingsville..............................................................................................III-100
Texas A&M University – San Antonio..........................................................................................III-102
Texas A&M International University .............................................................................................III-104
West Texas A&M University .........................................................................................................III-106
Texas A&M University - Commerce..............................................................................................III-109
Texas A&M University - Texarkana ..............................................................................................III-111
University of Houston System Administration...............................................................................III-113
University of Houston.....................................................................................................................III-115
University of Houston - Clear Lake................................................................................................III-117
University of Houston - Downtown................................................................................................III-119
University of Houston - Victoria ....................................................................................................III-121
Midwestern State University...........................................................................................................III-122
University of North Texas System Administration.........................................................................III-125
University of North Texas ..............................................................................................................III-126
University of North Texas at Dallas ...............................................................................................III-128
Stephen F. Austin State University .................................................................................................III-130
Texas Southern University...............................................................................................................III-132
Texas Tech University System Administration ..............................................................................III-135
Texas Tech University .....................................................................................................................III-136
Angelo State University...................................................................................................................III-138
Texas Woman's University...............................................................................................................III-140
Texas State University System ........................................................................................................III-143
Lamar University .............................................................................................................................III-144
Lamar Institute of Technology........................................................................................................III-146
Lamar State College - Orange.........................................................................................................III-148
Lamar State College - Port Arthur ..................................................................................................III-150
Sam Houston State University .........................................................................................................III-151
Texas State University .....................................................................................................................III-154
Sul Ross State University.................................................................................................................III-156
Sul Ross State University Rio Grande College...............................................................................III-158
The University of Texas Southwestern Medical Center .................................................................III-160
The University of Texas Medical Branch at Galveston ..................................................................III-163
The University of Texas Health Science Center at Houston...........................................................III-167
The University of Texas Health Science Center at San Antonio ....................................................III-171
The University of Texas M. D. Anderson Cancer Center................................................................III-175
The University of Texas Health Center at Tyler.............................................................................III-179
Texas A&M University System Health Science Center .................................................................III-182
University of North Texas Health Science Center at Fort Worth ....................................................III-187
Texas Tech University Health Sciences Center...............................................................................III-191
Texas Tech University Health Sciences Center at El Paso ............................................................III-194
Public Community/Junior Colleges .................................................................................................III-198
Texas State Technical College System Administration..................................................................III-207
Texas State Technical College - Harlingen.....................................................................................III-210
Texas State Technical College - West Texas..................................................................................III-211
Texas State Technical College - Marshall ......................................................................................III-213
Texas State Technical College - Waco ...........................................................................................III-214
Special Provisions Relating Only to Components of Texas State Technical College .....................III-216
Texas A&M Agrilife Research ........................................................................................................III-218
Texas A&M Agrilife Extension Service.........................................................................................III-221
Texas A&M Engineering Experiment Station ................................................................................III-224
Texas A&M Transportation Institute..............................................................................................III-226
Texas A&M Engineering Extension Service ..................................................................................III-229
Texas A&M Forest Service ............................................................................................................III-231
Texas A&M Veterinary Medical Diagnostic Laboratory ..............................................................III-234

Retirement and Group Insurance ..................................................................................................III-236
Social Security and Benefit Replacement Pay.............................................................................III-237
Bond Debt Service Payments.......................................................................................................III-237
Lease Payments............................................................................................................................III-238
Special Provisions Relating Only to State Agencies of Higher Education ..................................III-238
Recapitulation - Article III - General Revenue ...........................................................................III-262
Recapitulation - Article III - General Revenue - Dedicated .......................................................III-264
Recapitulation - Article III - Federal Funds................................................................................III-266
Recapitulation - Article III - Other Funds...................................................................................III-267
Recapitulation - Article III - All Funds.......................................................................................III-268

## ARTICLE IV - THE JUDICIARY

Supreme Court of Texas ................................................................................................................ IV-1
Court of Criminal Appeals............................................................................................................. IV-3
First Court of Appeals District, Houston ...................................................................................... IV-6
Second Court of Appeals District, Fort Worth .............................................................................. IV-8
Third Court of Appeals District, Austin........................................................................................ IV-9
Fourth Court of Appeals District, San Antonio ........................................................................... IV-10
Fifth Court of Appeals District, Dallas ........................................................................................ IV-11
Sixth Court of Appeals District, Texarkana................................................................................. IV-12
Seventh Court of Appeals District, Amarillo............................................................................... IV-13
Eighth Court of Appeals District, El Paso ................................................................................... IV-14
Ninth Court of Appeals District, Beaumont................................................................................. IV-16
Tenth Court of Appeals District, Waco ....................................................................................... IV-17
Eleventh Court of Appeals District, Eastland .............................................................................. IV-18
Twelfth Court of Appeals District, Tyler..................................................................................... IV-19
Thirteenth Court of Appeals District, Corpus Christi - Edinburg................................................ IV-20
Fourteenth Court of Appeals District, Houston ........................................................................... IV-21
Office of Court Administration, Texas Judicial Council ............................................................. IV-22
Office of Capital Writs................................................................................................................. IV-28
State Prosecuting Attorney, Office of the .................................................................................... IV-29
State Law Library ........................................................................................................................ IV-30
Commission on Judicial Conduct, State ...................................................................................... IV-32
Judiciary Section, Comptroller's Department.............................................................................. IV-33
Retirement and Group Insurance ................................................................................................. IV-37
Social Security and Benefit Replacement Pay............................................................................. IV-38
Lease Payments............................................................................................................................ IV-38
Special Provisions - Judiciary...................................................................................................... IV-39
Recapitulation - Article IV - General Revenue............................................................................ IV-40
Recapitulation - Article IV - General Revenue - Dedicated ........................................................ IV-41
Recapitulation - Article IV - Federal Funds................................................................................. IV-42
Recapitulation - Article IV - Other Funds ................................................................................... IV-43
Recapitulation - Article IV - All Funds ....................................................................................... IV-44

## ARTICLE V - PUBLIC SAFETY AND CRIMINAL JUSTICE

Alcoholic Beverage Commission.................................................................................................... V-1
Criminal Justice, Department of .................................................................................................... V-4
Fire Protection, Commission on.................................................................................................... V-21
Jail Standards, Commission on ..................................................................................................... V-23
Juvenile Justice Department.......................................................................................................... V-24
Law Enforcement, Commission on................................................................................................ V-36
Military Department....................................................................................................................... V-39
Public Safety, Department of ........................................................................................................ V-44
Retirement and Group Insurance ................................................................................................... V-60
Social Security and Benefit Replacement Pay............................................................................... V-60
Bond Debt Service Payments......................................................................................................... V-61
Lease Payments.............................................................................................................................. V-61
Special Provisions Relating to Public Safety and Criminal Justice Agencies ................................ V-61
Recapitulation - Article V - General Revenue................................................................................ V-62
Recapitulation - Article V - General Revenue - Dedicated............................................................ V-63
Recapitulation - Article V - Federal Funds.................................................................................... V-64
Recapitulation - Article V - Other Funds....................................................................................... V-65
Recapitulation - Article V - All Funds........................................................................................... V-66

## ARTICLE VI - NATURAL RESOURCES

Agriculture, Department of ........................................................................................................... VI-1
Animal Health Commission.......................................................................................................... VI-10
Commission on Environmental Quality........................................................................................ VI-13

# TABLE OF CONTENTS
(Continued)

General Land Office and Veterans' Land Board ............................................................................ VI-24
Low-Level Radioactive Waste Disposal Compact Commission ..................................................... VI-30
Parks and Wildlife Department ...................................................................................................... VI-32
Railroad Commission ..................................................................................................................... VI-45
Soil and Water Conservation Board ............................................................................................... VI-50
Water Development Board .............................................................................................................. VI-53
Retirement and Group Insurance ................................................................................................... VI-61
Social Security and Benefit Replacement Pay ............................................................................... VI-62
Bond Debt Service Payments ......................................................................................................... VI-62
Lease Payments .............................................................................................................................. VI-62
Recapitulation - Article VI - General Revenue .............................................................................. VI-64
Recapitulation - Article VI - General Revenue - Dedicated .......................................................... VI-65
Recapitulation - Article VI - Federal Funds .................................................................................. VI-66
Recapitulation - Article VI - Other Funds ..................................................................................... VI-67
Recapitulation - Article VI - All Funds ......................................................................................... VI-68

## ARTICLE VII - BUSINESS AND ECONOMIC DEVELOPMENT

Housing and Community Affairs, Department of ............................................................................ VII-1
Lottery Commission, Texas ............................................................................................................ VII-7
Motor Vehicles, Department of ...................................................................................................... VII-11
Transportation, Department of ........................................................................................................ VII-14
Workforce Commission, Texas ....................................................................................................... VII-31
    Reimbursements to the Unemployment Compensation Benefit Account ............................. VII-45
Retirement and Group Insurance ................................................................................................... VII-46
Social Security and Benefit Replacement Pay ............................................................................... VII-47
Bond Debt Service Payments ......................................................................................................... VII-47
Lease Payments .............................................................................................................................. VII-47
Recapitulation - Article VII - General Revenue ............................................................................ VII-49
Recapitulation - Article VII - General Revenue - Dedicated ......................................................... VII-50
Recapitulation - Article VII - Federal Funds ................................................................................. VII-51
Recapitulation - Article VII - Other Funds .................................................................................... VII-52
Recapitulation - Article VII - All Funds ........................................................................................ VII-53

## ARTICLE VIII - REGULATORY

Administrative Hearings, State Office of ........................................................................................ VIII-1
Chiropractic Examiners, Board of .................................................................................................. VIII-5
Dental Examiners, Texas State Board of ........................................................................................ VIII-7
Funeral Service Commission .......................................................................................................... VIII-9
Geoscientists, Board of Professional .............................................................................................. VIII-11
Health Professions Council ............................................................................................................ VIII-13
Injured Employee Counsel, Office of ............................................................................................. VIII-14
Insurance, Department of ................................................................................................................ VIII-16
Insurance Counsel, Office of Public .............................................................................................. VIII-24
Land Surveying, Board of Professional .......................................................................................... VIII-26
Licensing and Regulation, Department of ...................................................................................... VIII-27
Texas Medical Board ...................................................................................................................... VIII-32
Nursing, Texas Board of ................................................................................................................. VIII-36
Optometry Board ............................................................................................................................ VIII-39
Pharmacy, Board of ........................................................................................................................ VIII-40
Physical Therapy & Occupational Therapy Examiners, Executive Council of ............................. VIII-43
Plumbing Examiners, Board of ...................................................................................................... VIII-45
Podiatric Medical Examiners, Board of ......................................................................................... VIII-46
Psychologists, Board of Examiners of ........................................................................................... VIII-48
Racing Commission ........................................................................................................................ VIII-49
Securities Board ............................................................................................................................. VIII-53
Utility Commission of Texas, Public ............................................................................................. VIII-55
Utility Counsel, Office of Public ................................................................................................... VIII-59
Veterinary Medical Examiners, Board of ....................................................................................... VIII-60
Retirement and Group Insurance ................................................................................................... VIII-62
Social Security and Benefit Replacement Pay ............................................................................... VIII-63
Lease Payments .............................................................................................................................. VIII-63
Special Provisions Relating to All Regulatory Agencies ............................................................... VIII-63
Recapitulation - Article VIII - General Revenue ........................................................................... VIII-67
Recapitulation - Article VIII - General Revenue - Dedicated ....................................................... VIII-68
Recapitulation - Article VIII - Federal Funds ............................................................................... VIII-69
Recapitulation - Article VIII - Other Funds .................................................................................. VIII-70
Recapitulation - Article VIII - All Funds ...................................................................................... VIII-71

# TABLE OF CONTENTS
## (Continued)

## ARTICLE IX - GENERAL PROVISIONS

GENERAL PROVISIONS LEGISLATIVE INTENT ................................................................. IX-1
    Sec. 1.01. Limitations ....................................................................................................... IX-1

PROVISIONS RELATING TO THE POSITION CLASSIFICATION PLAN .............................. IX-1
    Sec. 2.01. Position Classification Plan.............................................................................. IX-1
        Classified Positions for the 2016-17 Biennium.......................................... IX-1
        Schedule A Classification Salary Schedule ............................................... IX-17
        Schedule B Classification Salary Schedule................................................ IX-17
        Schedule C Classification Salary Schedule................................................ IX-18

SALARY ADMINISTRATION AND OTHER EMPLOYMENT PROVISIONS ........................ IX-18
    Sec. 3.01. Salary Rates...................................................................................................... IX-18
    Sec. 3.02. Salary Supplementation .................................................................................. IX-19
    Sec. 3.03. Salary Limits ................................................................................................... IX-19
    Sec. 3.04. Scheduled Exempt Positions. .......................................................................... IX-19
    Sec. 3.05. Evening, Night, Weekend Shift Pay: Registered Nurses and Licensed
            Vocational Nurses ........................................................................................ IX-21
    Sec. 3.06. Recruitment and Retention Bonuses ............................................................... IX-21
    Sec. 3.07. Equity Adjustments......................................................................................... IX-21
    Sec. 3.08. Classification Study on Scheduled Exempt Positions...................................... IX-22
    Sec. 3.09. Method of Salary Payments ............................................................................ IX-22
    Sec. 3.10. Exception - Contracts Less than 12 Months.................................................... IX-22
    Sec. 3.11. Exceptions for Certain Employees.................................................................. IX-22
    Sec. 3.12. Exceptions for Salary Schedule C ................................................................. IX-22
    Sec. 3.13. Matching Retirement and Certain Insurance.................................................. IX-22

GRANT-MAKING PROVISIONS........................................................................................... IX-23
    Sec. 4.01. Grant Restriction .............................................................................................. IX-23
    Sec. 4.02. Grants ............................................................................................................... IX-23
    Sec. 4.03. Grants for Political Polling Prohibited ............................................................. IX-23
    Sec. 4.04. Limitation on Grants to Units of Local Government ....................................... IX-23

TRAVEL REGULATIONS...................................................................................................... IX-24
    Sec. 5.01. Travel Definitions. ........................................................................................... IX-24
    Sec. 5.02. General Travel Provisions................................................................................ IX-24
    Sec. 5.03. Transportation Expenses ................................................................................. IX-24
    Sec. 5.04. Transportation in Personally Owned or Leased Aircraft.................................. IX-24
    Sec. 5.05. Travel Meals and Lodging Expenses ............................................................... IX-24
    Sec. 5.06. Special Provisions Regarding Travel Expenses ............................................... IX-25
    Sec. 5.07. Travel and Per Diem of Board or Commission Members................................ IX-25
    Sec. 5.08. Travel of Advisory Committee Members ......................................................... IX-25

GENERAL LIMITATIONS ON EXPENDITURES.................................................................. IX-26
    Sec. 6.01. Unexpended Balance......................................................................................... IX-26
    Sec. 6.02. Interpretation of Estimates ............................................................................. IX-26
    Sec. 6.03. Excess Obligations Prohibited ........................................................................ IX-26
    Sec. 6.04. Interpretation of Legislative Intent.................................................................. IX-26
    Sec. 6.05. Comptroller's Duty to Pay ............................................................................... IX-27
    Sec. 6.06. Last Quarter Expenditures............................................................................... IX-27
    Sec. 6.07. Employee Benefit and Debt Service Items ...................................................... IX-27
    Sec. 6.08. Benefits Paid Proportional by Fund .................................................................. IX-27
    Sec. 6.09. Appropriations from Special Funds ................................................................. IX-28
    Sec. 6.10. Limitation on State Employment Levels.......................................................... IX-28
    Sec. 6.11. Purchases of Postage ...................................................................................... IX-31
    Sec. 6.12. Expenditures for State-Federal Relations........................................................ IX-31
    Sec. 6.13. Performance Rewards and Penalties ................................................................ IX-31
    Sec. 6.14. Bookkeeping Entries ....................................................................................... IX-32
    Sec. 6.15. Accounting for State Expenditures ................................................................. IX-32
    Sec. 6.16. Fee Increase Notification ................................................................................ IX-32
    Sec. 6.17. Consolidated Funds.......................................................................................... IX-32
    Sec. 6.18. Demographic and Statistical Studies................................................................ IX-32
    Sec. 6.19. Cost Allocations.............................................................................................. IX-33
    Sec. 6.20. Use of Appropriations to Contract for Audits.................................................. IX-33
    Sec. 6.21. Limitations on Use of Appropriated Funds..................................................... IX-33
    Sec. 6.22. Informational Items......................................................................................... IX-33
    Sec. 6.23. Appropriations from State Tax Revenue.......................................................... IX-33
    Sec. 6.24. Deposit and Notification Requirement for Certain RESTORE Act Funds ............ IX-33

# TABLE OF CONTENTS
## (Continued)

REPORTING REQUIREMENTS ......................................................................................... IX-34
Sec. 7.01. Budgeting and Reporting ......................................................................... IX-34
Sec. 7.02. Annual Reports and Inventories............................................................... IX-35
Sec. 7.03. Notification to Members of the Legislature.............................................. IX-35
Sec. 7.04. Contract Notification: Amounts Greater than $50,000 ........................... IX-35
Sec. 7.05. Reports and References............................................................................ IX-35
Sec. 7.06. Internal Assessments on Utilization of Historically Underutilized
            Businesses ............................................................................................... IX-36
Sec. 7.07. Historically Underutilized Business Policy Compliance ......................... IX-36
Sec. 7.08. Reporting of Historically Underutilized Business (HUB) Key Measures ............. IX-36
Sec. 7.09. Fraud Reporting ...................................................................................... IX-37
Sec. 7.10. Reporting Requirement for Deepwater Horizon Oil Spill Funds........................ IX-37
Sec. 7.11. Border Security ....................................................................................... IX-37
Sec. 7.12. Notification of Certain Purchases or Contract Awards, Amendments,
            and Extensions ....................................................................................... IX-38
Sec. 7.13. Notification of Certain Expenditures Related to Mitigation of
            Adverse Environmental Impacts .............................................................. IX-40

OTHER APPROPRIATION AUTHORITY ....................................................................... IX-40
Sec. 8.01. Acceptance of Gifts of Money ................................................................ IX-40
Sec. 8.02. Reimbursements and Payments............................................................... IX-40
Sec. 8.03. Surplus Property...................................................................................... IX-41
Sec. 8.04. Refunds of Deposits ............................................................................... IX-42
Sec. 8.05. Vending Machines ................................................................................. IX-42
Sec. 8.06. Pay Station Telephones .......................................................................... IX-42
Sec. 8.07. Appropriation of Collections for Seminars and Conferences ................. IX-42
Sec. 8.08. Appropriation of Bond Proceeds............................................................ IX-43
Sec. 8.09. CMIA Interest Payments........................................................................ IX-43
Sec. 8.10. Appropriation of Receipts: Credit, Charge, Debit Card, or Electronic
            Cost Recovery Service Fees.................................................................... IX-43
Sec. 8.11. Employee Meal Authorization ............................................................... IX-43
Sec. 8.12. Bank Fees and Charges .......................................................................... IX-43
Sec. 8.13. Appropriation of Specialty License Plate Receipts................................. IX-43
Sec. 8.14. Cost Recovery of Testing Fees............................................................... IX-43
Sec. 8.15. Cost Recovery of Fees ........................................................................... IX-44

INFORMATION RESOURCES PROVISIONS ................................................................. IX-44
Sec. 9.01. Purchases of Information Resources Technologies.................................. IX-44
Sec. 9.02. Quality Assurance Review of Major Information Resources Projects.................. IX-44
Sec. 9.03. Biennial Operating Plan and Information Resources Strategic Plan
            Approval................................................................................................. IX-45
Sec. 9.04. Information Technology Replacement..................................................... IX-45
Sec. 9.05. Texas.gov Project: Occupational Licenses.............................................. IX-46
Sec. 9.06. Texas.gov Project: Cost Recovery Fees ................................................. IX-46
Sec. 9.07. Payments to the Department of Information Resources............................ IX-46
Sec. 9.08. Computer Inventory Report .................................................................... IX-47
Sec. 9.09. Server Consolidation Status Update........................................................ IX-47
Sec. 9.10. Prioritization of Cybersecurity and Legacy System Projects.................. IX-48
Sec. 9.11. Cybersecurity Initiatives ........................................................................ IX-48
Sec. 9.12. Surplus Information Technology Hardware.............................................. IX-49

HEALTH-RELATED PROVISIONS.................................................................................. IX-49
Sec. 10.01.  Full Application for Health Coverage ................................................... IX-49
Sec. 10.02.  Appropriation of Disproportionate Share Hospital Payments to
            State - Owned Hospitals.......................................................................... IX-49
Sec. 10.03.  Informational Listing on Use of Tobacco Settlement Receipts ............ IX-49
Sec. 10.04.  Statewide Behavioral Health Strategic Plan and Coordinated
            Expenditures........................................................................................... IX-51
Sec. 10.05.  Funding for Autism Services ................................................................ IX-53

PROVISIONS RELATED TO REAL PROPERTY............................................................ IX-54
Sec. 11.01.  Limitation on Use of Funds for Personal Residences ........................... IX-54
Sec. 11.02.  Reporting Related to State Owned Housing .......................................... IX-54
Sec. 11.03.  Statewide Capital Planning ................................................................... IX-54
Sec. 11.04.  Efficient Use of State Owned and Leased Space ................................... IX-55
Sec. 11.05.  State Agency Emergency Leases ........................................................... IX-55
Sec. 11.06.  Prepayment of Annual Lease Costs........................................................ IX-56
Sec. 11.07.  Efficient Use of State Property to House State Facilities....................... IX-56

# TABLE OF CONTENTS
## (Continued)

PROVISIONS RELATED TO PROPERTY ................................................................................ IX-56
    Sec. 12.01.    Aircraft ............................................................................................ IX-56
    Sec. 12.02.    Publication or Sale of Printed, Recorded, or Electronically Produced
                Matter or Records .......................................................................... IX-57
    Sec. 12.03.    Limitation on Expenditures for Purchases and Conversions of
                Alternative Fuel Vehicles .............................................................. IX-57
    Sec. 12.04.    Transfer of Master Lease Purchase Program Payments ................... IX-57

FEDERAL FUNDS ................................................................................................................. IX-58
    Sec. 13.01.    Federal Funds/Block Grants ............................................................ IX-58
    Sec. 13.02.    Report of Additional Funding .......................................................... IX-58
    Sec. 13.03.    Report of Expanded Operational Capacity ....................................... IX-58
    Sec. 13.04.    Reports to Comptroller ..................................................................... IX-58
    Sec. 13.05.    Deposit and Expenditure Limitations ............................................... IX-58
    Sec. 13.06.    Reimbursements from Federal Funds ................................................ IX-59
    Sec. 13.07.    Limitations on Positions ................................................................... IX-59
    Sec. 13.08.    Funding Reductions .......................................................................... IX-59
    Sec. 13.09.    Unexpended Balances ....................................................................... IX-59
    Sec. 13.10.    Temporary Assistance for Needy Families (TANF)
                or Social Services Block Grant (SSBG) .......................................... IX-59
    Sec. 13.11.    Definition, Appropriation, Reporting and Audit of
                Earned Federal Funds ..................................................................... IX-60
    Sec. 13.12.    Reporting of Federal Homeland Security Funding ........................... IX-62

AGENCY DISCRETIONARY TRANSFER PROVISIONS ....................................................... IX-62
    Sec. 14.01.    Appropriation Transfers ................................................................... IX-62
    Sec. 14.02.    Transfers for Contract Services ........................................................ IX-63
    Sec. 14.03.    Limitation on Expenditures – Capital Budget .................................. IX-63
    Sec. 14.04.    Disaster Related Transfer Authority .................................................. IX-65
    Sec. 14.05.    Unexpended Balance Authority Between Fiscal Years within
                The Same Biennium ........................................................................ IX-66

AGENCY NON-DISCRETIONARY TRANSFER PROVISIONS ............................................. IX-67
    Sec. 15.01.    Reimbursements for Unemployment Benefits .................................. IX-67
    Sec. 15.02.    Payments to the State Office of Risk Management (SORM) ............. IX-68
    Sec. 15.03.    Contingency Appropriation Reduction ............................................. IX-69
    Sec. 15.04.    Appropriation Transfers: Billings for Statewide Allocated Costs ..... IX-70

LEGAL REPRESENTATION AND JUDGMENTS PROVISIONS ............................................. IX-70
    Sec. 16.01.    Court Representation and Outside Legal Counsel ............................. IX-70
    Sec. 16.02.    Contingent Fee Contract for Legal Services .................................... IX-71
    Sec. 16.03.    Proceeds of Litigation ...................................................................... IX-72
    Sec. 16.04.    Judgments and Settlements ............................................................... IX-72
    Sec. 16.05.    Incidents Report: State Supported Living Centers
                and State Hospitals ......................................................................... IX-74
    Sec. 16.06.    Professional and Legal Services ....................................................... IX-74

MISCELLANEOUS PROVISIONS .......................................................................................... IX-74
    Sec. 17.01.    Contingency Rider ........................................................................... IX-74
    Sec. 17.02.    Limitation on Substitution of General Obligation Bond
                Funded Projects .............................................................................. IX-74
    Sec. 17.03.    Interagency Contract to Coordinate Use of PARIS Data to Assist
                Veterans and Achieve Savings for State .......................................... IX-74
    Sec. 17.04.    Payroll Contribution for Group Health Insurance ............................ IX-75
    Sec. 17.05.    Appropriation for Salary Increases for Certain State Employees
                in Salary Schedule C ...................................................................... IX-75
    Sec. 17.06.    Veterans Services at Other State Agencies ....................................... IX-76
    Sec. 17.07.    Agency Coordination for Youth Prevention and Intervention Services ............ IX-76
    Sec. 17.08.    Additional Payroll Contribution for Retirement Contribution .......... IX-76
    Sec. 17.09.    Border Security – Informational Listing .......................................... IX-77

CONTINGENCY AND OTHER PROVISIONS ........................................................................ IX-79
Recapitulation – Article IX - General Provisions – General Revenue ............................................ IX-99
Recapitulation – Article IX – General Provisions – General Revenue – Dedicated ...................... IX-100
Recapitulation – Article IX - General Provisions – Federal Funds ............................................... IX-101
Recapitulation – Article IX – General Provisions – Other Funds ................................................. IX-102
Recapitulation – Article IX – General Provisions – All Funds ..................................................... IX-103

CONTINGENCY PROVISIONS: ARTICLE AND AGENCY INDEX .................................... IX-104

## TABLE OF CONTENTS
(Continued)

**ARTICLE X - THE LEGISLATURE**

Senate.....................................................................................................................................X-1
House of Representatives........................................................................................................X-2
Legislative Council ................................................................................................................X-4
Uniform State Laws, Commission on.....................................................................................X-5
State Auditor's Office .............................................................................................................X-5
Legislative Reference Library.................................................................................................X-6
Retirement and Group Insurance ...........................................................................................X-7
Social Security and Benefit Replacement Pay .......................................................................X-8
Lease Payments.......................................................................................................................X-8
Special Provisions Relating to the Legislature.......................................................................X-8
Recapitulation - Article X - General Revenue .......................................................................X-9
Recapitulation - Article X - Other Funds.............................................................................X-10
Recapitulation - Article X - All Funds..................................................................................X-11

**ARTICLE XI – SAVINGS CLAUSE**....................................................................................XI-1

**ARTICLE XII – EMERGENCY CLAUSE**............................................................................. XI-1

(HHSC) in Goal B, Medicaid, and Goal C, Children's Health Insurance Program, HHSC may implement the following quality-based reforms in the Medicaid and CHIP programs:

a.   develop quality-based outcome and process measures that promote the provision of efficient, quality health care and that can be used to implement quality-based payments for acute and long-term care services across delivery models and payment systems;

b.   implement quality-based payment systems for compensating a health care provider or facility participating in the Medicaid and CHIP programs;

c.   implement quality-based payment initiatives to reduce potentially preventable readmissions and potentially preventable complications; and

d.   implement a bundled payment initiative in the Medicaid program, including a shared savings component for providers that meet quality-based outcomes. The executive commissioner may select high-cost and/or high-volume services to bundle and may consider the experiences of other payers and other state of Texas programs that purchase healthcare services in making the selection.

e.   Under the Health and Human Services Commission's authority in 1 T.A.C. Sec. 355.307(c), the commission may implement a Special Reimbursement Class for long term care commonly referred to as "small house facilities." Such a class may include a rate reimbursement model that is cost neutral and that adequately addresses the cost differences that exist in a nursing facility constructed and operated as a small house facility, as well as the potential for off-setting cost savings through decreased utilization of higher cost institutional and ancillary services. The payment increment may be based upon a provider incentive payment rate.

Required Reporting: The commission shall provide annual reports to the Governor's Office of Budget, Planning, and Policy and Legislative Budget Board on December 1, 2015 and December 1, 2016 that include (1) the quality-based outcome and process measures developed; (2) the progress of the implementation of quality-based payment systems and other related initiatives; (3) outcome and process measures by health service region; and (4) cost-effectiveness of quality-based payment systems and other related initiatives.

47.   **Texas Office for the Prevention of Developmental Disabilities.**  Out of General Revenue Funds appropriated above in Strategy A.1.1, Enterprise Oversight and Policy, the Health and Human Services Commission shall expend an amount not to exceed $200,000 each fiscal year for salaries, travel expenses, and other costs in order to support the Office for Prevention of Developmental Disabilities. Grants and donations for the Texas Office for Prevention of Developmental Disabilities received through the authority provided by Article IX, Sec. 8.01, Acceptance of Gifts of Money, are not subject to this limit and shall be expended as they are received as a first source, and General Revenue shall be used as a second source to support the office.

48.   **Supplemental Payments.**  It is the intent of the Legislature that when the Health and Human Services Commission calculates supplemental payments, data be collected to provide transparency regarding claims associated with the supplemental payment program.  An independent audit of the program, including a review of regional affiliations, uncompensated care claims for both uninsured and insured individuals, and contractual agreements, and a report with findings should be completed and distributed annually on March 1 to the Governor, the Lieutenant Governor, the Speaker of the House of Representatives, the Senate Finance Committee members, the House Appropriations Committee members, and the Legislative Budget Board.

49.   **Prevent Eligibility Determination Fraud.**  It is the intent of the Legislature that to prevent fraud and to maximize efficiencies, the Health and Human Services Commission shall use technology to identify the risk for fraud associated with applications for benefits. Within the parameters of state and federal law, the commission shall set appropriate verification and documentation requirements based on the application's risk to ensure agency resources are targeted to maximize fraud reduction and case accuracy.

50.   **Medicaid Funding Reduction and Cost Containment.**

a.   Included in appropriations above in Goal B, Medicaid, is a reduction of $186,500,000 in General Revenue Funds and $249,349,498 in Federal Funds in fiscal year 2016 and $186,500,000 in General Revenue Funds and $247,220,930 in Federal Funds in fiscal year

2017, a biennial total of $373,000,000 in General Revenue Funds and $496,570,428 in Federal Funds. The Health and Human Services Commission (HHSC) is authorized to transfer these reductions between fiscal years and to allocate these reductions among health and human services agencies as listed in Article II of this Act, pursuant to the requirement to submit a plan included in Subsection (d) of this rider.

b.   This reduction shall be achieved through the implementation of the plan described under subsection (d) which may include any or all of the following initiatives:

   (1)   Continue strengthening and expanding prior authorization and utilization reviews,

   (2)   Incentivize appropriate neonatal intensive care unit utilization and coding,

   (3)   Fully implement dually eligible Medicare/Medicaid integrated care model and long-term services and supports quality payment initiative,

   (4)   Maximize co-payments in Medicaid programs,

   (5)   Increase fraud, waste, and abuse prevention and detection,

   (6)   Explore changes to premium structure for managed care organizations and contracting tools to reduce costs and increase efficiency,

   (7)   Renegotiate more efficient contracts, including reducing the administrative contract profit margin and establish rebate provisions where possible,

   (8)   Develop a dynamic premium development process for managed care organizations that has an ongoing methodology for reducing inappropriate utilization, improving outcomes, reducing unnecessary spending, and increasing efficiency,

   (9)   Implement fee-for-service payment changes and managed care premium adjustments that incentivize the most appropriate and effective use of services,

   (10)   Improve birth outcomes, including improving access to information and payment reform,

   (11)   Increase efficiencies in the vendor drug program,

   (12)   Increase third party recoupments,

   (13)   Create a pilot program on motor vehicle subrogation,

   (14)   Assess options to reduce costs for retroactive Medicaid claims,

   (15)   Review the cost effectiveness of including children with disabilities in dental managed care,

   (16)   Review and determine the benefits of providing the managed care-organizations with the ability to create a pharmacy lock-in program, and

   (17)   Implement additional initiatives identified by HHSC.

c.   HHSC shall reform reimbursement methodology to be in line with industry standards, policies, and utilization for acute care therapy services (including physical, occupational, and speech therapies) while considering stakeholder input and access to care. Out of the amount in subsection (a), in each fiscal year at least $50,000,000 in General Revenue Funds savings should be achieved through rate reductions and $25,000,000 in General Revenue Funds savings may be achieved through various medical policy initiatives listed in items (1)-(10), below. If $25,000,000 in savings is not achieved through various medical policy initiatives in fiscal year 2016, the amount of unrealized savings (the difference between $25,000,000 in General Revenue Funds and savings actually achieved in fiscal year 2016) should be achieved through additional rate reductions in fiscal year 2017 while continuing any

initiatives implemented in fiscal year 2016 that have been found to produce savings. HHSC may achieve savings through various medical policy initiatives, taking into consideration the following:

(1)     Clarifying policy language regarding co-therapy definition, documentation, and billing requirements,

(2)     Clarifying who can participate in therapy sessions in policy that interns, aides, students, orderlies and technicians can participate in therapy sessions when they are directly and appropriately supervised according to provider licensure requirements, but they are not eligible to enroll as providers and bill Texas Medicaid for services,

(3)     Consolidate Traditional, Comprehensive Care Program and Home Health Agency therapy policies into one policy,

(4)     Require a primary care or treating physician to initiate a signed order or referral prior to an initial therapy evaluation. The initial evaluation may require prior authorization and the signed order or referral must be dated prior to the evaluation,

(5)     Require a primary care or treating physician to order the therapy services based on the outcomes of the evaluation,

(6)     Clarify medical necessity for therapy services to ensure prior authorization staff who are reviewing requests are using guidelines based on the nationally recognized standards of care,

(7)     Require licensed Medicaid enrolled therapists to document and support decisions for continued therapy based on professional assessment of a client's progress relative to their individual treatment plan and in concert with the client's primary care physician and the individual and/or family,

(8)     Ensure appropriate duration of services by aligning authorization periods with national standards,

(9)     Streamline prior authorization processes, and

(10)   Implement policies that ensure services are provided in the most cost-efficient and medically appropriate setting, and implementation of other medical or billing policy changes.

d.     HHSC shall develop a plan to allocate the reductions required by Subsection (a) of this rider by taking actions such as those suggested under Subsection (b) and (c) of this rider to the budgets of the health and human services agencies as listed in Chapter 531, Government Code. The plan shall include reduction amounts by strategy and fiscal year and shall be submitted in writing before December 1, 2015 to the Legislative Budget Board, the Governor, and the Comptroller of Public Accounts.

**51.   Improve Efficiencies in Benefit Applications.**   Out of funds appropriated above, in order to improve efficiencies, the Health and Human Services Commission shall promote online submissions of applications for benefits administered by the agency. HHSC shall develop standards and technical requirements to allow organizations to electronically submit applications. It is the intent of the Legislature that HHSC only expend funds or utilize agency resources to partner with entities whose role in submitting benefit applications has been statutorily established, or with entities that provide in-person assistance using the agency's website for clients.

**52.   Dental and Orthodontia Providers in the Texas Medicaid Program.**   It is the intent of the Legislature that the Health and Human Services Commission (HHSC) use funds appropriated above in Strategy G.1.1, Office of Inspector General, to strengthen the capacity of the HHSC Inspector General to detect, investigate, and prosecute abuse by dentists and orthodontists who participate in the Texas Medicaid program. Further, it is the intent of the Legislature that HHSC conduct more extensive reviews of medical necessity for orthodontia services in the Medicaid program.



**42 U.S.C. § 1396a**

**(30)(A)** provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area;

**42 U.S.C. § 1396c**

If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds--
**(1)** that the plan has been so changed that it no longer complies with the provisions of section 1396a of this title; or
**(2)** that in the administration of the plan there is a failure to comply substantially with any such provision;

the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure).